CLIFFORD CHANCE US LLP
Douglas E. Deutsch
Sarah N. Campbell
31 West 52nd Street
New York, New York 10022
Telephone: (212) 878-8000

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

**In re:**                                                           :
                                                                     :          **Chapter 15**
                                                                     :
**MATALAN FINANCE PLC,**                                             :
                                                                     :          **Case No. 20-_____ (___)**
**Debtor in a Foreign Proceeding.[1]**                               :
                                                                     :
                                                                     :
-------------------------------------------------------- x

**DECLARATION OF STEPHEN MARK HILL IN SUPPORT OF**
**PETITION FOR ORDER GRANTING RECOGNITION OF FOREIGN MAIN**
**PROCEEDING PURSUANT TO 11 U.S.C. §§ 1515 AND 1517 AND GRANTING**
**CERTAIN RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 1519, 1520 AND 1521**

I, Stephen Mark Hill, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of

perjury as follows:

1.       I am the duly appointed foreign representative (the "**Foreign Representative**" or

"**Petitioner**") of Matalan Finance Plc (the "**Debtor**" or the "**Company**") which is the subject of

proceedings before the High Court of Justice, Business and Property Courts of England and

Wales, Insolvency and Companies Court (the "**English Court**") pursuant to the Companies Act

2006  (the "**Foreign Proceeding**") concerning a scheme of arrangement (the "**Scheme**") and am

---

[1]      Matalan Finance Plc is incorporated and registered in England and Wales with company number 05962488.
The Company has its registered office at Matalan Head Office, Perimeter Road, Knowsley Industrial Park,
Liverpool L33 7SZ, England, United Kingdom.

authorized to act as the foreign representative of the Company and commence this chapter 15 case.

2.      I submit this declaration in support of the *Verified Petition for Recognition of Foreign Main Proceeding* (the "**Verified Petition**" and, together with the Official Form 401 Petition filed contemporaneously herewith, the "**Chapter 15 Petition**") for recognition of the Debtor's Foreign Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code (the "**Bankruptcy Code**") and for certain related relief under sections 1519, 1520 and 1521 of the Bankruptcy Code, filed contemporaneously herewith.

3.      On June 7, 2020, the board of directors of the Company, among other things, authorized commencement of this case and appointed me as the foreign representative of the Company for the purposes of applying for relief under chapter 15 of the Bankruptcy Code (the "**Board Resolution**").  I am the Chief Financial Officer ("**CFO**") of the Company, a position I have held since July 2013.  I first began working at the Company in March 2007 and before becoming CFO I held a series of financial planning roles. A true and correct copy of the Board Resolution is annexed hereto as **Exhibit A**.

4.      All facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other employees, affiliates, officers or directors of the Company, or by professionals retained by the Company; or

(d) my opinion based upon my experience and knowledge of the Company's operations and financial condition.

## BACKGROUND

### *The Company's Business Operations*

5.      The Company was incorporated and registered in England and Wales in 2006 as Missouri Bidco Limited, registered office is at Matalan Head Office, Perimeter Road, Knowsley Industrial Park, Liverpool.  The Company is a wholly owned subsidiary of Missouri Topco Limited (the "**Parent**" and, together with the Company and the Parent's other subsidiaries, the "**Group**").   The Company's headquarters (and that of the Group) and one of the Group's distribution centers are also at the Matalan Head Office in Liverpool.

6.      The Group is a £1.1 billion revenue value fashion and home omni-channel retailer. The Group benefits from its significant scale and high brand awareness, consistently attracting over 10 million customers on an annual basis.  There are currently 230 Malatan stores in the United Kingdom.  In addition, there are 37 franchise stores located overseas in in the United Arab Emirates, Bahrain, Qatar, Saudi Arabia, Jordan, Oman, Egypt, Malta, Gibraltar, and Georgia.  Over the last three years, the Group has increased its market share in its core clothing and homeware categories.  The Group's product range is predominantly own label, targeted at mainstream, fashion conscious customers.

7.      Revenue from the Group's stores contributes a significant proportion of the Group's revenue.  The overseas franchises represent a small portion of the Group's revenue, with the majority of the remaining balance coming from the Group's online business.  The Group's online and store channels are complementary, with the Group's online offering growing rapidly

and the majority of online orders collected from stores.  The Group employs approximately 13,000 people all of whom are based in the United Kingdom.

8.      As a result of the Covid-19 pandemic and resulting "lockdown" imposed in the United Kingdom on March 23, 2020, all 232 retail stores then operated by the Group in the United Kingdom closed on March 24, 2020, with a phased re-opening within government guidelines of the Group's English and Northern Irish stores commencing on May 18, 2020 and more recently also in Scotland and Wales.  The nature of the Group's stores (out of town locations with substantial square footage), means that as stores are permitted to reopen the Group will be well positioned to adapt to the Covid-19 pandemic and comply with social distancing guidelines which are likely to continue for some time.

9.      While the Group's online business has continued to operate during the "lockdown", dispatch volume was temporarily constrained due to the social distancing measures implemented in the Group's supply and distribution centers.  In addition, while rapidly expanding, the Group's online business only accounts for a small proportion of the Group's revenue.  While online demand has remained resilient throughout the Covid-19 pandemic, it has not materially reduced the impact of the store closures.

10.     The closure of the Group stores has had a material impact on the cash flow of the Group.  While the Group believes the impact on cash flow will only be temporary and has taken

significant steps to mitigate this, it required additional liquidity to manage its cash flow in both the short and medium term.

***Summary of the Group's Capital Structure prior to the Additional Liquidity Arrangements*[2]**

11.     The Group's capital structure prior to the Additional Liquidity Arrangements (as defined in paragraph 17 below) is comprised of the following:

a.   *First Lien Notes*:  The Company is the issuer of £350,000,000 6¾ percent. first lien secured notes (the "**First Lien Notes**") due 2023.   Interest is payable semi-annually in arrears on January 31 and July 31 of each year. A number of Group companies are guarantors of the First Lien Notes.

b.   *Second Lien Notes*: The Company is the issuer of £130,000,000 9½ percent second lien secured notes (the "**Second Lien Notes**") due 2024 which were reduced in accordance with paragraph 20 below. Interest is payable semi-annually in arrears on January 31 and July 31 of each year. A number of Group companies are guarantors of the Second Lien Notes.

c.   *RCF Agreement*: The Company is a borrower and guarantor under a £50,000,000 multi-currency revolving credit facility (the "**Existing RCF**") provided under an agreement dated January 25, 2018 (the "**Existing RCF Agreement**") between, amongst others, the Company and Barclays Bank Plc, Lloyds Bank Plc and Morgan Stanley Bank International Limited (the "**Existing RCF Lenders**").  A number of Group companies are guarantors of the Existing RCF Agreement.  Prior to the Covid-19 pandemic, the Existing RCF had remained undrawn, save for the utilisation of certain ancillary facilities.  The Existing RCF was drawn in early April 2020.

---

[2]     Additional background as well as additional detail with respect to the terms of the scheme of arrangement proposed in respect of the Company (the "**Scheme**") are contained in (the "**Explanatory Statement**") annexed hereto as **Exhibit B**.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed in the Explanatory Statement.

12.     The First Lien Notes, Second Lien Notes, and Existing RCF Agreement all benefit from a common security package granted pursuant to a debenture dated January 25, 2018 (the **"Debenture"**).  Under the terms of the Debenture, the chargors (including the Company, the Parent, and other members of the Group) granted security over various assets, including, amongst others, shares held in other members of the Group, leases and intercompany loans in favour of Lloyds Bank Plc (as security agent) to be held on trust for the Secured Parties (as defined in the Debenture).

13.     Similarly, the First Lien Notes, Second Lien Notes, and Existing RCF Agreement benefit from guarantees provided by each of the guarantors under their own terms.

14.     The inter-relationship between the First Lien Notes, Second Lien Notes, and Existing RCF Agreement (and the security and guarantees thereto), are governed by an intercreditor agreement dated January 25, 2018 as amended and restated on June 8, 2020, between, amongst others, the Company and Lloyds Bank plc (as security agent) for the secured parties (the **"Intercreditor Agreement"**).

15.     Pursuant to the terms of the Intercreditor Agreement, the Existing RCF ranks senior to the First Lien Notes, which in turn rank senior to the Second Lien Notes, in each case, with respect to the proceeds of any enforcement of the security.

*Events Leading to the Foreign Proceeding*

16.     As noted, the Company requires liquidity to manage its cash flow in both the short and medium term.  Initially, the Company was not eligible for the Coronavirus Business Interruption Loan Scheme, due to the eligibility criteria which meant that only companies with an annual turnover between £45,000,000 to £500,000,000 could obtain 80% government-backed funding from accredited lenders.  Following consultation with and lobbying from businesses,

including the Company, the Coronavirus Large Business Interruption Loan Scheme ("**CLBILS**")
was introduced on April 16, 2020, available to companies with a turnover exceeding
£500,000,000. This change allowed the Company to begin discussions with accredited lenders
with a view to accessing CLBILS.

17.     Ultimately, an agreement was reached regarding a package to provide the Group
with additional liquidity (collectively, the "**Additional Liquidity Arrangements**") comprised of
the following elements, each as defined and described below, additional liquidity is being
provided pursuant to the CLBILS Facilities, the issuance of Additional Notes, the cancellation of
£50,000,000 of the principal amount of Second Lien Notes held by the Shareholder for
Shareholder PIK Notes, and the Second Lien Amendments.  Because the Additional Liquidity
Arrangements required certain modifications with respect to the Second Lien Notes, the Scheme
was proposed to enable amendments to be made to the terms and conditions of the Second Lien
Notes.

### The Additional Liquidity Arrangements

18.     On June 8, 2020, £25,000,000 in aggregate of revolving credit facilities were
provided by Barclays Bank Plc and Lloyds Bank Plc pursuant to the CLBILS (the "**CLBILS
Facilities**").  The Existing RCF Agreement was amended and restated to include the CLBILS
Facilities as additional revolving facilities (the "**Amended RCF Agreement**", with the revolving
facilities thereunder being the "**RCF Facilities**").

19.     On June 9, 2020, additional 16.5 percent notes due July 2022 generating net
proceeds of £25,000,000 were issued by the Company to certain holders of the First Lien Notes
(the "**Additional Notes**") pursuant to a new priority notes indenture dated June 9, 2020.  The

Additional Notes will mature on July 25, 2022 and interest on the Additional Notes will be payable quarterly in cash.

20.    As a condition precedent to the CLBILS Facilities and the Additional Notes, the Company issued £50,000,000 aggregate principal amount of subordinated unsecured notes (the "**Shareholder PIK Notes**") pursuant to an indenture dated June 9, 2020, in exchange for £50,000,000 Second Lien Notes held by John Hargreaves (the "**Shareholder**") (which were cancelled upon completion of the exchange).  This meant that the outstanding principal amount of the Second Lien Notes was reduced to £80,000,000 from £130,000,000.

*The Shareholder Equity Commitment*

21.    As a condition to the provision of the CLBILS Facilities, the Parent is required to use all reasonable commercial endeavors to sell the head office property located in Knowsley, Liverpool on terms where the head office is leased back to the Group (the "**HQ Sale and Leaseback**") with the net disposal proceeds being applied in prepayment and cancellation of the RCF Facilities.  In connection therewith, the Shareholder committed to invest up to £25,000,000 of additional equity in the Parent if, among other conditions, the aggregate commitments under the RCF Facilities have not been reduced to £50,000,000 by December 31, 2020 (the "**Shareholder Equity Commitment**").  The Shareholder Equity Commitment will terminate upon the first date on which the aggregate commitments under the RCF Facilities are reduced to £50,000,000 or less.

22.    In connection with the Shareholder Equity Commitment, the Company assigned its rights arising under the Shareholder Equity Commitment and any related bank guarantees to

the Security Agent as security for the Secured Obligations (each as defined in the Intercreditor

Agreement) (the **"Shareholder Credit Security"**).[3]

*The Scheme*

23.      As noted, the primary purpose of the Scheme is to enable amendments to be made

to the terms and conditions of the Second Lien Notes.  Broadly, the Scheme amends the terms

relating to the right to payment of the cash interest coupon in respect of the Second Lien Notes

so that payment-in-kind interest is paid instead until the RCF Facilities and the Additional Notes

have been reduced to certain levels and liquidity reaches an agreed threshold.  More specifically,

the Scheme converts the interest coupon to be paid on the Second Lien Notes to PIK Interest

with cash interest payable again on the Second Lien Notes if, as of the seventh calendar day

immediately prior to the start of the applicable interest period, the consolidated cash of the Group

is at least £50,000,000 provided that: (A) the Additional Notes have been redeemed in full; (B)

the amounts outstanding across the RCF Facilities have been reduced to £12,000,000 or less of

ancillary facilities; and (C) the total commitments under the RCF Facilities do not exceed

£50,000,000 in aggregate (the **"Second Lien Amendments"**).  Under the Scheme, Scheme

Creditors (comprised of the Second Lien Noteholders) will receive a cash payment of £5 per

£1,000 principal amount of Second Lien Notes, calculated as at 5:00 p.m. London time on July

---

[3]      The Scheme also includes waivers under the Intercreditor Agreement including with respect to any standstill
period, consultation period or notice period and the provision of any enforcement proposal in respect of any
enforcement of rights under or in respect of the Shareholder Credit Security.

16, 2020 (the "**Second Lien Deferral Fee**").[4]  The Scheme is estimated to result in annual cash interest saving of £7.6m per annum (including £3.8m due in July 2020) for the Company.

24.       As a condition precedent to the CLBILS Facilities and the Additional Notes, a lock-up agreement was entered into by the Company on June 8, 2020 and certain of the Second Lien Noteholders (the Scheme Creditors) who later acceded on the same day (the "**Lock-Up Agreement**" and the "**Participating Second Lien Noteholders**" respectively).  The Participating Second Lien Noteholders represent 50.35 percent of the Second Lien Notes.  The Second Lien Amendments would, at least in part, require consent by holders of 90% of the principal amount of the Second Lien Notes.

25.       On June 9, 2020, the Company announced its intention to propose the Scheme through the publication of a letter pursuant to the Practice Statement (Companies: Scheme of Arrangement) [2002] 1 WLR 1345 (the "**Practice Statement Letter**").

26.       The Practice Statement Letter was distributed by Lucid Issuer Services Limited, the information agent with respect to the Scheme (the "**Information Agent**"), to Scheme Creditors via Euroclear Bank SA/NV ("**Euroclear**") and Clearstream Banking, S.A. ("**Clearstream**") (together the "**Clearing Systems**") and the Trustee.  The Practice Statement Letter was also made available on the Information Agent's dedicated website in respect of the Scheme at www.lucid-is.com/matalan (the "**Lucid Website**").

27.       On June 19, 2020, the Company applied to the English Court for an order granting permission to convene a meeting of Scheme Creditors to consider and vote on the Scheme (the

---

[4]    The Scheme also includes (i)  waivers of certain defaults, events of default or acceleration under the Second Lien Notes or any insolvency event under the Existing Intercreditor Agreement arising as a result of any steps taken in respect of the Additional Liquidity Arrangements; and (ii) provisions releasing, among others, the Company, the Second Lien Notes Guarantors, the Trustee, and the Security Agent with respect to the formulation, negotiation, promotion, or provision of the Additional Liquidity Arrangements and entry into the Second Lien Amendments.

"**Scheme Meeting**") and, by order dated June 29, 2020 (the "**Convening Order**"), the Company

was granted permission to convene the Scheme Meetings.

28.     On June 30, 2020, the terms of the Scheme, notice of the Scheme Meeting, the

Explanatory Statement and relevant notices and voting forms were posted to the Lucid Website

in accordance with the terms of the Convening Order.  Notice of the Scheme Meeting and that

Scheme Creditors could access Scheme documentation via the Lucid Website was also (i)

circulated to the Scheme Creditors through the Clearing Systems, (ii) posted on the Group's

website, and (iii) circulated to the following publications: Drapers, Debtwire, Bloomberg, Sky

News and Reorg.

29.     The Scheme Meeting was held on July 20, 2020, commencing at 10:00 a.m.

(London time) and took place virtually via Webex, an application that allowed Scheme Creditors

to attend the Scheme Meeting using either video conferencing facilities or telephone.

30.     The votes cast in favor of the Scheme reflect the significant levels of support for

the Scheme.  The Scheme Creditors present and voting in person or by proxy at the Scheme

Meeting represented 99.06 per cent. by value (being GBP 83,014,375 of GBP 83,800,000) of the

Scheme Creditors entitled to vote at the Scheme Meeting.  100 percent (by value) and 100

percent (by number) of Scheme Creditors present in person or by proxy at the Scheme Meeting

and entitled to vote, voted in favor of the Scheme proposed at the Scheme Meeting.  No Scheme

Creditors present at the Scheme Meeting abstained from voting in respect of the Scheme.

31.     Accordingly, the Scheme has been approved by a majority in number and at least

75 percent in value of the Scheme Creditors present and voting at the Scheme Meeting.

32.     On July 27 2020, the sanction hearing took place and the English Court

sanctioned the Scheme by order dated July 27 2020 (the "**Sanction Order**"). The Sanction Order

was filed with the Registrar of Companies in England and Wales on July 27, 2020.

### *The Chapter 15 Case*

33.     Because the Second Lien Notes are held through the Clearing System, it has not

been possible to identify all the persons or entities holding the Second Lien Notes, however, it is

anticipated that certain of the Scheme Creditors are US persons or entities.  In addition, the

Indenture governing the Second Lien Notes contains a New York choice of forum provision.

The Explanatory Statement provided that, as the Second Lien Notes are governed by New York

law and certain of the Scheme Creditors are expected to be US persons, the Company would

seek recognition under chapter 15 of the Bankruptcy Code.  In addition, to prevent adverse

action by any US Scheme Creditor pending chapter 15 recognition, the Company would also

seek provisional relief from the US Bankruptcy Court applying the stay under section 362 of the

Bankruptcy Code.

34.     The Company is seeking recognition under chapter 15 in order to give effect to

the Company's Scheme in the US and to ensure orderly and consistent implementation of the

Scheme.  The Company has assets in the US consisting of a retainer deposited with US counsel and held in a New York bank account.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

Based on the foregoing, I believe that the relief being requested in this chapter 15 case is well-justified, necessary under the circumstances, in the best interest of the Debtor and its creditors and should be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated: July \_\_\_, 2020

_____
Stephen Mark Hill
Foreign Representative of
Matalan Finance Plc

**Exhibit A**

## MINUTES OF A MEETING OF THE BOARD OF DIRECTORS

**Matalan Finance plc**
**Company Number 05962488**
**(the "Company")**

**held by telephone on _7_ June 2020 at _6:30_ p.m.**

PRESENT:        Stephen Mark Hill (by telephone)

                           Gregory Vincent Pateras  (by telephone)

                           John Nicholas Mills  (by telephone)

1. **CHAIRMAN**

1.1 **IT WAS RESOLVED** that Stephen Mark Hill be appointed Chairman of the meeting.

2. **QUORUM**

2.1 The Chairman declared that the meeting had been properly convened and that a quorum was present.

3. **BACKGROUND**

3.1 The Chairman explained that, as a result of the Covid-19 pandemic and the resulting "lockdown", 232 Matalan stores were closed in the United Kingdom on 23 March 2020. This resulted in a significant reduction in the revenue of Missouri Topco Limited (the "**Parent**") and its subsidiaries (the "**Group**"). The Group began a phased reopening of its stores in accordance with the UK Government guidelines on 19 May 2020.

3.2 In the interim, the Group took extensive measures to seek to contain the impact of the Covid-19 pandemic on the Group's business wherever possible. The nature and extent of these measures are set out in the statements made on 11 April 2020 and 27 April 2020 which are available on the Group's website.

3.3 Despite the steps taken by the Group, the Group's revised projections indicated that solely due to the direct impact of the Covid-19 pandemic the Group would require an additional injection of funding to enable it to manage its short to medium term liquidity.

3.4 Following extensive discussions with a variety of financing parties, including certain of the Group's existing lenders and noteholders and approximately 30 alternative capital providers, the Group agreed a term sheet in respect of the Additional Liquidity Arrangements (as defined below).

4. **DESCRIPTION OF TRANSACTION AND DOCUMENTS**

4.1 The Chairman reminded the meeting that the Company is a party to the following documents:

4.1.1    the multicurrency revolving facility agreement dated 25 January 2018 between, amongst others, Missouri Topco Limited as the parent (the "**Parent**"), the Company, Matalan Limited and Matalan Retail Ltd. as the original borrowers (the "**Original Borrowers**"), certain of the Parent's subsidiaries as Guarantors (the "**Subsidiary Guarantors**") and Barclays Bank PLC, Lloyds Bank plc and Morgan Stanley Senior Funding, Inc. as the Original Lenders (the "**Existing RCF**");

4.1.2    the first lien notes indenture dated 25 January 2018 entered into between, among others, the Company as the issuer, the Parent, the Subsidiary Guarantors, Lloyds Bank plc as the Security Agent and Deutsche Trustee Company Limited as First Lien Note Trustee (the "**First Lien Notes Indenture**");

4.1.3    the second lien notes indenture dated 25 January 2018 entered into between, among others, the Company as the issuer, the Parent, the Subsidiary Guarantors, Lloyds Bank plc as the Security Agent and Deutsche Trustee Company Limited as Second Lien Note Trustee (the "**Second Lien Notes Indenture**");

4.1.4    the intercreditor agreement dated 25 January 2018, between amongst others, the Company as the issuer, the Parent, the Subsidiary Guarantors, Lloyds Bank plc as Security Agent and Barclays Bank PLC, Lloyds Bank plc and Morgan Stanley Senior Funding, Inc. as Senior Lenders (the "**Existing Intercreditor Agreement**"); and

4.1.5    the debenture dated 25 January 2018 between, amongst others, the Company and certain of the Parent's subsidiaries as Chargors (the "**Subsidiary Chargors**") and Lloyds Bank plc as security agent (the "**Existing Debenture**").

4.2    The Group is seeking to improve its liquidity position by:

4.2.1    amending and restating the Existing RCF to, amongst other things, include an additional aggregate of £25,000,000 revolving credit facilities pursuant to the Coronavirus Large Business Interruption Scheme (the "**New Money Facilities**") to be provided by certain financial institutions (the "**Lenders**");

4.2.2    issuing a series of new senior secured notes due 2022 to certain additional noteholders (the "**New Priority Noteholders**") of the Existing First Lien Notes generating proceeds to the Company of £25,000,000 (the "**New Priority Notes**"); and

4.2.3    the Company proposing a scheme of arrangement pursuant to Part 26 of the Companies Act 2006 (the "**Scheme**") in respect of the Second Lien Notes Indenture pursuant to which the £130,000,000 9.5% senior secured notes due 2024 were issued (the "**Second Lien Notes**") (other than the principal amount of £50,000,000 of Second Lien Notes held by John Hargreaves) (the "**Shareholder Notes**" and the "**Scheme Creditors**")) to, among other things, temporarily amend the terms relating to the payment of the cash interest coupon under the Second Lien Notes Indenture so that payment-in-kind interest is paid instead until the New Money Facilities and the New Priority Notes have been reduced to certain agreed levels and liquidity reaches an agreed threshold,

(together, the **"Additional Liquidity Arrangements"**).

4.3    As a condition of the New Money Facilities, the Parent is required to use commercially reasonable endeavours to sell the head office property at Knowsley, Liverpool on terms on which it is leased back to the Group (the "HQ Sale and Leaseback") with any net proceeds being applied in prepayment and cancellation of the New Money Facilities and the Existing RCF.

4.4    In connection with the HQ Sale and Leaseback, John Hargreaves (as shareholder of the Parent ) has agreed to invest up to £25,000,000 of additional equity in the Parent subject to certain conditions (the **"Shareholder Equity Commitment"**). The Parent has assigned its rights under the Shareholder Equity Commitment (to the extent permitted thereunder) and related bank guarantee as security for the Secured Parties (as defined in the Existing Intercreditor Agreement).

4.5    As a condition of the New Money Facilities and the New Priority Notes, John Hargreaves has agreed to exchange his Shareholder Notes for subordinated, unsecured notes which are on substantially the same terms as the Second Lien Notes (the **"Shareholder PIK Notes"**) except that, amongst other things, the Shareholder PIK Notes are unsecured and do not have the benefit of any guarantee and interest payable on the Shareholder PIK Notes is "payment-in-kind" interest.

4.6    The Chairman described the transaction to be entered into, outlined the main commercial terms and explained that in connection with the Additional Liquidity Arrangements, the Company would enter into the following documents, each of which was tabled to the meeting, in order to consider (amongst other things) continuing to provide a guarantee and indemnity in respect of the obligations under the certain of the following Documents on the terms and conditions set out therein (the **"Guarantee"**):

4.6.1    an amendment and restatement agreement to be entered into by, amongst others, the Parent, the Original Borrowers, the Subsidiary Guarantors, the Original Lenders and Lloyds Bank plc as agent (the **"Agent"**) and security agent (the **"Security Agent"**), which will amend and restate certain terms of the Existing RCF and will attach as a schedule the Existing RCF as restated by the amendment and restatement agreement to the Existing RCF (the **"Amended Facility Agreement"**);

4.6.2    an amendment and restatement deed to the Existing Intercreditor Agreement to be entered into by, amongst others, the Parent, Barclays Bank PLC, Lloyds Bank plc, Morgan Stanley Senior Funding, Inc. as Senior Lenders, the Agent, Security Agent and Lucid Trustee Services Limited as trustee under the New Priority Notes (the **"NPN Trustee"**), which will amend and restate certain terms of the Existing Intercreditor Agreement and will attach as a schedule the Existing Intercreditor Agreement as restated by the amendment and restatement deed to the existing Intercreditor Agreement (the **"Amended Intercreditor Agreement"**);

4.6.3    a supplemental debenture to the Existing Debenture entered into by, amongst others, the Company as Supplemental Chargor and the Security Agent, which confirms the existing security created pursuant to the Existing Debenture and

grants security over certain charged property to secure certain obligations (the **"Supplemental Debenture"**);

4.6.4 an agreement entered into by, amongst others, the Parent, the Company, the Security Agent, Barclays Bank PLC, Lloyds Bank plc and Morgan Stanley Senior Funding, Inc. as Senior Lenders and the NPN Trustee, which sets out certain additional priority arrangements relating to the Amended Intercreditor Agreement;

4.6.5 an indenture entered into by, amongst others, the Parent, the Company, the Security Agent and the NPN Trustee, setting out certain arrangements in relation to the New Priority Notes;

4.6.6 one or more Regulation S Global Notes and Rule 144A Global Notes evidencing the New Priority Notes to be issued pursuant to the NPN Indenture;

4.6.7 a note purchase agreement entered into by, amongst others, the Company, the Parent, the Company, the Security Agent and Lucid Issuer Services Limited as New Priority Notes Trustee, setting out certain arrangements in relation to the New Priority Notes;

4.6.8 a settlement agency agreement entered into by the Company and Elavon Financing Services DAC, setting out certain arrangements in relation to the New Priority Notes;

4.6.9 documents required for The International Stock Exchange listing application in relation to certain of the Documents (as defined herein);

4.6.10 a letter from the Company appointing Corporation Services Company (or any other company) as the agent for services of process for the Company in relation to certain of the Documents;

4.6.11 a subscription agreement pursuant to which the Company will issue £50,000,000 aggregate principal amount of Shareholder PIK Notes in exchange for the Shareholder Notes;

4.6.12 an indenture entered into by, amongst others, the Company, U.S. Bank Trustees Limited as trustee and paying agent, setting out certain arrangements in relation to the Shareholder PIK Notes;

4.6.13 a note subscription agreement entered into by the Company and the purchaser of the Shareholder PIK Notes;

4.6.14 a second supplemental indenture to the First Lien Notes Indenture to be entered into by, amongst others, the Company, other members of the Group who are acceding as Guarantors, the Security Agent and the First Lien Notes Trustee;

4.6.15 a supplemental indenture to the Second Lien Notes Indenture to be entered into by, amongst others, the Company, other members of the Group who are acceding as Guarantors, the Security Agent and Deutsche Trustee Company Limited as trustee under the Second Lien Notes (the **"Supplemental Second Lien Indenture"**);

4.6.16   a state aid attestation in the form required by each Lender, signed by the Company as a Borrower under the New Money Facilities;

4.6.17   certain declarations as to the Company's data and the business and operations of the Company, in the form required by the CLBILS website maintained by the Secretary of State, signed by the Company as a Borrower under the New Money Facilities;

4.6.18   a CLBILS eligibility criteria certificate and product profile in the form required by each Lender signed by the Company as a Borrower under the New Money Facilities;

4.6.19   a side letter from the Parent, the Issuer, Matalan Limited and Jonmar Limited to the NPN Trustee and holders of the New Priority Notes setting out, among other things, the terms of the Shareholder Equity Commitment and the HQ Sale and Leaseback;

4.6.20   a certificate in the agreed form signed by a director of the Company confirming, amongst other things, that since the date of the Existing RCF there have been no amendments to the Company's constitutional documents and attaching copies of the resolutions of the board of directors of the Company (the "**Board**") approving action taken in relation to the Additional Liquidity Arrangements;

4.6.21   a certificate in the agreed form signed by a director of the Company providing certain confirmations and attaching certain documents (including copies of the resolutions of the Board approving action taken in relation to the Additional Liquidity Arrangements) as required in connection with the New Priority Notes;

4.6.22   a fee letter between the Company and the NPN Trustee;

4.6.23   an instruction letter from the Scheme Creditors (signed by the Company pursuant to the Scheme) to Deutsche Trustee Company Limited as trustee under the Second Lien Notes (the "**Instruction Letter to the Trustee**");

4.6.24   a waiver letter from Deutsche Trustee Company Limited as trustee under the Second Lien Notes to the Senior Agent and the Security Agent (each as defined in the Existing Intercreditor Agreement) covering the priority of the Existing RCF, the New Money Facilities and the New Priority Notes (the "**ICA Waiver Letter**");

4.6.25   an amended and restated Global Note (as defined in the Second Lien Notes Indenture);

4.6.26   the PSL (as defined below);

4.6.27   the Explanatory Statement (as defined below);

4.6.28   an engagement letter between the Company and Dan Glosband in respect of the US expert opinion for the purposes of the Scheme; and

4.6.29   an engagement letter between the Company and Lucid Issuer Services Limited,

(together with the Lock Up-Agreement (as defined below), the **"Documents"**).

4.7 The Chairman explained that although the parties to the Documents had already had substantial negotiations on the terms of the Documents, further amendments may be made to the Documents before execution.

4.8 The Chairman explained that, as a condition precedent to the Additional Liquidity Arrangements, an English-law lock-up agreement (the **"Lock-Up Agreement"**) will be entered into between the Company and certain holders of the Second Lien Notes (the **"Original Participating Second Lien Noteholders"**), which was also tabled to the meeting. In summary, the purpose of the Lock-Up Agreement is to provide the Company and its stakeholders with evidence that certain of its creditors will support the Scheme.

4.9 In particular, under the terms of the Lock-Up Agreement, the Original Participating Second Lien Noteholders (and any subsequent Scheme Creditor who accedes to the Lock-Up Agreement) will agree, amongst other things:

4.9.1 to promptly take all actions which are reasonably required or desirable to support, facilitate, implement or otherwise give effect to the Scheme;

4.9.2 to support and vote promptly in favour of the Scheme; and

4.9.3 not to intentionally take any action which would or would reasonably be expected to frustrate, delay, impede or prevent the Scheme, until such time as the Lock-Up Agreement is terminated.

5. **SCHEME**

5.1 As the amendments to the interest provisions under the Second Lien Notes Indenture require the consent of 90 per cent. of the holders of the Second Lien Notes, the Company agreed to propose the Scheme as a condition subsequent to the New Money Facilities and the New Priority Notes. Although the Company is required to propose the Scheme and to use all reasonable endeavours to ensure that the Scheme is successful, the failure of the scheme is not an event of default under the New Money Facilities or the New Priority Notes.

5.2 A scheme of arrangement is a compromise or arrangement between a company and one or more of its classes of creditors or members. In the event that the scheme of arrangement is:

5.2.1 approved by a majority in number representing at least 75 per cent by value of the creditors who attend a meeting convened for that purpose at the direction of the English court;

5.2.2 approved by the English court at a court hearing; and

5.2.3 filed at Companies House,

5.2.4 it would bind all creditors who are subject to the terms of the scheme, whether or not they voted in favour of it or indeed whether they voted at all. As such, schemes of arrangement are an effective way in which to force a minority of dissenting or apathetic

creditors into a proposed course of action which would otherwise require the consent of higher proportion of creditors but which is considered beneficial by the majority of affected creditors as well as the Company proposing the scheme. Creditors who do not attend the meeting either in person or by proxy, or who do not otherwise vote, are not counted for the purposes of determining whether the requisite approval thresholds have been met. However, voting is divided into classes such that only creditors with similar rights in respect of the proposed scheme are required to vote together, and the voting threshold must be met by each class. In respect of the Scheme, it is proposed that there will be only one class for voting comprising all holders of the Second Lien Notes (other than the Shareholder Notes), as further described in the draft letter (the "**PSL**") to be sent by the Company to each Scheme Creditor, advising them of the intention to propose the Scheme.

5.3     The principal purpose of the proposed Scheme is to facilitate the Additional Liquidity Arrangements by, amongst other things, granting authority to the Company and others to execute the Supplemental Second Lien Indenture, the Instruction Letter to the Trustee and the ICA Waiver Letter which is required to implement the Scheme on behalf of the Scheme Creditors.

5.4     Pursuant to the Scheme, the Company will be released from all liability arising out of or in connection with the Scheme subject to certain exceptions as set out in the Scheme.

5.5     In connection with the Scheme all Scheme Creditors will be entitled to receive a cash payment of £5 per £1,000 principal amount of Second Lien Notes (the "**Deferral Fee**"). The Deferral Fee will be paid two business days following implementation of the Scheme.

5.6     Implementing the Scheme requires the following steps:

5.6.1     issuing the PSL to the Scheme Creditors;

5.6.2     applying to the English Court to request permission to convene the scheme meeting and obtain any other relevant directions (the "**First Court Application**");

5.6.3     sending copies of all documents required to the Scheme Creditors;

5.6.4     holding the meeting of Scheme Creditors for the purpose of voting on the Scheme (the "**Scheme Meeting**");

5.6.5     applying to the English Court for the purpose of obtaining the Court's sanction of the Scheme (assuming the Scheme is approved by the requisite majority at the Scheme Meeting) (the "**Second Court Application**");

5.6.6     assuming that the English Court sanctions the Scheme, filing an office copy of the order sanctioning the Scheme with the English registrar of companies; and

5.6.7     following the sanction of the Scheme, the Chapter 15 Filing (as defined below) will occur;

5.6.8     execution of the Supplemental Second Lien Indenture and an instruction letter to the Second Lien Note Trustee regarding the entry into the Supplemental

Second Lien Indenture, the ICA Waiver Letter, the amended and restated Global Note and any other documents, undertakings or steps required to implement the Scheme; and

5.6.9    payment of the Deferral Fee to all Scheme Creditors

(together, the **"Scheme Steps"**).

5.7    The proposed timeline for the Scheme was provided by Clifford Chance and is as set out below:

5.7.1    distribution of the PSL to Scheme Creditors on 8 June 2020;

5.7.2    the Court hearing pursuant to the First Court Application to take place on or around 29 June 2020

5.7.3    the Scheme Meeting to take place on or around 20 July 2020;

5.7.4    the Court hearing pursuant to the Second Court Application to take place on or around 27 July 2020; and

5.7.5    the implementation of the amendments to the Second Lien Notes and the Ch 15 Filling to take place on or around 28 July 2020;

5.7.6    the Chapter 15 Filing to take place on or around 29 July 2020 with the Chapter 15 Hearing to follow a minimum of 21 days from the filing; and

5.7.7    payment of the Deferral Fee to all Scheme Creditors to take place on or around 29 July 2020.

5.8    This timetable is subject to change.

5.9    Following the issuance of the PSL, an explanatory statement in respect of the Scheme (the **"Explanatory Statement"**) will be issued to Scheme Creditors, explaining, among other things, the primary objectives and key elements of the Additional Liquidity Arrangements, and the purpose and terms of the Scheme. The Board reviewed the initial draft of the Explanatory Statement and noted that this document was subject to further refinement and completion.

*Chapter 15 Filing*

5.10    As the Second Lien Notes are governed by New York law and certain of the Scheme Creditors are expected to be US persons, the Company will seek recognition and enforcement (**"Chapter 15 Recognition"**) under Chapter 15 of the US Bankruptcy Code (the **"Chapter 15 Filing"**) for the Scheme.

5.11    As such, to help ensure enforcement in the US and to give effect to the Scheme (if approved by the requisite majority of Scheme Creditors and sanctioned by the Court) in the US, it was resolved that the Company would commence and pursue the Chapter 15 Filing with the US Bankruptcy Court immediately following the Scheme becoming effective. To effect the Chapter 15 Filing, it was resolved that Mr Stephen Hill would be appointed as the Company's foreign representative.

## 6. DECLARATION OF INTERESTS IN CONTRACTS/ARRANGEMENTS

6.1 The Chairman noted that John Mills had declared an interest in the Additional Liquidity Arrangements, the Documents or the transactions contemplated by them as set out above. It was noted that his interest cannot reasonably be regarded as likely to give rise to a conflict of interest and therefore, in accordance with article 16.2 of the articles of association of the Company, that he would count towards the quorum for the meeting and was entitled to vote at the meeting as he had not been disqualified from voting by the articles of association.

6.2 The Board noted that no other director present had declared to the meeting any interest direct or indirect in the Additional Liquidity Arrangements, the Documents or the transactions contemplated by them which was required by section 177 or section 182 of the Companies Act 2006 or the Company's articles of association.

6.3 The Board noted that no director present, therefore was disqualified from voting at the meeting or from forming part of the quorum for the meeting.

## 7. BENEFIT

7.1 After due and careful consideration, the Board was unanimously of the view that the Additional Liquidity Arrangements were the most attractive sources of additional liquidity available to the Group. The blended costs of the Additional Liquidity Arrangements provided the lowest of the options identified by the Group and evidences the support of a significant portion of its existing banks and noteholders. In addition, the Board considered that the Additional Liquidity Arrangements were deliverable in the timeframe available, whereas each of the alternative financing proposals identified and considered contained significant practical hurdles or required additional stakeholder consent which may well not have been forthcoming.

7.2 In the absence of (i) the Additional Liquidity Arrangements; or (ii) a suitable alternative capable of implementation, the Group would have been unable to make significant payments due in early June and would have been required to consider all alternatives to preserve value for all stakeholders.

7.3 After due and careful consideration (and on the basis of professional advice), the Board was of the opinion that the Additional Liquidity Arrangements and the entry into the Documents are necessary for the continuing operation of the Group on a going concern basis.

7.4 Accordingly, the Board was unanimously of the opinion that in resolving that the Company should enter into the Additional Liquidity Arrangements and the Documents to which it is to be a party, including continuing to provide the Guarantee and to secure the obligations thereunder by executing the Supplemental Debenture, the members of the Board were acting in good faith in the manner most likely to promote the success of the Company for the benefit of its members as a whole and in accordance with their other duties. The Board also is unanimously of the opinion that the entry into the Documents is in the best interests of the Company's creditors as a whole.

7.5 After due and careful consideration the Board was unanimously of the opinion that the Company would materially benefit from the Additional Liquidity Arrangements and

from executing and delivering the Documents to which it is to be a party, and from entering the transactions contemplated by them.

7.6 After due and careful consideration the Board was unanimously of the opinion that (1) it would enter into the Additional Liquidity Arrangements and the Documents to which it is to be a party in good faith, (2) it was acting for the purpose of carrying on its business and (3) there are reasonable grounds for believing that entering into the Additional Liquidity Arrangements and the Documents to which it is to be a party would benefit the Company.

## 8. SOLVENCY

8.1 There was produced to the meeting a copy of the 12 month liquidity forecast relating to the Group.

8.2 After due and careful consideration of the materials made available to the Board, the Board was of the opinion that:

8.2.1 the additional liquidity supplied by the Additional Liquidity Arrangements provides a stable platform for the Group to trade during the remainder of the "lockdown" period and ensures adequate headroom thereafter during a gradual and potentially uneven period of recovery;

8.2.2 the obligors under the applicable Documents are likely to be able to meet their obligations under the Documents to which they are a party when due and therefore it is unlikely that either a claim will be made on the Guarantee or that the security granted by the Company will be enforced; and

8.2.3 (i) the Company will not be deemed to be unable to pay its debts within the meaning of section 123 of the Insolvency Act 1986 and will not become so in consequence of entering into the Documents, and (ii) immediately prior to and subsequent to entry into the Documents the Company will be able to meet its liabilities as they fall due in the ordinary course of business.

## 9. SUBSIDIARY

9.1 The Chairman noted that the Company is the sole shareholder in Matalan Limited (the "**Subsidiary**").

9.2 The Chairman reported that it was proposed that the Subsidiary enter into certain of the Documents and certain other documents required to implement the Additional Liquidity Arrangements.

9.3 The following documents were presented to the meeting:

9.3.1 proposed written resolutions of the Company as sole shareholder in the Subsidiaries (the "**Resolutions**") passing, if thought fit, ordinary resolutions authorising the directors of the Subsidiary to approve the terms of, and the transactions contemplated by, the Documents and certain other documents required to implement the Additional Liquidity Arrangements to which it is to be party.

9.4 **IT WAS RESOLVED** that:

    9.4.1   the Resolutions be approved;

    9.4.2   the Resolutions be signed on behalf of the Company; and

    9.4.3   any Director of the Company be authorised to:

        (a)   sign the Resolutions; and

        (b)   agree any amendments to the Resolutions.

## 10. GENERAL MEETING

10.1   It was proposed that a general meeting of the Company be convened for the purpose of considering and, if thought fit, passing the resolutions to authorise the Company to enter into the Documents (the **"Ordinary Resolutions"**).

10.2   A notice convening a general meeting for these purposes was produced to the meeting. **IT WAS RESOLVED** that:

    10.2.1   the notice be approved and signed by a director or the secretary;

    10.2.2   the secretary be directed to deliver the notice to the persons entitled to receive it; and

    10.2.3   subject to the necessary consents being obtained, the meeting be held immediately.

## 11. ADJOURNMENT

The meeting was then adjourned until after the general meeting had been held. On resumption it was reported that the Ordinary Resolutions set out in the notice of meeting had been passed at the general meeting.

## 12. APPROVAL OF TRANSACTION AND DOCUMENTS

12.1   After due and careful consideration, **IT WAS RESOLVED** that,

    12.1.1   the proposal of the Scheme, including the issuance of the PSL and the entry into the Documents in connection thereto, be approved;

    12.1.2   the Company entering into the Documents and continuing to provide the Guarantee under the Documents, be approved;

    12.1.3   the Company continuing to secure the obligations under the Documents on the terms of the Existing Debenture and the Supplemental Debenture be approved; and

    12.1.4   the terms of, and the transactions contemplated by, the Documents to which the Company is to be a party as produced to the meeting, or the Documents to which it is to be a party with amendments authorised by a director of the Company, be approved.

13. **EXECUTION OF DOCUMENTS**

13.1 **IT WAS RESOLVED** that:

13.1.1 each director of the Company (each an **"authorised signatory"**) be severally authorised to execute, on behalf of the Company, the Documents to which it is to be a party, in the form of the copy produced to the meeting, with any amendments he/she may approve; and

13.1.2 execution of the Documents to which the Company is to be a party by the authorised signatories in accordance with resolution 13.2 shall be conclusive evidence of his/her approval of the amendments made to them.

13.2 **IT WAS RESOLVED** that:

13.2.1 each authorised signatory shall be severally authorised to sign and despatch (by whatever means, including electronically) on behalf of the Company any document, agreement, witness statement, notice as he/she may consider necessary in connection with the Documents and the Scheme;

13.2.2 a director and the secretary or any two directors or any director in the presence of a witness who attests the signature shall be authorised on behalf of the Company to execute and deliver any agreement, power of attorney, deed or other document required to be executed and delivered as a deed as he/she may consider to be necessary in connection with the Documents and the Scheme; and

13.2.3 each authorised signatory shall be severally authorised to do all other acts and things not otherwise the subject of an authorisation in these minutes as he/she may consider necessary or desirable in connection with the Additional Liquidity Arrangements (including the Scheme and the Ch 15 Filing) and the Documents.

14. **FILING OF DOCUMENTS**

14.1 **IT WAS RESOLVED** that the secretary of the Company and each director and is severally authorised to despatch to the Agent:

14.2 to despatch to Lucid Trustee Services Limited a copy of the Lock-Up Agreement and all documents required to be distributed to the Scheme Creditors pursuant to the terms of the Scheme;

14.3 to despatch to Walkers (Guernsey) LLP copies of all announcements which need to be published by on The International Stock Exchange;

14.4 a copy of the constitutional documents of the Company;

14.5 a copy of the resolutions passed at this meeting, and/or extract resolutions passed at this meeting, and/or a copy of the Minutes of this meeting signed by the Chairman;

14.6 a certificate displaying the name, title and specimen signature of each of the authorised signatories of the Company;

14.7    a certificate signed by an authorised signatory of the Company certifying that each copy document referred to in this paragraph 12 is correct, complete and in full force and effect as at a date no earlier than the date of the Documents; and

14.8    a certificate signed by a director of the Company confirming that the guaranteeing of the Total Commitments (as defined in the Amended Facility Agreement) by the Company would not cause any guaranteeing or similar limit binding on any Original Obligor (as defined in the Amended Facility Agreement) to be exceeded.

15.    **CLOSE OF MEETING**

There being no further business, the Chairman declared the meeting closed.

..............................................................
Chairman

**Exhibit B**

THIS EXPLANATORY STATEMENT DOES NOT CONSTITUTE AN OFFER OR INVITATION TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER OR INVITATION OR SOLICITATION IN SUCH JURISDICTION.    NONE OF THE SECURITIES REFERRED TO IN THIS EXPLANATORY STATEMENT MAY BE SOLD, ISSUED, OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.

THE SCHEME CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE SCHEME, INCLUDING THE MERITS AND RISKS INVOLVED.  THIS EXPLANATORY STATEMENT WILL NOT BE FILED WITH THE US SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE SECURITIES AUTHORITY, AND THE SCHEME DOCUMENT AND THE SECOND LIEN AMENDMENTS DOCUMENTS WILL NOT BE REVIEWED BY THE SEC OR ANY STATE SECURITIES AUTHORITY AND NONE OF THEM HAS OR WILL APPROVE, DISAPPROVE, PASS UPON, OR ENDORSE THE MERITS OF THE SCHEME, OR THE ACCURACY, ADEQUACY, OR COMPLETENESS OF THIS EXPLANATORY STATEMENT, THE SCHEME DOCUMENT, OR THE SECOND LIEN AMENDMENTS DOCUMENTS.    IT IS UNLAWFUL TO MAKE ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

THE TRUSTEE AND SECURITY AGENT MAKE NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY OR COMPLETENESS OF THIS EXPLANATORY STATEMENT AND EXPRESS NO OPINION WHATSOEVER AS TO THE MERITS OF THE PROPOSALS AS PRESENTED TO HOLDERS IN THIS EXPLANATORY STATEMENT.  THIS EXPLANATORY STATEMENT IS BEING DELIVERED TO HOLDERS SOLELY AT THE INSTIGATION OF MATALAN FINANCE PLC (THE "COMPANY") WITHOUT THE PRIOR APPROVAL OR CONSENT OF THE TRUSTEE AND THE SECURITY AGENT. THE TRUSTEE AND THE SECURITY AGENT HAVE NOT BEEN INVOLVED IN NEGOTIATING OR FORMULATING THIS EXPLANATORY STATEMENT AND THE PROPOSALS SET OUT HEREIN, AND MAKE NO REPRESENTATION THAT ALL INFORMATION HAS BEEN DISCLOSED TO HOLDERS IN THIS EXPLANATORY STATEMENT.  THE TRUSTEE AND THE SECURITY AGENT MAKE NO ASSESSMENT OF THE IMPACT OF THE PROPOSALS AS PRESENTED TO HOLDERS, EITHER AS A CLASS OR AS INDIVIDUALS.  ACCORDINGLY, THE TRUSTEE AND THE SECURITY AGENT URGE HOLDERS WHO ARE IN DOUBT AS TO THE MEANING OF THE PROPOSALS SET FORTH IN THIS EXPLANATORY STATEMENT (INCLUDING ANY TAX CONSEQUENCES) TO SEEK THEIR OWN INDEPENDENT ADVICE.

THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.  THIS DOCUMENT COMPRISES AN EXPLANATORY STATEMENT IN COMPLIANCE WITH SECTION 897 OF THE COMPANIES ACT 2006.

THE DISTRIBUTION OF THIS EXPLANATORY STATEMENT IN CERTAIN JURISDICTIONS MAY BE RESTRICTED BY LAWS AND REGULATIONS.

**PERSONS INTO WHOSE POSSESSION THE EXPLANATORY STATEMENT COMES ARE REQUIRED TO INFORM THEMSELVES ABOUT, AND TO OBSERVE, ANY SUCH RESTRICTIONS.**

This Explanatory Statement is being sent to persons who are believed to be Scheme Creditors at the date of this Explanatory Statement.  If you have assigned, sold, or otherwise transferred, or assign, sell, or otherwise transfer, your interests as a Scheme Creditor before the Voting Record Time, you must forward a copy of this Explanatory Statement at once to the person or persons to whom you have assigned, sold, or otherwise transferred, or assign, sell, or otherwise transfer, your interests as a Scheme Creditor.

If you are in any doubt as to the contents of this Explanatory Statement or what action you should take, you are recommended to seek your own independent financial, legal, and tax advice immediately from your stockbroker, bank manager, solicitor, accountant, or other independent professional adviser who, if you are taking advice in the UK, is authorised pursuant to the Financial Services and Markets Act 2000, or by an appropriate regulatory body, or from another appropriately authorised independent financial adviser if you are in a territory outside the UK.

This Explanatory Statement is accompanied by a number of documents, including voting instructions, an Account Holder Letter, and Notice of the Scheme Meeting.  It is important that you read this Explanatory Statement carefully for information about the Scheme and that you or your Account Holder complete and return the Account Holder Letter which accompanies this Explanatory Statement.

Further copies of this Explanatory Statement can be obtained via the Scheme Website at: www.lucid-is.com/matalan or by contacting the Information Agent via email at matalan@lucid-is.com.

<div align="center">

**PROPOSAL IN RELATION TO SCHEME OF ARRANGEMENT**
under Part 26 of the Companies Act 2006
between
**Matalan Finance Plc**
and its respective
**SCHEME CREDITORS**
(as defined in this Explanatory Statement)
**DATE:  24 JUNE 2020**

</div>

A summary of the Scheme is set out in Part 6 (*Overview of the Scheme*) of this Explanatory Statement and the full text of the Scheme is set out at Part 12 (*The Scheme Document*) of this Explanatory Statement.  The terms of the Additional Liquidity Arrangements implemented and to be implemented, including pursuant to the Scheme as to the amendments to be effected by the Scheme, are described in Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement.

The Scheme Meeting for the Scheme Creditors to consider and vote on the Scheme will be held on 20 July 2020 (or such later time or date as Company may decide) commencing at 10:00a.m. (London time).  The Scheme Meeting will take place via webinar, as set out in Appendix B (*Notice of the Scheme Meeting*) of this Explanatory Statement.  A Scheme Creditor wishing to attend the Scheme Meeting (via webinar) may obtain details from the Information Agent by

contacting them at matalan@lucid-is.com.  Upon any Scheme Creditor (or its representative) providing evidence satisfactory to the Information Agent of its (or its representative's) authority to represent the Scheme Creditor at the Scheme Meeting (for example, a valid power of attorney and/or board minutes) the Information Agent shall provide the details.

Scheme Creditors wishing to vote on the Scheme must give instructions to their Account Holder in the relevant Clearing System through which they hold the Second Lien Notes.  In order to validly complete the voting sections of the Account Holder Letter (as set out in Part 5 (*Process for Voting on and Implementation of the Scheme*) of this Explanatory Statement), Scheme Creditors holding Second Lien Notes through Euroclear or Clearstream will need to issue Custody Instructions to the relevant Clearing System to, among other things, block the trading of their Second Lien Notes on the records of the relevant Clearing System, on or prior to **5:00p.m.** (London time) on 15 July 2020 (being the Custody Instruction Deadline).  All Scheme Creditors will need to ensure that the voting sections of the Account Holder Letter are received by the Information Agent on or prior to **5:00p.m.** (London time) on 16 July 2020 (being the Voting Instruction Deadline).  For further information as to how to vote in respect of the Scheme, please refer to Part 5 (*Process for Voting on and Implementation of the Scheme*) of this Explanatory Statement.

The Claim Value of the Scheme Creditors will be calculated based on information provided in the Account Holder Letters and information confidentially provided to the Company (acting through the Information Agent) by the Clearing Systems.  This information will be used by the Chairperson of the Scheme Meeting (in conjunction with the Information Agent) to determine whether the resolution to approve the Scheme is passed at the Scheme Meeting.

**Failure to deliver a valid Account Holder Letter on behalf of a Holder by the Voting Instruction Deadline will mean that the voting instructions contained in the Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Holder may not be entitled to vote at the Scheme Meeting.**

**The Scheme can only become effective, *inter alia*, if approved by a majority in number representing at least 75 per cent. in value of the Scheme Creditors present and voting at the Scheme Meeting (whether in person or by proxy).  As at 8 June 2020, Holders of approximately 50.35 per cent. by aggregate principal amount of Second Lien Notes have acceded to the Lock-Up Agreement ("Participating Second Lien Noteholders"), confirming their support for the Scheme on the terms set out in the Lock-Up Agreement.  Such Participating Second Lien Noteholders are required to cast their votes in favour of the Scheme in accordance with the terms of the Lock-Up Agreement.  No separate or additional fees other than the Second Lien Deferral Fee are payable to Scheme Creditors under the terms of the Lock-Up Agreement**.

Further information in relation to actions to be taken by Scheme Creditors preceding the Scheme Meeting and the voting process are set out in Appendix A (*Instructions to Scheme Creditors*) of this Explanatory Statement.

The Company has appointed Lucid Issuer Services Limited as its Information Agent in respect of the Scheme to facilitate, among other things, communications with Scheme Creditors.  If you are (or think you may be) a Scheme Creditor and you have any questions about this Explanatory Statement or the actions you should take, including the completion of an Account

Holder Letter, please contact the Information Agent, whose contact details are set out below for assistance.  All relevant documentation may be found at www.lucid-is.com/matalan.

Lucid Issuer Services Limited
Attention of:  David Shilson
Email:  matalan@lucid-is.com

The statements contained in this Explanatory Statement are made as at the date of this Explanatory Statement, unless another time is specified in relation to them, and delivery of this Explanatory Statement shall not give rise to any implication that there has not been any change in the information set out in this Explanatory Statement since that date.

Nothing contained in this Explanatory Statement shall constitute a warranty or guarantee of any kind, express or implied, and nothing contained in this Explanatory Statement shall constitute any admission of any fact or liability on the part of the Company or any Affiliate of the Company with respect to any asset to which it or they may be entitled or any claim against it or them.  Without prejudice to the generality of the foregoing, nothing in the Scheme Document or this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by the Company, that a liability is owed to any person in respect of any claim or that any person is or may be a Scheme Creditor.  The failure to distribute this Explanatory Statement to any Scheme Creditor shall not constitute an admission by the Company that such person is not a Scheme Creditor.

No person has been authorised by the Company, Lucid Issuer Services Limited as Information Agent, or the Trustee to give any information or to make any representations concerning the Scheme that are inconsistent with the statements contained in this Explanatory Statement and, if made, such representations may not be relied upon as having been so authorised.  This Explanatory Statement is issued solely in connection with the Scheme.

If the Scheme is approved by the Scheme Creditors at the Scheme Meeting, the Scheme Sanction Hearing will be required in order to sanction the approved Scheme.  All Scheme Creditors are entitled to attend the Scheme Sanction Hearing in person, or through counsel, to support or oppose the sanctioning of the Scheme.  The Scheme Sanction Hearing is expected to take place remotely on or around 27 July 2020. The precise time and details of how to attend the Scheme Sanction Hearing will be available from: (i) the High Court and (ii) the Scheme Website, in each case as soon as it has been finally fixed by the High Court. Any change to the date of the Scheme Sanction Hearing will also be published on the Scheme Website as soon as possible.

Overseas Scheme Creditors should read the section titled '*Information for US and other overseas Scheme Creditors*' at page 4.

Further important information is set out under the heading "*Important Notice*" on pages 1 to 3.

# CONTENTS

Clause                                                                                          Page

Important Notice ................................................................................................................. 1

Important Securities Law Notice ......................................................................................... 4

Expected Timetable of Principal Events ............................................................................. 6

    Part 1 Explanatory Statement ....................................................................................... 7

    Part 2 Background to the Company, the Group and the Group's Financing Arrangements
        prior to the Covid-19 Pandemic ........................................................................... 9

    Part 3 Background to the Additional Liquidity Arrangements (including the Scheme) . 12

    Part 4 Rationale for and Summary of the Additional Liquidity Arrangements (including
        the Scheme) ...................................................................................................... 18

    Part 5 Process for Voting on and Implementation of the Scheme................................... 29

    Part 6 Overview of the Scheme ................................................................................... 34

    Part 7 Second Lien Amendments Documents ............................................................... 44

    Part 8 Financial Information........................................................................................ 47

    Part 9 Board of the Company ...................................................................................... 51

    Part 10 Additional Information ................................................................................... 54

    Part 11 Risk Factors .................................................................................................. 55

    Part 12 The Scheme Document ................................................................................... 78

    Part 13 Definitions and Construction .......................................................................... 79

Appendix A Instructions to Scheme Creditors ................................................................... 91

Appendix B Notice of the Scheme Meeting ....................................................................... 99

Appendix C Account Holder Letter................................................................................. 102

Appendix D Second Lien Supplemental Indenture ........................................................... 115

Appendix E Intercreditor Agreement Side Letter ............................................................. 116

Appendix F Deed of Release .......................................................................................... 117

Appendix G Simplified Group Structure .......................................................................... 118

**IMPORTANT NOTICE**

(A)    **Information**

Unless the context otherwise requires, defined terms in this Explanatory Statement have the meanings set out in Part 13 (*Definitions and Construction*) of this Explanatory Statement below.  The appendices of this Explanatory Statement form an integral part of it and, unless expressly stated otherwise, references of this Explanatory Statement shall be construed as references to the Explanatory Statement including the appendices to it.

**Explanatory Statement Content**

This Explanatory Statement has been prepared by the Company in connection with a scheme of arrangement under Part 26 of the Companies Act 2006 to inform the prospective Scheme Creditors of the proposed terms of the Scheme.  The Company does not assume any duty of care or obligations to any party seeking to rely on this Explanatory Statement for any other purpose.  Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on for any other purpose including in connection with any investment decision in relation to the assets, debt, securities, or any other financial interest of the Company or any of their subsidiaries, including any decision to buy or sell any assets, debt, securities, or other financial interest.  Any parties making such investment decisions should rely on their own enquiries prior to making such decisions.

The information contained in this Explanatory Statement has been prepared based upon information available to the Company prior to the date of this Explanatory Statement.  To the best of the Company's knowledge, information and belief, the information contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the accuracy of such information.  The audited financial statements have been prepared in accordance with IFRS.  The Company has taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary to enable Scheme Creditors to make an informed decision about the effect of the Scheme on them.  The Board has approved the entry into the Scheme and the preparation and publication of this Explanatory Statement.

None of the Scheme Creditors has authorised the content of this Explanatory Statement or any part of it, neither do they accept any responsibility for the accuracy, completeness or reasonableness of the statements contained within it.

The Company's financial and legal advisers have not verified that the information contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the accuracy of such information and each of those persons expressly disclaims responsibility for such information.

Nothing contained in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of any of the Company's or the Group's future financial performance except where otherwise specifically stated.

In this Explanatory Statement, references to GBP or "**£**" are to the lawful currency of the UK.

The general descriptions of the Scheme and the Second Lien Amendments Documents contained in this Explanatory Statement are qualified in their entirety by reference to, and should be read together with, the binding terms of the Scheme Document and the Second Lien Amendments Documents.  If there is any conflict between this Explanatory Statement, the Scheme Document, and/or any of the Second Lien Amendments Documents, the terms of the Scheme Document shall prevail (as applicable).  Each Scheme Creditor is advised to read and consider carefully the text of the Scheme Document itself.  This Explanatory Statement has been prepared solely to assist Scheme Creditors in respect of voting on the Scheme.

Neither the Trustee nor the Security Agent nor any of their respective directors, employees, officers, agents, or Affiliates, have been involved in the negotiation of the terms of the Scheme or have independently verified the statements and information contained in this Explanatory Statement and no such party makes any representation or warranty, express or implied, or assumes any responsibility, as to the accuracy or adequacy of their contents.  Each Scheme Creditor must make its own commercial decision whether to support the Scheme and should seek its own independent advice in this regard.  Each Scheme Creditor will additionally represent that, in completing and submitting the Account Holder Letter, it has made an independent decision in consultation with its own agents and professional advisers to the extent that it considers it necessary.

**Forward-looking Statements**

This Explanatory Statement contains certain statements, statistics and projections that are, or may be, forward-looking.  The accuracy and completeness of all such statements, including, without limitation, statements regarding the Group's (or any Affiliate's, including the Company's) future financial position, strategy, plans, and objectives for the management of future operations, is not warranted or guaranteed.  These statements typically contain words such as "intends", "expects", "anticipates", "estimates", "should", "would", "could", "will", "may" and words of similar import.  By their nature, forward-looking statements involve risk and uncertainty because they relate to events and depend on circumstances that will occur in the future.  Although the Company believes that the expectations reflected in such statements are reasonable, no assurance can be given that such expectations will prove to be correct.  There are a number of factors which could cause actual results and developments to differ materially from those expressed or implied by such forward-looking statements.  These factors include, but are not limited to, risks relating to the Covid-19 pandemic, future revenues being lower than expected, and general economic conditions deteriorating.  You should review carefully Part 11 (*Risk Factors*) of this Explanatory Statement for a more complete discussion of the risks associated with such statements and the Second Lien Amendments.

Should one or more of these risks or uncertainties materialise, or should underlying assumptions prove incorrect, actual results may vary materially from those described herein.  None of the boards of the Group companies assume any obligation to update or correct or revise any forward-looking statements contained in this Explanatory

Statement to reflect any change of expectations with respect thereto or any change in event, situation or circumstances on which any such forward-looking statement was based.

**Risk Factors**

**YOU SHOULD REVIEW CAREFULLY Part 11 (*RISK FACTORS*) OF THIS EXPLANATORY STATEMENT FOR A MORE COMPLETE DISCUSSION OF THE RISKS ASSOCIATED WITH SUCH STATEMENTS.**

**Legal, Tax and Financial Advice**

Scheme Creditors should not construe the contents of this Explanatory Statement as legal, tax, financial, or other advice, and should consult with their own professional advisers as to the matters described in this Explanatory Statement.

**Scheme Creditors should consult their own legal and tax advisers with respect to the legal and tax consequences of the Scheme in their particular circumstances or other matters relevant to the actions that Scheme Creditors should take in relation to the Scheme, or the implications/consequences of those actions.**

(B)    **Other Jurisdictions**

The implications of the Scheme for Scheme Creditors who are resident in or citizens of, jurisdictions other than the UK may be affected by the laws of the relevant jurisdiction. Such overseas Scheme Creditors should inform themselves about, and observe, any applicable legal requirements.

## IMPORTANT SECURITIES LAW NOTICE

**THIS EXPLANATORY STATEMENT DOES NOT CONSTITUTE AN OFFER OR INVITATION TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY IN ANY JURISDICTION TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE ANY SUCH OFFER OR INVITATION OR SOLICITATION IN SUCH JURISDICTION.  NONE OF THE SECURITIES REFERRED TO IN THIS EXPLANATORY STATEMENT SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**Information for US and other overseas Scheme Creditors**

Neither this Explanatory Statement nor any part hereof constitutes an offer or invitation to distribute, issue or sell, or a solicitation of an offer to buy any securities in any jurisdiction to or from any person to whom it is unlawful to make any such offer or invitation or solicitation in such jurisdiction and neither this Explanatory Statement nor any part hereof may be used for or in connection with an offer or invitation to, or the solicitation by, any person in any jurisdiction or in any circumstances in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation.  Accordingly, no securities may be offered or sold, directly or indirectly, and neither this Explanatory Statement nor any part hereof nor any prospectus, offering circular, form of application, advertisement, other offering materials nor other information may be issued, distributed or published in any country or jurisdiction except in circumstances that will result in compliance with all applicable laws, orders, rules and regulations.

To the extent that, for purposes of US securities laws, any securities are issued pursuant to the Scheme, such securities will not be registered under the US Securities Act of 1933, as amended (the "**Securities Act**"), or under any relevant securities laws of any state or other jurisdiction of the US.  Such securities, if any, will be issued in reliance upon an exemption from the registration requirements of, or in a transaction not subject to, the registration requirements of the Securities Act.  No public offering of such securities will be made in the US.  The Court has been advised that its sanctioning of the Scheme will be relied upon as an approval of the Scheme following a hearing on its fairness to security holders at which hearing all such security holders are entitled to attend in person or through counsel to support or oppose the sanctioning of the Scheme and with respect to which notification has been given to all such security holders.  Such transaction will not be approved or disapproved by the SEC, nor will the SEC or any US state securities commission pass upon the merits or fairness of the transaction nor upon the adequacy or accuracy of the information contained in this Explanatory Statement.  Any representation to the contrary is a criminal offence in the US.  The information disclosed in this Explanatory Statement is not the same as that which would have been disclosed if this Explanatory Statement had been prepared for the purpose of complying with the registration requirements of the Securities Act or in accordance with the laws and regulations of any state or other jurisdiction of the US.

The audited financial statements have been prepared in accordance with IFRS and may not be comparable to the financial statements of US or other foreign companies.  It may be difficult for you to enforce your rights and any claim you may have arising under US federal securities laws, since the Company is located in a foreign country and all of its officers and directors are residents of a foreign country.  You may not be able to sue a foreign company or its officers or

directors in a foreign court for violations of US securities laws.  It may be difficult to compel a foreign company and its Affiliates to subject themselves to a US court's judgment.

## EXPECTED TIMETABLE OF PRINCIPAL EVENTS

**Holders should observe any deadlines set by any institution, custodian, or settlement system through which they hold interests in the Second Lien Notes to ensure that any voting instructions given by them are taken into account at the Scheme Meeting for the purposes of the Scheme.  We would strongly urge each Holder to contact its relevant Account Holder or Intermediary as soon as possible to ensure they are aware of this Explanatory Statement and the process and timetable.**

| Event | Time and/or date |
|---|---|
| Scheme Convening Hearing | 29 June 2020 |
| Custody Instruction Deadline | 5:00p.m. (London time) 15 July 2020 |
| Voting Instruction Deadline | 5:00p.m. (London time) 16 July 2020 |
| Voting Record Time | 5:00p.m. (London time) 16 July 2020 |
| Scheme Meeting | 10:00a.m. (London time) 20 July 2020 |
| Scheme Sanction Hearing* | 27 July 2020 |
| Chapter 15 Filing* | 28 July 2020 |
| Scheme Effective Date and Second Lien Amendments Effective Date* | 28 July 2020 |
| Payment of the Second Lien Deferral Fee | 30 July 2020 |
| Chapter 15 Hearing* | 19 August 2020 |
| Chapter 15 Order* | 19 August 2020 |

**All references in this Explanatory Statement to times are to London time.**

The Scheme Meeting will take place via webinar, as set out in Appendix B (*Notice of the Scheme Meeting*) of this Explanatory Statement.  A Scheme Creditor wishing to attend the Scheme Meeting (via webinar) may obtain details from the Information Agent via email at matalan@lucid-is.com.  Upon any Scheme Creditor (or its representative) providing evidence of their authority to represent the Scheme Creditor at the Scheme Meeting (for example, a valid power of attorney and/or board minutes) the Information Agent shall provide the details.  **The dates given are based on current expectations and may be subject to change.  If any of the expected dates change, the Company will give Scheme Creditors adequate notice of the change to the extent possible, through the Scheme Website.**

* It should be noted that these times and dates are indicative only and will depend upon a number of different factors.  For example, the date of the Chapter 15 Hearing is subject to the US Bankruptcy Court's availability to hear the petition, and the Second Lien Amendments Effective Date will only occur after the conditions precedent to the implementation of the Second Lien Amendments have been satisfied or waived.

# PART 1
# EXPLANATORY STATEMENT

*What is the Explanatory Statement?*

1.1    The Explanatory Statement is provided pursuant to section 897 of the Companies Act for the purpose of providing you with sufficient information about all relevant aspects of the Scheme and the other Additional Liquidity Arrangements so as to enable you to make an informed decision on whether to approve the Scheme.  The Second Lien Amendments will not become effective unless the Scheme is sanctioned by the Court, the Scheme Sanction Order is delivered to the Registrar of Companies, and certain other conditions (as further described in Part 6 (*Overview of the Scheme*) of this Explanatory Statement) are satisfied.

1.2    In addition to this Part 1 (*Explanatory Statement*), this Explanatory Statement provides:

(a)    an overview of the Group's business activities and the Group's financing arrangements prior to the commencement of the Additional Liquidity Arrangements, at Part 2 (*Background to the Company, the Group and the Group's financing Arrangements prior to the Covid-19 Pandemic*);

(b)    an overview of the circumstances giving rise to the Additional Liquidity Arrangements and the Scheme and the steps taken in relation thereto, at Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*);

(c)    a summary of the Additional Liquidity Arrangements (including the Scheme) and why the Board considers them to be in the best interests of the Group and the Company's stakeholders taken as a whole, including the Scheme Creditors, at Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*);

(d)    an overview of the process of voting and implementation of the Scheme, at Part 5 (*Process for Voting on and Implementation of the Scheme*);

(e)    an overview of the Scheme, at Part 6 (*Overview of the Scheme*);

(f)    an overview of certain of the key terms of the documents implementing the Scheme, at Part 7 (*Second Lien Amendments Documents*);

(g)    detailed financial information regarding the Group, at Part 8 (*Financial Information*);

(h)    information regarding the management of the Company, including details of directors' interests, at Part 9 (*Board of the Company*);

(i)    certain additional information in respect of the Company, at Part 10 (*Additional Information*); and

(j)    a summary of the risk factors relating to implementation of the Scheme and the Group's operations after implementation of the Scheme, at Part 11 (*Risk Factors*).

1.3    This section forms part of an Explanatory Statement for the Scheme proposed by the Company which forms part of the wider Additional Liquidity Arrangements of the Group, the details of which are explained below.  This section provides a summary of the information contained in this Explanatory Statement and should not be read in place of this Explanatory Statement in its entirety.

1.4    A list of the defined terms used in this Explanatory Statement is shown at Part 13 (*Definitions and Construction*) of this Explanatory Statement.

## PART 2
### BACKGROUND TO THE COMPANY, THE GROUP AND THE GROUP'S FINANCING ARRANGEMENTS PRIOR TO THE COVID-19 PANDEMIC

1.    **The Company**

1.1    The Company was incorporated and registered in England and Wales on 10 October 2006 as Missouri Bidco Limited, a private company with limited liability, with registration number 05962488. The Company changed its name to Matalan Finance Limited on 15 March 2010 and was registered as a public limited company on 25 March 2010. The registered office of the Company is Matalan Head Office, Perimeter Road, Knowsley Industrial Park, Liverpool, L33 7SZ.

1.2    The Company is resident in the UK for tax purposes and has its centre of main interests in the UK.

1.3    As at the date of this Explanatory Statement, the Company's entire issued and outstanding share capital is held by Matalan Group Limited, a wholly owned subsidiary of the Parent.

1.4    The Company is a borrower and Guarantor of the Existing RCF and is the issuer of the First Lien Notes, the Second Lien Notes, and, following the implementation of part of the Additional Liquidity Arrangements, the issuer of the Additional Notes and the Shareholder PIK Notes, and a borrower and Guarantor of the CLBILS Facilities.

2.    **The Group**

2.1    The Group is a leading UK retailer of value clothing and homeware with one of the largest portfolios of "out of town" clothing retail space in the UK. The Group is a £1.1 billion revenue value fashion and home omni-channel retailer.

2.2    The Group benefits from its significant scale and high brand awareness, consistently attracting over 10 million customers on an annual basis. Over the last three years, the Group has increased its market share in its core clothing and homeware categories. The Group's product range is predominantly own label, targeted at mainstream, fashion conscious customers.

2.3    Revenue from the Group's stores contributes a significant proportion of the Group's revenue. With 231 stores currently operated in the UK, the majority of the Group's store portfolio is located out of town, either on stand-alone sites or in retail parks. In addition to its UK store network, there are 36 overseas franchise stores outside of the UK, located in the United Arab Emirates, Bahrain, Qatar, Saudi Arabia, Jordan, Oman, Egypt, Malta, Gibraltar, and Georgia. The overseas franchises represent a small portion of the Group's revenue, with the majority of the remaining balance coming from the Group's online business. The Group's online and store channels are complementary, with the Group's online offering growing rapidly and the majority of online orders collected from stores. The Group employs approximately 13,000 people all of whom are based in the UK.

2.4 A simplified structure chart of the Group is set out in Appendix G (*Simplified Group Structure*).

3. **The Group's financial arrangements prior to the Covid-19 Pandemic**

3.1 Prior to the implementation of the Additional Liquidity Arrangements, the Group's capital structure comprised of the following:

(a) *First Lien Notes*

The Company is the issuer of £350,000,000 6¾ per cent. first lien secured notes (the "**First Lien Notes**") due 2023.  Interest is payable semi-annually in arrears on 31 January and 31 July of each year.  A number of Group companies are Guarantors of the First Lien Notes.

(b) *Second Lien Notes*

The Company is the issuer of 9½ per cent. second lien secured notes (the "**Second Lien Notes**") due 2024. Prior to the implementation of the Additional Liquidity Arrangements, the outstanding principal amount of Second Lien Notes was £130,000,000.  Interest is payable semi-annually in arrears on 31 January and 31 July of each year.  A number of Group companies are Guarantors of the Second Lien Notes.

(c) *Existing RCF Agreement*

The Company is a borrower and guarantor under a £50,000,000 multi-currency revolving credit facility (the "**Existing RCF Agreement**") dated 25 January 2018.  A number of Group companies are Guarantors of the Existing RCF Agreement.  Prior to the Covid-19 pandemic, the Existing RCF had remained undrawn, save for the utilisation of certain ancillary facilities.

3.2 **Security, guarantees, and Intercreditor Agreement**

3.3 The First Lien Notes, Second Lien Notes, and Existing RCF Agreement all benefit from a common security package granted pursuant to a debenture dated 25 January 2018 (the "**Debenture**").  Under the terms of the Debenture, the chargors (including the Company, the Parent, and other members of the Group) granted security over various assets (including, amongst others, shares held in other members of the Group, leases and intercompany loans) in favour of Lloyds Bank Plc (as security agent) to be held on trust for the Secured Parties (as defined in the Debenture).

3.4 Similarly, the First Lien Notes, Second Lien Notes, and Existing RCF Agreement benefit from guarantees provided by each of the Guarantors under their own terms.

3.5 The inter-relationship between the First Lien Notes, Second Lien Notes, and Existing RCF Agreement (and the security and guarantees thereto), are governed by an intercreditor agreement dated 25 January 2018 as amended and restated on 8 June 2020, between, amongst others, the Company and Lloyds Bank plc (as security agent) for the secured parties (the "**Intercreditor Agreement**").

3.6    Pursuant to the terms of the Intercreditor Agreement, the Existing RCF ranks senior to the First Lien Notes, which in turn ranks senior to the Second Lien Notes, in each case, with respect to the proceeds of any enforcement of the security.

**PART 3**
**BACKGROUND TO THE ADDITIONAL LIQUIDITY ARRANGEMENTS
(INCLUDING THE SCHEME)**

1.      **Events leading to the Additional Liquidity Arrangements and the Scheme**

1.1     As a result of the Covid-19 pandemic and resulting "lockdown" imposed in the UK on 23 March 2020, all 232 retail stores then operated by the Group in the UK closed on 24 March 2020, with a phased re-opening within Government guidelines of the Group's English and Northern Irish stores commencing on 18 May 2020 and more recently also in Scotland and Wales.  The nature of the Group's stores (which are out of town locations with substantial square footage) means that now that stores are permitted to reopen the Group will be well positioned to adapt to the Covid-19 pandemic and comply with social distancing guidelines which are likely to continue for some time.

1.2     While the Group's online business has continued to operate during the "lockdown", despatch volume was temporarily constrained due to the social distancing measures implemented in the Group's supply and distribution centres.  In addition, while rapidly expanding, the Group's online business only accounts for a small proportion of the Group's revenue.  While online demand has remained resilient throughout the Covid-19 pandemic, it has not materially reduced the impact of the store closures.

1.3     The closure of the Group stores has had a material impact on the cash flow of the Group.  While the Group believes the impact on cash flow will only be temporary and has taken significant steps to mitigate this, it requires additional liquidity to manage its cash flow in both the short and medium term.

2.      **Steps taken by the Group to mitigate the impact of the Covid-19 pandemic on the Group's financial position**

2.1     The Group has taken extensive measures to seek to contain the impact of the Covid-19 pandemic on the Group's business wherever possible.  The nature and extent of such measures have been disclosed to Scheme Creditors and to the public, primarily through the issuance of three statements relating to Covid-19 pandemic contingency planning, the first on 11 April 2020 (the "**First Covid-19 Statement**") the second on 27 April 2020 (the "**Second Covid-19 Statement**"), and the third on 5 June 2020 (the "**Third Covid-19 Statement**") which appear on the Company's website at https://www.matalan.co.uk/corporate/corporate-publications.

2.2     In seeking to mitigate the impact of the Covid-19 pandemic on the Group's business, the Group appointed Deloitte LLP ("**Deloitte**") as its financial advisers on 19 March 2020 and continues to work with them to forecast and manage its cash flow.

*Steps taken prior to the First Covid-19 Statement*

2.3     Prior to the First Covid-19 Statement, the directors of the Company took steps to preserve cash reserves, manage working capital, reduce costs, and access available government support made available to UK companies during the Covid-19 pandemic.

2.4    As detailed in the First Covid-19 Statement, these steps included significantly reshaping incoming stock volumes, engaging with suppliers (including landlords), placing over 10,000 employees on furlough, deferring capex wherever possible, deferring tax and national insurance payments, and accessing the Government's 12-month business rates exemption.

*Steps taken prior to the Second Covid-19 Statement*

2.5    In its Second Covid-19 Statement, the Group disclosed further detail around the cost reduction steps that had been taken including additional measures to improve the Group's liquidity which are described in the following paragraphs.

2.6    On 11 April 2020, the Company confirmed that it was not eligible for the Coronavirus Business Interruption Loan Scheme, due to the eligibility criteria which meant that only companies with an annual turnover between £45,000,000 - £500,000,000 could obtain 80 per cent.  Government-backed funding from accredited lenders.  Following consultation with and lobbying from businesses, including the Company, the Coronavirus Large Business Interruption Loan Scheme ("**CLBILS**") was introduced on 16 April 2020, available to companies with a turnover exceeding £500,000,000.  This change allowed the Company to begin discussions with accredited lenders with a view to accessing CLBILS.

2.7    As at the 2019 year-end, the Company's £50,000,000 revolving credit facility (the "**Existing RCF**") provided under an agreement dated 25 January 2018 between, amongst others, the Company and Barclays Bank Plc, Lloyds Bank Plc, and Morgan Stanley Bank International Limited (the "**Existing RCF Agreement**" and the "**Existing RCF Lenders**") remained undrawn, save for the utilisation of certain ancillary facilities.  In early April 2020, Matalan Retail Limited drew down the balance of the Existing RCF.  This drawdown marks the first time in the Group's history that it has had to draw down its Existing RCF (other than for utilising ancillary facilities).

2.8    The additional cost preserving measures taken by the Group include:

    (a)    unwinding of in-the-money foreign currency hedges releasing over £18,000,000 in additional funds available to the Group;

    (b)    making a successful Time to Pay application to HMRC in relation to other tax payments providing a temporary liquidity benefit of up to £20,000,000 up until the end of June 2020;

    (c)    working with suppliers to cancel products not yet delivered for spring and summer and amending its existing orders for the coming autumn and winter, saving £142,000,000 against forecasted stock purchases.  In addition, the Group negotiated a number of changes to its supplier terms to extend its existing payment terms, delivering an additional £23,000,000 of cash benefits;

    (d)    deferring payment of approximately £23,000,000 of rent due in March 2020, with the intention of spreading the repayment over a period of 12 months commencing in September 2020;

(e)     furloughing approximately 90 per cent. of employees, resulting in significant costs saving totalling £21,000,000 as against the Group's original budget;

(f)     removing a further £10,000,000 out of the Group's broader cost base and reducing capex to £25,000,000 (a 45 per cent. reduction from the prior year);

(g)     deferring VAT payments due between 20 March 2020 and the end of June 2020 until 31 March 2021.  In addition, agreeing with HMRC to defer payment of other taxes due in April and May;

(h)     accessing the Government's 12-month business rates exemption resulting in a permanent saving of approximately £44,000,000; and

(i)     continuing to assess and implement new measures aimed at preserving liquidity and ensuring the continued operation of the Group.

3.      **Additional liquidity required due to the impact of the Covid-19 pandemic**

3.1     Despite the steps taken by the Group described in paragraph 2 above, the Group's revised projections indicated that due solely to the direct impact of the Covid-19 pandemic, the Group would require an additional injection of funding to enable it to manage the short to medium term cash flow.  As a consequence, the Group commenced negotiations with its creditors and a range of third parties in early April 2020 (see paragraph 4 below).

3.2     Concurrently with the negotiations detailed in paragraph 4 below, and as disclosed in the Third Covid-19 Statement, the Group took further steps to improve its financial position.  For instance, as set out in the Third Covid-19 Statement, and in line with governmental guidance and regulation, the Group re-opened 175 of its stores by 30 May 2020, unfurloughed over 5,000 employees, and improved margin on online sales. While these steps have undoubtedly positively impacted the Group's prospects for continued success, they have not obviated the need for additional liquidity.

4.      **Steps taken to access additional liquidity**

4.1     In connection with the drawdown of the Existing RCF referred to in paragraph 2.7 above, on 3 April 2020, the Parent negotiated a temporary waiver with the Existing RCF Lenders of any existing potential defaults or events of default which had arisen as a result of the Covid-19 pandemic (the "**RCF Waiver**").  As a condition to the RCF Waiver, the Parent, on behalf of the Group, agreed to certain additional covenants, including an obligation to obtain the consent of the Existing RCF Lenders in advance of entering into any new financing arrangements.

4.2     In tandem with securing the RCF Waiver, the Group and its advisers engaged with existing creditors of the Group to discuss additional liquidity needs.  To this effect, the Group and its advisers engaged with the Shareholder, Existing RCF Lenders that qualified as accredited CLBILS lenders, and, on 9 April 2020, a number of holders of First Lien Notes.  As disclosed in the Second Covid-19 Statement, Perella Weinberg Partners were appointed as financial advisers to the same group of holders of First Lien

Notes on 26 April 2020, and Kirkland & Ellis International LLP were appointed as their legal advisers shortly thereafter.

4.3    Moreover, in order to protect against any potential detriment to the Group arising out of failed negotiations with its existing creditors, the Group and its advisers began discussions with approximately 30 alternative capital providers.

4.4    Following extensive discussions with a variety of financing parties and the consideration of a number of financing proposals, the Group agreed the key terms with respect to the Additional Liquidity Arrangements on 28 May 2020.  The Company believes that the terms of the Additional Liquidity Arrangements were, in combination, the most attractive sources of additional liquidity available to the Group.  The blended cost of these facilities is the lowest of the options identified, and the Company believes the support offered by its Existing RCF Lenders who are accredited CLBILS lenders and certain of the holders of the First Lien Notes provides compelling evidence of its stakeholders' long-term belief in the strength and resilience of its business model and competitive position.

4.5    As a prerequisite to implementing the Additional Liquidity Arrangements, the consent of the First Lien Notes was required.

4.6    On 28 May 2020, the Company launched a consent solicitation (the "**First Lien Consent Solicitation**") to, among other things, (i) obtain the consents and waivers required to implement the Additional Liquidity Arrangements and (ii) amend the covenants in the First Lien Notes Indenture to be in line with the covenants in the Additional Notes.  In connection with the First Lien Consent Solicitation, the Company offered a cash payment of £5 per £1,000 principal amount of First Lien Notes to holders of the First Lien Notes providing their consent in accordance with the terms set out in the First Lien Consent Solicitation ("**First Lien Consent Fee**").

4.7    The Company announced that the First Lien Consent Solicitation had been successfully approved on 3 June 2020.  The total amount of the First Lien Consent Fee paid on 9 June 2020 to the relevant holders of the First Lien Notes was £1,737,950.

5.    **The Additional Liquidity Arrangements**

5.1    The measures the Company has taken and will continue to take in order to improve its financial prospects encompass a broad additional liquidity package being provided to the Group pursuant to the CLBILS Facilities, the Additional Notes, the cancellation of £50,000,000 of the principal amount of Second Lien Notes held by the Shareholder in exchange for the Shareholder PIK Notes, as well as amendments to be effected by this Scheme (the "**Additional Liquidity Arrangements**").  The Additional Liquidity Arrangements are further detailed in Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement.

5.2    The Company believes that the additional liquidity headroom supplied by the Additional Liquidity Arrangements will be sufficient to support its business during the remainder of the Covid-19 "lockdown" period and to ensure adequate headroom

thereafter during a gradual and potentially uneven period of recovery. The Company believes that this package of measures, taken as a whole:

(a)     provides a stable platform for the Group to trade through the economic disruption and uncertainty caused by the Covid-19 pandemic;

(b)     provides and preserves operational liquidity headroom at a time of heightened uncertainty;

(c)     offers a fair allocation of risk and reward to debt holders and the Shareholder; and

(d)     protects value for all creditors while respecting the fundamental priorities under its existing intercreditor arrangements.

5.3     Given the Group's urgent need for additional liquidity in order to meet significant payments due in June 2020, notably the Group's quarterly rent payment payable in advance at the end of that month, each of the steps taken in Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement occurred in June 2020 (i.e. before the Scheme Meeting has been convened). These steps were inter-conditional on each other and were implemented over the course of 8 June 2020 and 9 June 2020.

## 6.     The purpose of the Scheme

6.1     As explained at paragraph 5.1 above, the Scheme is part of the Additional Liquidity Arrangements which ensures that the Group can continue to trade through the economic disruption and uncertainty caused by the Covid-19 pandemic.

6.2     If sanctioned, the Scheme will release the following rights under the Second Lien Notes:

(a)     the right to the cash interest coupon payable, including any cash interest accrued and unpaid; and

(b)     the rights which are subject to the Additional Waivers described below relating, principally, to covenants that would or might be triggered by the Scheme,

in each case in respect of the Second Lien Notes (together such rights being the **"Scheme Claims"**).

6.3     Moreover, if sanctioned, the Scheme will:

(a)     with effect from the Scheme Effective Date, authorise the Company (for and on behalf of the Scheme Creditors) to enter into the Trustee Instruction Letter and the Security Agent Instruction Letter; and

(b)     with effect from the Second Lien Amendments Effective Date:

(i)     amend the Company's obligation to pay the cash coupon under the Second Lien Notes in accordance with the terms set out in Part 4

(*Rationale for and Summary of the Additional Liquidity Arrangement*) of this Explanatory Statement and amend the Global Note to reflect this amendment. This amendment will apply to interest payable under the Second Lien Notes on an Interest Payment Date (under and as defined in Second Lien Notes Indenture) falling on or after the Second Lien Amendment Effective Date;

(ii)      approve the Additional Waivers (as described in Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement) and instruct the Trustee and the Security Agent to enter into the Intercreditor Agreement Side Letter;

(iii)     entitle all Scheme Creditors to receive payment of the Second Lien Deferral Fee;

(iv)      discharge all of the rights, title and interest of the Scheme Creditors to their Scheme Claims in exchange for which the Scheme Creditors will be eligible to receive the Scheme Consideration; and

(v)       release fully and finally all Liabilities to the Scheme Creditors arising in relation to or arising out of, or in connection with the Scheme Claims, the formulation, negotiation, promotion, or provision of the Additional Liquidity Arrangements, and the formulation, negotiation, promotion, and entry into of the Second Lien Amendments Documents and the Scheme against, among others, the Company, the Trustee, the Security Agent, and any other Scheme Creditor (subject to certain exceptions as discussed at Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangement*) of this Explanatory Statement).

6.4      Further details of the effects of the Scheme are set out in Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangement*) of this Explanatory Statement.

*Recognition in the US*

6.5      Following the sanction of the Scheme, the Company will seek recognition under Chapter 15 of the US Bankruptcy Code ("***Chapter 15 Recognition***") of the Scheme. This is because the Second Lien Notes are governed by the law of New York, and Chapter 15 Recognition is a relatively inexpensive process which will bring certainty as to the effectiveness of the variation of rights in respect of the Second Lien Notes to be effected by the authority conferred by the terms of the Scheme.

6.6      For further information, please see Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangement*) of this Explanatory Statement.

**PART 4**
**RATIONALE FOR AND SUMMARY OF THE ADDITIONAL LIQUIDITY
ARRANGEMENTS (INCLUDING THE SCHEME)**

1.    **Overview**

1.1    The summary below is intended to be a guide to the Additional Liquidity Arrangements (including the Scheme) and is not intended to be a substitute for reading the Second Lien Amendments Documents.  A summary of the main documents relevant to the Scheme is set out in Part 7 (*Second Lien Amendments Documents*) of this Explanatory Statement.

1.2    As described above at Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement, the Group identified a substantial additional funding requirement that the Group was unable to meet without a material injection of liquidity.

1.3    The proposed Scheme is part of the broader Additional Liquidity Arrangements, the implementation of which will ensure the continuing operations of the Group for the benefit of all stakeholders, with the key elements for a sustainable capital structure and a foundation from which the Company can deliver long-term value for all of its stakeholders.

1.4    The primary objectives of the Additional Liquidity Arrangements are to:

(a)    obtain new capital in order to enable the Group to cover its operating expenses and recover its competitive position, especially in light of the Covid-19 pandemic; and

(b)    ensure the Group can service its general corporate and working capital obligations going forward and with sufficient flexibility in light of the uncertainty inherent in the timing and extent to which the restrictions imposed by the Government in response to the Covid-19 pandemic will be lifted.

2.    **Overview of Key Steps**

2.1    The Additional Liquidity Arrangements envisage all of the following steps occurring:

(a)    entry into the CLBILS Facilities;

(b)    issuance of the Additional Notes;

(c)    exchange of Shareholder Notes for Shareholder PIK Notes;

(d)    provision of Shareholder Equity Commitment and Shareholder Credit Security with respect to the HQ Sale and Leaseback;

(e)    entry into supplemental Intercreditor Arrangements;

(f)    entry into the Lock-Up Agreement;

(g)     proposal of the Scheme; and

(h)     filing for Chapter 15 Recognition.

2.2     Given the Group's urgent need for additional liquidity in order to meet significant payments due in June, each of the steps set out above (other than with respect to the steps required following launch of the Scheme and for Chapter 15 Recognition) were implemented on 9 June 2020.  Each step is explored in further detail in the paragraphs which follow.

2.3     While the sanctioning of the Scheme is not a requirement of the CLBILS Facilities or Additional Notes, if the Scheme is not sanctioned it will place the Group under additional cash constraints when the cash coupon on the Second Lien Notes becomes due and payable on 31 July 2020. A description of the impact on the Group is provided in paragraph 12.5 below.

3.      **Entry into the CLBILS Facilities**

3.1     On 8 June 2020, £25,000,000 in aggregate of revolving credit facilities were provided by Barclays Bank Plc and Lloyds Bank Plc pursuant to the CLBILS (the "**CLBILS Facilities**").  The Existing RCF Agreement was amended and restated to include the CLBILS Facilities as additional revolving facilities (the "**Amended RCF Agreement**"), with the revolving facilities thereunder being the "**RCF Facilities**".  The borrowers, guarantee, and security package and maturity date for the CLBILS Facilities were the same as those provided under the Existing RCF with the following additions:

(a)     Matalan Direct Limited, Matalan Travel Limited, and HPO1 Nominees Limited (the "**Additional Guarantors**") have acceded as guarantors to the Amended RCF Agreement, the Additional Notes, the First Lien Notes, and the Second Lien Notes; and

(b)     the Shareholder Credit Security was provided.

3.2     The CLBILS Facilities are secured on a *pari passu* basis with the Existing RCF, each of which, pursuant to the terms of an agreement dated 8 June 2020 entered into between the lenders under the RCF Facilities, the Security Agent, and Lucid Trustee Services Limited as new priority note trustee (the "**Priority Agreement**") ranks senior to the Additional Notes, with the Additional Notes in turn ranking senior to the First Lien Notes, and the First Lien Notes in turn ranking senior to the Second Lien Notes, in each case with respect to distribution of the proceeds of any enforcement of the security.

3.3     As well as certain other changes to the terms of the Amended RCF Agreement, the net leverage ratio in the Existing RCF has been suspended until 31 August 2021 and the RCF Facilities have the benefit of actual and forecast liquidity covenants with a minimum liquidity requirement, a breach of which shall be an event of default under the Amended RCF Agreement.  The Amended RCF Agreement includes a prohibition on amending the terms of the Additional Notes, the First Lien Notes, the Second Lien Notes, and the Shareholder PIK Notes without the consent of lenders holding 66 2/3 per cent. of the total commitments under the RCF Facilities.  The terms of the Amended RCF Agreement restrict the redemption of, or cash payments under, each of the

Shareholder PIK Notes and the Second Lien Notes (other than cash interest prior to sanction of the Scheme, or if the Scheme is not sanctioned, and PIK Interest (as further described below) if the Scheme is sanctioned). It also restricts the redemption and repurchase of the First Lien Notes and the redemption and repurchase of the Additional Notes until the aggregate commitments under the RCF Facilities are reduced to no more than £50,000,000.

4.    **Issuance of the Additional Notes**

4.1    On 9 June 2020, the additional 16.5 per cent. notes due July 2022 generating net proceeds of £25,000,000 were issued by the Company to certain holders of the First Lien Notes (the "**Additional Notes**" and the "**Additional Notes Holders**") pursuant to a new priority notes indenture dated 9 June 2020 (the "**Additional Notes Indenture**"). The Additional Notes will mature on 25 July 2022 and interest on the Additional Notes will be payable quarterly in cash.

4.2    Pursuant to the terms of the Priority Agreement, the Additional Notes rank behind the RCF Facilities but ahead of the First Lien Notes, with the First Lien Notes in turn ranking senior to the Second Lien Notes, in each case, with respect to the distribution of the proceeds of any enforcement of the security. The guarantee and security package for the Additional Notes is the same as that provided in respect of the RCF Facilities (including the accession by the Additional Guarantors).

5.    **Exchange of Shareholder Notes for Shareholder PIK Notes**

5.1    As a condition precedent to the CLBILS Facilities and the Additional Notes, the Company issued £50,000,000 aggregate principal amount of subordinated unsecured notes (the "**Shareholder PIK Notes**") pursuant to an indenture dated 9 June 2020 (the "**Shareholder PIK Notes Indenture**") in exchange for the Shareholder Notes (which were cancelled upon completion of the exchange). This meant that the outstanding principal amount of the Second Lien Notes was reduced to £80,000,000 from £130,000,000. The Shareholder PIK Notes are on substantially the same terms as the Second Lien Notes except that:

(a)    interest on the Shareholder PIK Notes is only be payable as "payment-in-kind" interest ("**PIK Interest**");

(b)    the Shareholder PIK Notes are unsecured and do not have the benefit of any guarantees from any member of the Group;

(c)    the Shareholder PIK Notes will mature six months after the Second Lien Notes; and

(d)    the Shareholder PIK Notes are subject to terms that: (i) subordinate (on the same basis as Shareholder Liabilities under and as defined in the Intercreditor Agreement) all claims of the holders of the Shareholder PIK Notes to the Senior Liabilities, First Lien Liabilities, and Second Lien Liabilities (each as defined in the Intercreditor Agreement); (ii) ensure that no payments (other than through capitalisation of PIK Interest) are made in respect of the Shareholder PIK Notes until the irrevocable and unconditional final repayment, redemption and/or

discharge of the RCF Facilities, certain Hedging Liabilities (as defined in the Intercreditor Agreement), the Additional Notes, the First Lien Notes, and the Second Lien Notes unless otherwise permitted pursuant to the terms of such prior-ranking finance documents; and (iii) prohibit the holders of such notes from taking any Enforcement Action (as defined in the Intercreditor Agreement) with respect to such notes until the irrevocable and unconditional final repayment, redemption and/or discharge of the RCF Facilities, certain Hedging Liabilities (as defined in the Intercreditor Agreement), the Additional Notes, the First Lien Notes and the Second Lien Notes.

6.      **Provision of Shareholder Equity Commitment and Shareholder Credit Security with respect to the HQ Sale and Leaseback**

6.1     A condition to the provision of the CLBILS Facilities was the requirement for the Parent to use all reasonable commercial endeavours to sell the head office property located in Knowsley, Liverpool on terms where the head office is leased back to the Group (the "**HQ Sale and Leaseback**") with the net disposal proceeds being applied in prepayment and cancellation of the RCF Facilities.

6.2     In relation to the HQ Sale and Leaseback, the Shareholder committed to invest up to £25,000,000 of additional equity in the Parent if, among other conditions, the aggregate commitments under the RCF Facilities have not been reduced to £50,000,000 by 31 December 2020 (the "**Shareholder Equity Commitment**").  The Shareholder Equity Commitment will terminate upon the first date on which the aggregate commitments under the RCF Facilities are reduced to £50,000,000 or less.

6.3     In the event that the Shareholder fails to make any payment required under the Shareholder Equity Commitment and the aggregate commitments under the RCF Facilities have not otherwise been reduced to £50,000,000 or less, such failure shall constitute an event of default under the Amended RCF Agreement on the 30th day following the delivery of a notice of exercise by the Company to the Shareholder, subject to a 120 day grace period (the "**Shareholder Default**").  During such grace period, subject to certain pre-conditions relating to minimum cash balances, any member of the Group will be permitted to repay or prepay and cancel the RCF Facilities so as to reduce the aggregate commitments thereunder to £50,000,000 or refinance the RCF Facilities, in each case within 90 days of commencement of the grace period. Following the expiry of the grace period, a Shareholder Default entitles: (i) the lenders under the Amended RCF Agreement to accelerate the RCF Facilities (with any such acceleration triggering a cross default under the Additional Notes) and (ii) the Security Agent to exercise its rights under the Shareholder Credit Security.

6.4     In connection with the Shareholder Equity Commitment, the Company assigned its rights arising under the Shareholder Equity Commitment and any related bank guarantees to the Security Agent as security for the Secured Obligations (each as defined in the Intercreditor Agreement) (the "**Shareholder Credit Security**").

7.      **Entry into Supplemental Intercreditor Arrangements**

7.1     While the creditors under the RCF Facilities and the Additional Notes have priority over the First Lien Notes, which in turn have priority over the Second Lien Notes, the

Priority Agreement was entered into to govern the relationship between them with respect to distributions of proceeds of any enforcement of the security.

7.2   Pursuant to the terms of the Priority Agreement, enforcement proceeds, and other payments received by the Additional Notes Holders (other than cash interest then due on the Additional Notes and certain other permitted payments) will be applied, first, in satisfaction of amounts owing under the RCF Facilities *pro rata* as between them and, second, in satisfaction of amounts owing under the Additional Notes.

7.3   In addition, until the final discharge of the RCF Facilities, for the sole purpose of calculating the Senior Credit Participations (as defined in the Intercreditor Agreement) the participations of the holders of the Additional Notes shall be deemed to be zero for the purposes of forming the Instructing Group (as defined in the Intercreditor Agreement).

8.   As part of the First Lien Consent Solicitation, the holders of the First Lien Notes agreed to irrevocably and unconditionally waive any standstill period, consultation period, or notice period and the provision of any enforcement proposal (in each case as required under the terms of the Intercreditor Agreement), to give equivalent instructions and not to challenge any enforcement by the lenders under the Amended RCF Agreement (or assert that any such enforcement is inconsistent with the security enforcement principles stipulated in the Intercreditor Agreement) in respect of any enforcement of the rights arising under or in respect of the Shareholder Credit Security.

9.   **Lock-Up Agreement**

9.1   As a condition precedent to the CLBILS Facilities and the Additional Notes, a lock-up agreement was entered into by the Company on 8 June 2020 and certain of the Scheme Creditors who later acceded on the same day (the "**Lock-Up Agreement**" and the "**Participating Second Lien Noteholders**", respectively).

9.2   The Participating Second Lien Noteholders represent 50.35 per cent. of the Second Lien Notes.

9.3   The Information Agent has published the Lock-Up Agreement on its Scheme Website.

9.4   It was a condition precedent under the CLBILS Facilities and the Additional Notes and a condition to the Existing RCF Lenders agreeing to permanently waive existing potential defaults or events of default which have arisen as a result of the Covid-19 pandemic that certain of the Scheme Creditors enter into the Lock-Up Agreement. Other Scheme Creditors can accede to the Lock-Up Agreement, however as at the date of this Explanatory Statement, no other formal consents from other Holders have been received.  No separate or additional fees other than the Second Lien Deferral Fee are payable to Holders under the terms of the Lock-Up Agreement.

9.5   Under the Lock-Up Agreement, the parties thereto agree, among other things:

(a)   to promptly take all actions which are reasonably required or desirable to support, facilitate, implement, or otherwise give effect to the Second Lien Amendments in a manner consistent with the terms of the Lock-Up Agreement;

(b)     to support and vote promptly in favour of proposals contemplated by the Lock-Up Agreement or reasonably necessary or desirable to implement the Second Lien Amendments (including the Scheme); and

(c)     not to intentionally take any action which would or would reasonably be expected to frustrate, delay, impede, or prevent the Second Lien Amendments, until such time as the Lock-Up Agreement is terminated.

9.6     The Lock-Up Agreement will remain in place until it is terminated by agreement or by notice in accordance with its terms.  If not so terminated, the Lock-Up Agreement also provides for automatic termination on the earliest to occur of:

(a)     the implementation of the Second Lien Amendments;

(b)     if;

(i)     at the Scheme Meeting which is not adjourned and at which a vote takes place, the Scheme is not approved by the requisite majorities of the relevant Scheme Creditors; or

(ii)     the Court issues a formal judgement (A) refusing to convene the Scheme Meeting or (B) refusing to sanction the Scheme and, in each case, any appeal lodged by the Company has been finally dismissed; and

(iii)     15 August 2020, which may be extended with the consent of the Company and the Super Majority Participating Second Lien Noteholders (as defined in the Lock-Up Agreement).

## 10.     **Scheme**

10.1     As a condition subsequent to the provision of the CLBILS Facilities and the issuance of Additional Notes, the Company agreed to propose the Scheme.  The Scheme envisions the following steps occurring:

(a)     from the Scheme Effective Date, granting authority to the Company to execute on behalf of the Scheme Creditors the documents required to implement the steps contemplated by and in connection with the Scheme (the "**Second Lien Amendments Documents**"), including:

(i)     an instruction letter to the Trustee (the "**Trustee Instruction Letter**"), instructing the Trustee to, among other things:

(A)     enter into a supplemental indenture to the Second Lien Notes Indenture, to be entered into by, among others, the Company (for and on behalf of itself and the Scheme Creditors), the Trustee, and the Security Agent to implement the Second Lien Amendments (the "**Second Lien Supplemental Indenture**");

(B)     enter into a side letter to the Intercreditor Agreement to provide the waivers described in paragraph 10.1(b)(iii) below (the "**Intercreditor Agreement Side Letter**");

      (C)    amend the Global Notes to reflect the Second Lien Amendments; and

      (D)    carry out all other legally permitted steps within its control including, without limitation, executing any documents, undertakings, and/or notices, and providing any directions or instructions reasonably necessary in order to implement the Scheme, and

    (ii)    an instruction letter to the Security Agent (the "**Security Agent Instruction Letter**") instructing the Security Agent to:

      (A)    enter into the Second Lien Supplemental Indenture;

      (B)    enter into the Intercreditor Agreement Side Letter;

      (C)    enter into an English-law deed of release between, among others, the Company and the Scheme Creditors (the "**Deed of Release**"), which gives effect to the releases set out in paragraph 10.2(b) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement, substantially in the form appended to Appendix F (*Deed of Release*) of this Explanatory Statement, subject to any amendments made in accordance with the terms of the Scheme Document; and

      (D)    carry out all other legally permitted steps within its control including, without limitation, executing any documents, undertakings, and/or notices, and providing any directions or instructions reasonably necessary in order to implement the Scheme;

(b)    from the Second Lien Amendments Effective Date, and in accordance with the terms of the Second Lien Supplemental Indenture and the Intercreditor Agreement Side Letter (as applicable), the effect of the Second Lien Amendments Documents is to:

    (i)    convert the interest coupon to be paid on the Second Lien Notes to PIK Interest, such that interest will be payable as PIK Interest provided that cash interest will become payable again (instead of PIK interest) if, and only if, as of the seventh calendar day immediately prior to the start of the applicable interest period the consolidated cash of the Group is at least £50,000,000 provided that: (A) the Additional Notes have been redeemed in full; (B) the amounts outstanding across the RCF Facilities have been reduced to £12,000,000 or less of ancillary facilities; and (C) the total commitments under the RCF Facilities do not exceed £50,000,000 in aggregate. This amendment will apply to interest payable under the Second Lien Notes on an Interest Payment Date (under and as defined in Second Lien Notes Indenture) falling on or after the Second Lien Amendment Effective Date;

(ii)    irrevocably and unconditionally waive any defaults, events of default, or acceleration under the Second Lien Notes Indenture and the Second Lien Notes or any insolvency event under the Existing Intercreditor Agreement which arise as a result of any steps taken in respect of the Additional Liquidity Arrangements (including without limitation any steps taken in respect of the Scheme and the Chapter 15 Filing);

(iii)   irrevocably and unconditionally waive any standstill period, consultation period, or notice period and the provision of any enforcement proposal (in each case as required under the terms of the Intercreditor Agreement), to give equivalent instructions and not to challenge any enforcement by the lenders under the Amended RCF Agreement (or assert that any such enforcement is inconsistent with the security enforcement principles stipulated in the Intercreditor Agreement) in respect of any enforcement of the rights under or in respect of the Shareholder Credit Security (together with the waivers referred to in sub-paragraph 10.1(b)(ii) above the "**Additional Waivers**"); and

(iv)    amend the Global Notes to reflect the amendments described in sub-paragraph 10.1(b)(i) above; and

(c)    entitle all Scheme Creditors, whether they have participated in the Scheme or not, to receive, within two Business Days of the Second Lien Amendments Effective Date, a cash payment of £5 per £1,000 principal amount of Second Lien Notes, calculated as at the Voting Instruction Deadline (the "**Second Lien Deferral Fee**"),

(together the "**Second Lien Amendments**").

10.2    Upon the occurrence of the Second Lien Amendments Effective Date, the Scheme will:

(a)    vary the rights, title and interest of the Scheme Creditors to the Scheme Claims in exchange for the Second Lien Deferral Fee and the go forward PIK Interest coupon as described in paragraph 10.1 above (the "**Scheme Consideration**"); and

(b)    release fully and finally all Liabilities to the Scheme Creditors arising in relation to or arising out of, or in connection with the Scheme Claims, the formulation, negotiation, promotion, or provision of the Additional Liquidity Arrangements, and the formulation, negotiation, promotion, and entry into of the Second Lien Amendments Documents and the Scheme against, among others, the Company, the Second Lien Notes Guarantors, the Trustee, the Security Agent, and any other Scheme Creditor (each a "**Released Party**", together the "**Released Parties**" under and as more fully defined in clause 7.2 of the Scheme Document), subject to exceptions such that the release does not:

(i)    have the effect of waiving, releasing or discharging any rights of any Scheme Creditor arising under:

(A)     any rights of the Scheme Creditors arising out of the Scheme or any Second Lien Amendments Documents;

(B)     any report or advice provided by any Adviser, on which report or advice such Scheme Creditor is expressly entitled to rely;

(C)     any claims arising as a result of any breach of any Second Lien Amendments Document that remains in effect following the Second Lien Amendments Effective Date; and

(D)     any remedy in respect of any such rights arising under the documents described at sub-paragraphs (A) to (C) hereof; or

(ii)    apply to any Liability in respect of fraud, wilful misconduct, or gross negligence by any Released Party.

10.3    While the Company is required under the terms of the CLBILS Facilities and the Additional Notes to use reasonable endeavours to ensure that the Scheme is successful, there is no obligation to ensure that the Scheme is successful and no event of default arises under the CLBILS Facilities or the Additional Notes in the event that the Scheme is not sanctioned. This does not mean that the failure of the Scheme has no consequence for the Company and its creditors. The potential consequences are set out in detail at paragraph 12 below.

11.     **Why does the Board consider the Scheme to be in the best interests of all stakeholders and what are the consequences of failing to implement the Scheme?**

As mentioned in paragraph 4 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement, the Company has explored other alternatives prior to and in parallel with the negotiation of the Additional Liquidity Arrangements and the Board believes that the Additional Liquidity Arrangements, taken as a whole, represent a better alternative than the most probable alternative scenario (see paragraph 12 below). Accordingly, the Board considers the Additional Liquidity Arrangements to be in the best interests of those stakeholders with an economic interest in the Company and the Group, including the Scheme Creditors.

12.     **Alternatives to the Additional Liquidity Arrangements**

12.1    As mentioned in paragraph 5.3 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*), due to the Group's urgent need for liquidity, several steps required to be taken as part of the Additional Liquidity Arrangements took place on 8 June 2020 and 9 June 2020. Consequently, the Scheme could not be implemented as a condition precedent to the CLBILS Facilities or the Additional Notes. While the Additional Liquidity Providers are supportive of the Group and have allowed the Scheme to go ahead as a condition subsequent to funding, this was driven primarily by the Group's critical need for liquidity and does not mean that the outcome of the Scheme has no consequence for the Company or the Additional Liquidity Providers.

12.2    As conditions to the provision of the Additional Liquidity Arrangements and to the Existing RCF Lenders agreeing to permanently waive existing potential defaults or

events of default which have arisen as a result of the Covid-19 pandemic, the Existing RCF Lenders and the Additional Liquidity Providers have insisted that the Company takes certain measures to improve the Company's cash position in the short to medium term which include:

(a)     the HQ Sale and Leaseback;

(b)     the exchange of the Shareholder Notes for Shareholder PIK Notes (saving £4.8m of cash interest per annum); and

(c)     the Second Lien Amendments, which will result in an annual cash interest saving of £7.6m per annum (including £3.8m due in July 2020) for the Company.

and have been framed as a combination of conditions precedent, conditions subsequent, and ongoing obligations but have all been expressed as having significant importance to the Existing RCF Lenders and the Additional Liquidity Providers.

12.3    The conditions set out in paragraph 12.2 above have underpinned the respective credit approvals obtained for providing the CLBILS Facilities and the Additional Notes and agreeing to permanently waive existing potential defaults or events of default which have arisen as a result of the Covid-19 pandemic and are needed to address the challenging environment faced by the Group in light of the Covid-19 pandemic. Importantly, the new liquidity package has also been sized on the assumption that the cash coupon on the Second Lien Notes would not be paid, and this has also been communicated to holders of the First Lien Notes as part of the First Lien Consent Solicitation.

12.4    The Amended RCF Agreement includes restrictive covenants on actual and forecasted cashflow and is subject to minimum liquidity requirements, a breach of which is an event of default and could, in circumstances where the RCF Facilities are not fully drawn, lead to a drawstop of the Amended RCF Agreement, so constraining liquidity. An acceleration of the RCF Facilities following an event of default would in turn cross-default into the Additional Notes, the First Lien Notes and the Second Lien Notes, significantly de-stabilising the Group's capital structure and potentially exacerbating the liquidity conditions faced by the Group.

12.5    In the event that the Scheme is not sanctioned, the Group will face additional cash requirements as early as 31 July 2020 when the cash coupon on the Second Lien Notes becomes due and payable and at a time when it has already taken extensive measures to reduce its cash outflow.  This will have the following impact:

(a)     **pressure on liquidity**: within the initial store reopening and recovery period the minimum liquidity level prescribed within the Amended RCF Agreement is necessarily tight.  There is therefore little room within those liquidity thresholds for the payment of cash pay coupon to the Scheme Creditors whilst the CLBILS Facilities and Additional Notes are in place.  Further, the Additional Liquidity Arrangements were sized on the basis that the cash coupon on the Second Lien Notes would not be paid;

(b)      **pressure on working capital**: in common with all retail businesses the Company needs to preserve working capital over the summer months in order to begin the restocking process for the critical Christmas trading period;

(c)      **reopening of senior creditor discussions**: in the event that the liquidity covenants in the Amended RCF Agreement are breached, the Additional Liquidity Providers and the Existing RCF Lenders may seek more substantive amendments to be made in respect of the Second Lien Notes given the Second Lien Notes are currently trading at a significant discount to par. Any breach of the minimum liquidity covenant prescribed within the Amended RCF Agreement will constitute an event of default and could potentially result in events of default throughout the Group's capital structure; and

(d)      **additional cost cutting**: further cost reduction within the Group to protect short term liquidity but which could slow the longer term recovery of the business.

12.6     In conclusion, the outflow of cash interest to Scheme Creditors who may be considered to be "out of the money" is highly likely to cause additional financial stress factors for the Company at a time when accelerated recovery from the Covid-19 pandemic is its priority. Whilst the Company is confident that the business is in a very strong position to return to its pre-Covid-19 financial health in the short to medium term, there are a range of macro-economic, consumer spending and broader factors (such as any potential extensive second Covid-19 peak and associated additional lockdown period) outside of the Company's control that will affect the recovery of the UK retail industry as a whole. The Company has therefore been advised by its professional advisers that it requires the maximum flexibility possible to manage its cash during this uncertain recovery period.

**The Board strongly recommends that Scheme Creditors vote in favour of the Scheme.**

## PART 5
## PROCESS FOR VOTING ON AND IMPLEMENTATION OF THE SCHEME

1.      **Conditions to the Scheme becoming effective**

1.1     In order for the Scheme to become effective on its terms and legally binding the
        Company and the Scheme Creditors (the relevant date being the Scheme Effective
        Date):

        (a)     the Scheme must be approved by a majority in number representing 75 per cent.
                or more in value of the Scheme Creditors present and voting (in person or by
                proxy) at the Scheme Meeting convened for the purpose of considering the
                proposed Scheme;

        (b)     the Scheme must be sanctioned by the Court; and

        (c)     an official copy of the Scheme Sanction Order must be delivered to the Registrar
                of Companies for England and Wales,

        (the "**Scheme Conditions**").

2.      **Approval of the Scheme**

2.1     In order for the Second Lien Amendments to become effective, the Scheme requires
        the approval of both a majority in number and at least 75 per cent. in value of the
        Scheme Creditors present and voting (either in person or by proxy) at the Scheme
        Meeting to be held at or about **10:00a.m.** (London time) on 20 July 2020 (or such later
        time or date as the Company may decide), as well as the sanction of the Court at the
        Scheme Sanction Hearing and the delivery of the Scheme Sanction Order to the
        Registrar of Companies.

2.2     The Information Agent will give notice via the Scheme Website and confirm (i) the
        percentage of Scheme Creditors who have submitted validly completed Account Holder
        Letters and (ii) whether the Scheme has been approved or not.  If the Scheme becomes
        effective, the Scheme Creditors will be bound by the Scheme and the Second Lien
        Amendments Documents, whether or not such Scheme Creditors approved the Scheme,
        objected to the Scheme or took no action in respect of the Scheme.

3.      **Voting on the Scheme**

        A Scheme Creditor may attend the Scheme Meeting remotely and vote.  Due to the
        evidential difficulties of proving that a person owns securities held within a Clearing
        System, Scheme Creditors who wish to attend and vote in person at the Scheme Meeting
        must follow the procedures set out in this Explanatory Statement and the Account
        Holder Letter set out in Appendix C (*Account Holder Letter*) of this Explanatory
        Statement.

4.      **Entitlement to vote on the Scheme**

4.1     In accordance with established practice, the Company will utilise a system whereby
        individual Scheme Creditors will, insofar as is possible, receive notice of the Scheme

Meeting and be given the opportunity to register their vote to accept or reject the proposed terms of the Scheme.

4.2    The means of voting has been designed to enable the Scheme Creditors, whose Second Lien Notes are held through a Clearing System, to vote through a form of ballot procedure with which they should be familiar.  Consequently, Scheme Creditors will receive, with this Explanatory Statement, an Account Holder Letter with voting instructions from the Company which Scheme Creditors are urged to complete and submit in accordance with those instructions as soon as possible and no later than the Voting Instruction Deadline.

5.    **Completion of Account Holder Letters**

5.1    Scheme Creditors who wish to vote at the Scheme Meeting should ensure that the Account Holder Letter set out in Appendix C (*Account Holder Letter*) of this Explanatory Statement is validly completed and submitted to the Company via the Information Agent as soon as possible in accordance with the instructions contained therein, irrespective of whether that Scheme Creditor intends to attend the Scheme Meeting, in order to exercise its right to vote at the Scheme Meeting.

5.2    Validly completed Account Holder Letters should be submitted to the Information Agent either online via the Scheme Website or via email at matalan@lucid-is.com as soon as possible and, in any event, so as to be received by the Company prior to 5:00p.m. (London time) on 16 July 2020 (being the Voting Instruction Deadline). Acceptance of an Account Holder Letter by the Information Agent for the purposes of voting on the Scheme is subject to receipt by the Information Agent of the relevant Scheme Creditors Custody Instructions prior to 5:00p.m. London time on 15 July 2020.

6.    **Amendment of voting instructions in Account Holder Letters**

6.1    If a Scheme Creditor wishes to amend its voting instructions provided in an Account Holder Letter, it may do so by submitting a new Account Holder Letter to the Information Agent by the Voting Instruction Deadline either online via the Scheme Website or via email at matalan@lucid-is.com.

6.2    The last validly completed Account Holder Letter received by the Company in respect of an Scheme Creditor prior to the commencement of the Scheme Meeting will take precedence over any earlier validly submitted Account Holder Letter(s) in respect of that Scheme Creditor.

7.    **Attendance at the Scheme Meeting**

The Scheme Meeting will commence at **10:00a.m.** London Time on 20 July 2020. The Scheme Meeting will take place via webinar hosted by Clifford Chance LLP, as set out in Appendix B (*Notice of the Scheme Meeting*) of this Explanatory Statement.  A Scheme Creditor wishing to attend the Scheme Meeting may obtain details from the Information Agent by contacting them at matalan@lucid-is.com.  Upon any Scheme Creditor (or its representative) providing evidence of their authority to represent the Scheme Creditor at the Scheme Meeting (for example, a valid power of attorney and/or board minutes) and the Information Agent being satisfied in respect of the same, they

shall provide the details.  The Scheme Creditor or the proxy attending the Scheme Meeting on the Scheme Creditor's behalf will be required to send a copy of the Account Holder Letter to the Information Agent via email to matalan@lucid-is.com prior to the Scheme Meeting, which can then be matched against the original Account Holder Letter submitted by or on behalf of the relevant Scheme Creditor.  Appendix A (*Instructions to Scheme Creditors*) of this Explanatory Statement sets out further instructions for Scheme Creditors who wish to cast their vote at the Scheme Meeting having had the opportunity to listen to the presentation made, ask questions of the Company's representatives, and listen to any views expressed by other Scheme Creditors. Notwithstanding that a vote by proxy is encouraged, the Company emphasises that **it will be possible for Scheme Creditors who choose to attend the Scheme Meeting in person by remote means to vote at the Scheme Meeting**, even if a Scheme Creditor should have submitted a proxy vote by the means described above beforehand.

8.     **Claim Value for the purposes of the Scheme Meeting**

Subject always to the discretion of the Chairperson of the Scheme Meeting (including as noted below), for voting purposes at the Scheme Meeting, the Claim Value attributable to a Scheme Creditor is the aggregate amount in GBP of principal and accrued interest (calculated as at 16 July 2020) owing to a Scheme Creditor in respect of its Second Lien Notes held at the Voting Record Time.

9.     **Important Information regarding calculating Claim Value**

9.1    The Claim Value of Scheme Creditors will be calculated by the Information Agent based on information confidentially provided to the Company by the Information Agent.  This information will be used by the Chairperson of the Scheme Meeting, and checked by the Information Agent acting in its capacity as independent scrutineer, to determine whether the resolution is passed at the Scheme Meeting.

9.2    Scheme Creditors will not need to provide the Company with any information relating to the amount they are, or may be, owed in connection with their Scheme Claims in order for the Chairperson of the Scheme Meeting to determine their Claim Value.  The Claim Value admitted by the Company, or by the Chairperson of the Scheme Meeting, for voting purposes does not (of itself) constitute an admission of the existence or amounts of any liability of the Company (or any company within the Group) (see paragraph 10.2(b) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement for the release of claims contemplated by the Scheme).

9.3    The Chairperson of the Scheme Meeting may reject any vote purportedly cast by an Scheme Creditor if the relevant Scheme Creditor has not complied with the applicable voting procedures and/or the instructions in relation to the Account Holder Letter.

10.    **Impact of the Successful Implementation of the Scheme**

10.1   If the Scheme is successfully implemented, and as explained more fully Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement, it will:

(a)    from the Scheme Effective Date, grant authority to the Company to execute on behalf of the Scheme Creditors the Second Lien Amendments Documents, including:

    (i)    the Trustee Instruction Letter, instructing the Trustee to, among other things:

        (A)    enter into the Second Lien Supplemental Indenture;

        (B)    enter into the Intercreditor Agreement Side Letter;

        (C)    amend the Global Notes to reflect the Second Lien Amendments;

        (D)    carry out all other legally permitted steps within its control including, without limitation, executing any documents, undertakings, and/or notices, and providing any directions or instructions reasonably necessary in order to implement the Scheme, and

    (ii)    the Security Agent Instruction Letter, instructing the Security Agent to, among other things:

        (A)    enter into the Second Lien Supplemental Indenture;

        (B)    enter into the Intercreditor Agreement Side Letter;

        (C)    enter into the Deed of Release; and

        (D)    carry out all other legally permitted steps within its control including, without limitation, executing any documents, undertakings, and/or notices and, providing any directions or instructions reasonably necessary in order to implement the Scheme;

(b)    from the Second Lien Amendments Effective Date, and in accordance with the terms of the Second Lien Supplemental Indenture and the Intercreditor Agreement Side Letter (as applicable):

    (i)    convert the interest coupon to be paid on the Second Lien Notes to PIK Interest, such that interest will be payable as PIK Interest provided that cash interest will become payable again (instead of PIK interest) if, and only if, as of the seventh calendar day immediately prior to the start of the applicable interest period the consolidated cash of the Group is at least £50,000,000 provided that: (A) the Additional Notes have been redeemed in full; (B) the amounts outstanding across the RCF Facilities have been reduced to £12,000,000 or less of ancillary facilities; and (C) the total commitments under the RCF Facilities do not exceed £50,000,000 in aggregate.  This amendment will apply to interest payable under the Second Lien Notes on an Interest Payment Date (under and as defined in Second Lien Notes Indenture) falling on or after the Second Lien Amendment Effective Date;

(ii)    irrevocably and unconditionally grant the Additional Waivers; and

(iii)    amend the Global Note to reflect the amendments described in paragraph 10.1(b)(i) above.

(c)    entitle all Scheme Creditors, whether they have participated in the Scheme or not, to receive within two Business Days of the Second Lien Amendments Effective Date, the Second Lien Deferral Fee via the Clearing Systems.

10.2    If the Scheme is successfully implemented, all Scheme Creditors (including those who do not vote in favour of the Scheme or those who do not vote at all in respect of the Scheme) will be bound by the terms of the Scheme, along with (i) the Company, and (ii) the Trustee, the Second Lien Notes Guarantors, and the Security Agent pursuant to their relevant deed of undertaking.

**PART 6**
**OVERVIEW OF THE SCHEME**

1.    **Scheme of arrangement overview**

1.1    As explained above at Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement, certain steps required to implement the Additional Liquidity Arrangements are proposed to be effected by way of a scheme of arrangement of the Company under Part 26 of the Companies Act.

1.2    A scheme of arrangement is a statutory procedure under Part 26 of the Companies Act which enables a company to agree a compromise or arrangement with its creditors or any class of its creditors in respect of its debts or obligations owed to those creditors. A scheme of arrangement requires the following to occur in order to become legally binding:

(a)    the approval of a majority in number representing at least 75 per cent. in value of the creditors or class of creditors present in person or by proxy and voting at the Scheme Meeting convened to approve the scheme of arrangement;

(b)    the approval of the Court by the making of an order sanctioning the scheme of arrangement;

(c)    the delivery of the order sanctioning the scheme of arrangement to the Registrar of Companies; and

(d)    the satisfaction of any other conditions to effectiveness imposed by the terms of the Scheme.

1.3    If the scheme of arrangement is approved by the requisite majorities and sanctioned by the Court, the order sanctioning the scheme of arrangement is delivered to the Registrar of Companies and any other conditions are satisfied, the scheme of arrangement will become effective in accordance with its terms and bind all the creditors subject to it, including those creditors who voted in favour of it and those creditors who voted against it or did not vote at all and their successors and assigns.

1.4    A scheme of arrangement cannot be sanctioned by the Court unless the court is satisfied, among other things, that the relevant provisions of Part 26 of the Companies Act have been complied with and an intelligent and honest person, a member of the class concerned and acting in respect of his own interest, might reasonably approve the scheme of arrangement.

1.5    The role of the Scheme Creditors in the implementation of the Scheme is set out in detail in Appendix A (*Instructions to Scheme Creditors*) of this Explanatory Statement, to which Scheme Creditors should refer.

1.6    A summary of:  (i) the identity of Scheme Creditors; (ii) the process for voting at the Scheme Meeting; and (iii) when the Scheme will become effective, is set out below.

2.      **Identity of Scheme Creditors**

2.1     As detailed at paragraph 3 below, the Company intends to convene one class of creditors, comprised of the Holders as at the Voting Record Time.

2.2     The Company shall hold a Scheme Meeting for its Scheme Creditors.  At the Scheme Meeting, the value of a Scheme Creditor's claim for voting purposes in the Scheme will be the aggregate amount in GBP of principal and accrued interest (calculated as at 16 July 2020) owing to a Scheme Creditor in respect of its Second Lien Notes held at the Voting Record Time.  The amount of the Scheme Claims of each Scheme Creditor for the purposes of voting in respect of the Scheme will be calculated as at the Voting Record Time by the Information Agent based on information within that Scheme Creditor's Account Holder Letter which will be confidentially provided by the Information Agent to the Company.  This information will be used by the Chairperson of the Scheme Meeting to determine whether each resolution is passed at that Scheme Meeting.  Scheme Creditors do not need to take any action in respect of confirming the amount of their Scheme Claims other than providing the details requested in the applicable Account Holder Letter.  Scheme Creditors are entitled to be informed of the determined amount of their Scheme Claims prior to the commencement of the Scheme Meeting upon written request to the Information Agent via email at matalan@lucid-is.com.

2.3     The Holders are the persons with the economic interest in the Scheme Claims, and, accordingly, the Holders who comprise the Scheme Creditors will be entitled to vote in respect of the Scheme.

2.4     Each Holder that wishes to vote at the Scheme Meeting will be required to ensure that its Account Holder instructs the relevant Clearing System through which those Second Lien Notes are held to block the relevant Second Lien Notes.  This can be effected by giving Custody Instructions to that effect to Euroclear or Clearstream prior to the Custody Instruction Deadline.  As the procedure for blocking such Second Lien Notes may take a considerable period of time, Holders should ensure that Custody Instructions are given as early as possible so that the relevant Second Lien Notes may be blocked prior to the Custody Instruction Deadline and that such Custody Instructions include the name, email address and telephone number of the Scheme Creditor.  Further details on how to vote can be found at Appendix A (*Instructions to Scheme Creditors*) of this Explanatory Statement.

3.      **Scheme Meeting – Class Constitution**

3.1     Under the terms of the Practice Statement, it is the responsibility of the Company to formulate the class or classes of creditors for the purpose of convening a Scheme Meeting to consider and, if thought fit, approve the proposed Scheme.  Each class must be properly constituted so that any Scheme Meeting consists of creditors whose rights against the Company are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.  If the rights of Scheme Creditors are so different or would be affected so differently by the Scheme as to make it impossible for them to consult together with a view to their common interest, they must be divided into separate classes and a separate meeting must be held for each class of creditor.

3.2     The Company has considered the present rights of the Scheme Creditors against the Company and the way in which those rights will be affected by the Scheme.  Based on the information available to it, the Company has concluded that the Scheme Creditors fall into one class for the purposes of voting on the Scheme at the Scheme Meeting. The principal reasons for the Scheme Creditors constituting one class are explained in sub-paragraphs 3.2(a)-(d) inclusive below.

(a)     As Holders, the existing rights of the Scheme Creditors against the Company are the same.  They each hold Second Lien Notes on the same terms.  In particular, the Scheme Creditors have the same right against the Company to be repaid principal and interest and would rank *pari passu* between themselves in the event of an enforcement or an insolvency scenario occurring.

(b)     With respect to the variation of the Scheme Creditors' rights under the Scheme, each Scheme Creditor will have its interest coupon temporarily converted to PIK Interest and will provide the Additional Waivers on the same terms as each other Scheme Creditor.  In exchange, all Scheme Creditors will be entitled to receive the Second Lien Deferral Fee upon the Scheme becoming effective.

(c)     The Company is aware that certain of the Second Lien Notes are held by the Shareholder and also by members of the Shareholder's family, directly or indirectly, all of whom are also shareholders in the Company.  The Company does not consider that, in principle, the crossholding of Second Lien Notes and an equity interest raises any class issues.

(d)     The Company understands that, further to the Shareholder Notes being exchanged for Shareholder PIK Notes and cancelled pursuant to the arrangements described in Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement, the only Second Lien Notes the Shareholder currently holds are in circa £18,000,000 of Second Lien Notes which are held by the Hargreaves family (including circa £12,000,000 held directly by the Shareholder), which will be subject to the Scheme.  The Holders of these Second Lien Notes will vote as Scheme Creditors.  Further to the analysis in sub-paragraph 3.2(b) above, the Company takes the view that there is no difference in rights against the Company, or, if relevant, any material difference in any rights or interests, that makes it impossible or inappropriate for the Hargreaves family to consult with all other Holders with respect to the Scheme:

(i)      first, as the provision of the CLBILS Facilities and the Additional Notes to the Company was not dependent on the Scheme being sanctioned, it cannot be said that the Hargreaves family are voting to defer cash interest on the Second Lien Notes in order to protect their equity interest. The Scheme is a condition subsequent mandated by the terms of the Additional Liquidity Arrangements; however, a failure to comply with that condition subsequent is not an event of default;

(ii)     secondly, the issue to be considered by the Scheme Creditors is, essentially, whether the temporary deferral of cash interest (and the substitution of PIK Interest in the meantime) is in their interests in all

the circumstances, in particular, in the light of (i) the Second Lien Deferral Fee offered in exchange; and (ii) the commercial benefits to the Company (and so in respect of the covenant owed to them). The fact that certain members of that class might potentially benefit in the longer-term from a future return on equity, which at this time is uncertain, is too remote a benefit to affect the assessment of that issue in a substantial way; and

(iii)    thirdly, if the Scheme is not sanctioned and the Company should enter into a formal insolvency proceeding, both the Holders and those with an interest in the Company's shares will likely receive a nil return on those investments. In seeking to avoid that potential outcome by supporting a deferral of cash interest, the interests of the Holders and the interests of those interested in the Company's shares are aligned. There is no adverse interest on the part of the holders of equity in the Company that warrants those holders being placed in a separate class, or of having their votes disregarded or discounted.

(e)    Further to the above potential class issues, the Company is aware that one of the Scheme Creditors (who, for the avoidance of doubt, is unconnected to the Shareholder) is also a holder of First Lien Notes. This Scheme Creditor (i) participated in the Additional Notes, (ii) is bound to support the Scheme, (iii) received an underwriting fee of 5 per cent. to compensate it for the provision of the Additional Notes (which, the Company was advised by its financial advisers, was in line with market practice) but not, for the avoidance of doubt, any fee in connection with the Scheme save for the Second Lien Deferral Fee, and (iv) had the fees of its advisers met by the Company in respect of the negotiation and documentation of the arrangements for the provision of the Additional Notes. The provision of the Additional Notes occurred prior to and is not dependent on the Scheme being sanctioned. As such, the Company has been advised and believes that the Scheme Creditor is not required to be placed in a separate class from those Scheme Creditors that are not participating in the Additional Liquidity Arrangements (other than the Scheme) and are not therefore entitled to the relevant arrangement fees or reimbursement of adviser fees. In addition, the Company has been advised and believes that no class issues arise as a result of any Scheme Creditor entering into the Lock-Up Agreement, particularly as no fee or other compensation arrangement exists in respect of the Scheme Creditor's provision of this undertaking to support the Scheme.

(f)    In addition, the Company is aware that the Shareholder acceded to the Lock-Up Agreement with respect to the Second Lien Notes held directly by him (as referred to in sub-paragraph (d) above), meaning that the Shareholder is bound to vote in favour of the Scheme. For the reasons stated in sub-paragraph (e) above, the Company has been advised and believes that no class issues arise as a result of the Shareholder entering into the Lock-Up Agreement.

(g)    Finally, the Company is aware that certain creditors of the Group may hold credit default protection instruments (**"CDS"**) in relation to the Company and

its indebtedness, which may become payable in connection with steps taken relating to the proposal by the Company of a Scheme.  The Company is not aware of whether any Scheme Creditors themselves hold CDS.  The Company is not itself party to any CDS arrangements and cannot compel Scheme Creditors to disclose financial information, in particular, as regards positions that may have been acquired in the market as a hedge against the performance of the Company.  The holding of CDS should not however impact on the composition of voting classes.

4.      As set out above, the Company proposes the Scheme Creditors fall into one class. Accordingly, it is proposed that one meeting be convened for the purposes of considering and, if the Scheme Creditors think fit, approving the Scheme.

5.      **Scheme Meeting – Process**

5.1     For the Scheme to become effective and binding on all Scheme Creditors, the Scheme must be approved by a majority in number representing 75 per cent. in value or more of the Scheme Creditors present and voting at the Scheme Meeting (in person or by proxy) in each class.

5.2     The Scheme must then be sanctioned by the Court and, in accordance with the terms and conditions contained in the Scheme Document, office copies of the Scheme Sanction Order must be delivered to the Registrar of Companies.

5.3     It is currently expected that the office copies of the Scheme Sanction Order will be delivered to the Registrar of Companies for registration on or around the date of the Sanction Hearing Date.

6.      **Scheme Meeting - Voting**

6.1     Scheme Creditors should refer to the detailed instructions in relation to voting at the Scheme Meeting in Appendix A (*Instructions to Scheme Creditors*) of this Explanatory Statement.

6.2     Each Account Holder must: (i) ensure that the relevant Second Lien Notes (as applicable) are blocked in their account by no later than the Custody Instruction Deadline, being **5:00p.m.** (London time) on **15 July 2020**; and (ii) complete and deliver the Account Holder Letter to the Information Agent by the Voting Instruction Deadline, being **5:00p.m.** (London time) on **16 July 2020** in order to vote at the Scheme Meeting. Holders may vote at the Scheme Meeting either in person or by proxy.

6.3     If a valid Account Holder Letter has not been submitted on behalf of a Holder for the purposes of voting to the Information Agent before the Voting Instruction Deadline, subject only to the discretion of the Chairperson, that Holder will not be entitled to vote at the Scheme Meeting.

7.      **Court sanction of the Scheme**

7.1     Before the Scheme can become effective and binding on the Company and the Scheme Creditors, the Court must sanction the Scheme at the Scheme Sanction Hearing.  The

Scheme Sanction Hearing will take place if the requisite statutory majorities of the Scheme Creditors have approved the Scheme at the Scheme Meeting.  The Company expects that the Scheme Sanction Hearing will take place on or about 27 July 2020**.**

7.2    The Company may, at the Scheme Sanction Hearing, consent on behalf of the Scheme Creditors to any modification of the Scheme, the Scheme Document and the Second Lien Amendments Documents that the Court may think fit to approve or impose for the purpose of implementing and/or consummating the Scheme.  However, if such modifications could reasonably be expected directly or indirectly to have a material adverse effect on the rights of one or more of the Scheme Creditors as Scheme Creditors then the Company may not give such consent without the prior written consent of the relevant Scheme Creditor(s).

## 8.    Occurrence of the Scheme Effective Date

8.1    Pursuant to the Scheme, following the delivery of an office copy of the Scheme Sanction Order for registration to the Registrar of Companies in England and Wales, within the meaning of the Companies Act, the Scheme Effective Date will occur.  The Company shall issue the Scheme Effective Date Notice confirming that the Scheme Effective Date has occurred via the Information Agent.

8.2    On and from the Scheme Effective Time and notwithstanding any term of any relevant document, each Scheme Creditor will appoint the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any duly authorised representative) to enter into the Second Lien Amendments Documents as set out in Part 7 (*Second Lien Amendments Documents*) of this Explanatory Statement.

## 9.    Effect of the Scheme

9.1    The effect of the Scheme is summarised here but is more particularly set out in the Second Lien Amendments Documents referred to in Part 7 (*Second Lien Amendments Documents*) of this Explanatory Statement.

9.2    The Scheme will:

(a)    from the Scheme Effective Date, grant authority to the Company to execute on behalf of the Scheme Creditors the Second Lien Amendments Documents, including:

(i)    the Trustee Instruction Letter, instructing the Trustee to, among other things:

(A)    enter into the Second Lien Supplemental Indenture;

(B)    enter into the Intercreditor Agreement Side Letter;

(C)    amend the Global Notes to reflect the Second Lien Amendments;

(D)    carry out all other legally permitted steps within its control including, without limitation, executing any documents,

undertakings, and/or notices, and providing any directions or instructions reasonably necessary in order to implement the Scheme, and

(ii)    the Security Agent Instruction Letter, instructing the Security Agent to, among other things:

(A)    enter into the Second Lien Supplemental Indenture;

(B)    enter into the Intercreditor Agreement Side Letter;

(C)    enter into the Deed of Release; and

(D)    carry out all other legally permitted steps within its control including, without limitation, executing any documents, undertakings, and/or notices, and providing any directions or instructions reasonably necessary in order to implement the Scheme;

(b)    from the Second Lien Amendments Effective Date, and in accordance with the terms of the Second Lien Supplemental Indenture and the Intercreditor Agreement Side Letter (as applicable) the effect of the Second Lien Amendments Documents is to:

(i)    convert the interest coupon to be paid on the Second Lien Notes to PIK Interest, such that interest will be payable as PIK Interest provided that cash interest will become payable again (instead of PIK interest) if, and only if, as of the seventh calendar day immediately prior to the start of the applicable interest period the consolidated cash of the Group is at least £50,000,000 provided that: (A) the Additional Notes have been redeemed in full; (B) the amounts outstanding across the RCF Facilities have been reduced to £12,000,000 or less of ancillary facilities; and (C) the total commitments under the RCF Facilities do not exceed £50,000,000 in aggregate. This amendment will apply to interest payable under the Second Lien Notes on an Interest Payment Date (under and as defined in Second Lien Notes Indenture) falling on or after the Second Lien Amendment Effective Date;

(ii)    irrevocably and unconditionally grant the Additional Waivers; and

(iii)    amend the Global Notes to reflect the amendments described in paragraph 9.2(a) above,

(c)    entitle all Scheme Creditors, whether they have participated in the Scheme or not, to receive within two Business Days of the Second Lien Amendments Effective Date, the Second Lien Deferral Fee.

## 10.    Undertakings

10.1    The Company has sought and received undertakings from certain parties required to take certain steps to implement the Scheme. The undertakings will (among other

things) demonstrate that such third parties have undertaken to the Court and the Company to be bound by and comply with the obligations expressed to apply to them under the Scheme and do or procure to be done all such acts and things as may be necessary or desirable to implement and/or consummate the Scheme.

*Trustee*

10.2    The Trustee has agreed to enter into an undertaking, pursuant to which it has agreed to be bound by and to perform the obligations under the Scheme and not to vote or submit a vote in respect of the Scheme.

*Second Lien Notes Guarantors*

10.3    The Second Lien Notes Guarantors have each agreed to enter into an undertaking, pursuant to which each has agreed to be bound by and to perform the obligations under the Scheme applicable to it.

*Security Agent under the Intercreditor Agreement*

10.4    The Security Agent (under and as defined in the Intercreditor Agreement) has agreed to enter into an undertaking, pursuant to which it has agreed to be bound by and to perform the obligations under the Scheme applicable to it.

11.    **Whose Rights will be Altered by the Scheme?**

11.1    Subject to paragraph 11.2 below, the Scheme will affect the rights of the Company and the Scheme Creditors only in respect of their Scheme Claims.

11.2    The Scheme will affect the claims of Holders, including any accrued but unpaid interest in respect of the Second Lien Notes, other than those which arise as a result of failure to comply with the terms of the Scheme.

12.    **Scheme jurisdiction**

12.1    The Company considers that the Court has domestic jurisdiction under English law to sanction the Scheme because the Company is incorporated and registered in England and Wales.

12.2    Further, no rule of trans-national law, including in Regulation (EU) No. 1215/2012 on Jurisdiction and Recognition and Enforcement of Judgments in Civil and Commercial Matters ("**Brussels (Recast) Regulations**"), excludes that jurisdiction.  In particular, if the Brussels (Recast) Regulations applies in relation to the Scheme, the Court would have jurisdiction under the Brussels (Recast) Regulations because a number of Scheme Creditors (holding Second Lien Notes) are domiciled in England and Wales and are subject to the personal jurisdiction of the Court by virtue of having their head office, central administration, or principal place of business in the jurisdiction of the Court.

13.    **Recognition in the US**

13.1    As the Second Lien Notes are governed by New York law and certain of the Scheme Creditors are expected to be US persons, the Company will seek recognition ("**Chapter**

**15 Recognition**") under Chapter 15 of the US Bankruptcy Code (the "**Chapter 15 Filing**").  In addition, to prevent adverse action by any US Scheme Creditor pending Chapter 15 Recognition, the Company will also seek provisional relief from the US Bankruptcy Court applying the stay under section 362 of the US Bankruptcy Code.  In order to help ensure enforcement in the US and to give effect to the Scheme (if approved by the requisite majority of Scheme Creditors and sanctioned by the Court) in the US, the Company has resolved to seek Chapter 15 Recognition and appoint Stephen Hill, director and Chief Financial Officer of the Company as its foreign representative and to commence and pursue the Chapter 15 Filing with the US Bankruptcy Court immediately following the Second Lien Effective Date.  The Company is advised that the Scheme is likely to be recognised by the US Court as a foreign main proceeding.

13.2    Chapter 15 of the US Bankruptcy Code is designed to give judicial access to a foreign debtor (or representative thereof) to, among other things, protect the foreign debtor's US assets and authorise the foreign debtor or its representative to administer the foreign debtor's US assets.  Chapter 15 is predicated on principles of comity and the fair and efficient administration of cross-border insolvencies.  Chapter 15 functions through "recognition" of a foreign proceeding.

13.3    If the US Bankruptcy Court recognises the Scheme as a foreign "main" proceeding of the Company, the stay of actions and selected other provisions of the US Bankruptcy Code automatically take effect within the US.  If the US Bankruptcy Court recognises the Scheme as a foreign "non-main" proceeding of the Company, the US Bankruptcy Court must be petitioned for further relief.  Once a foreign proceeding is "recognised" under Chapter 15, foreign judgments generally will be enforced unless "manifestly contrary to the public policy of the US", which is a very demanding standard to meet.

13.4    The Company, through its foreign representative, will request that the US Bankruptcy Court hold a recognition hearing as soon as possible after the Second Lien Amendments Effective Date.  The granting of Chapter 15 Recognition is not a condition to the effectiveness of the Scheme or the Second Lien Amendments.

13.5    Notice of the Chapter 15 Filing and the relevant dates will be served upon all interested parties including the following:

(a)    the Company;

(b)    the Trustee;

(c)    Kirkland & Ellis International LLP as counsel to certain of the holders of the Additional Notes;

(d)    all persons or bodies authorised to administer the Scheme proceedings;

(e)    all parties required to be given notice under the US Bankruptcy Rules;

(f)    the Information Agent; and

(g)    such other parties with an interest in the relevant proceedings that have timely requested notice pursuant to the US Bankruptcy Rules.

13.6    Additionally, the Company will publish notice of the Chapter 15 Filing on the Scheme
Website.

**PART 7**
**SECOND LIEN AMENDMENTS DOCUMENTS**

The following is a summary of the key agreements that will implement aspects of the Scheme.

1.1    **Trustee Instruction Letter**

An instruction letter to the Trustee to:

(a)    enter into the Second Lien Supplemental Indenture in substantially the form set out in Appendix D of this Explanatory Statement;

(b)    enter into the Intercreditor Agreement Side Letter, in substantially the form set out in Appendix E of this Explanatory Statement;

(c)    amend the Global Notes to reflect the changes made pursuant to the Second Lien Supplemental Indenture; and

(d)    carry out all other legally permitted steps within its control including, without limitation, executing any documents, undertakings, and/or notices, and providing any directions or instructions reasonably necessary in order to implement the Scheme.

1.2    **Security Agent Instruction Letter**

An instruction letter to the Security Agent to:

(a)    enter into the Second Lien Supplemental Indenture in substantially the form set out in Appendix D of this Explanatory Statement;

(b)    enter into the Intercreditor Agreement Side Letter, in substantially the form set out in Appendix E of this Explanatory Statement;

(c)    enter into the Deed of Release, in substantially the form set out in Appendix F (*Deed of Release*) of this Explanatory Statement; and

(d)    carry out all other legally permitted steps within their control including, without limitation, executing any documents, undertakings, and/or notices, and providing any directions or instructions reasonably necessary in order to implement the Scheme.

1.3    **Second Lien Supplemental Indenture**

A supplemental indenture to the Second Lien Notes Indenture to be entered into by various parties, including the Company, the Guarantors, the Additional Guarantors, the Scheme Creditors (executed by the Company on their behalf pursuant to the Scheme), the Trustee, and the Security Agent, in substantially the form set out in Appendix D of this Explanatory Statement.  The Second Lien Supplemental Indenture will:

(a)    convert the interest coupon to be paid on the Second Lien Notes to PIK Interest, such that interest will be payable as PIK Interest provided that cash interest will

become payable again (instead of PIK interest) if, and only if, as of the seventh calendar day immediately prior to the start of the applicable interest period the consolidated cash of the Group is at least £50,000,000 provided that: (A) the Additional Notes have been redeemed in full; (B) the amounts outstanding across the RCF Facilities have been reduced to £12,000,000 or less of ancillary facilities; and (C) the total commitments under the RCF Facilities do not exceed £50,000,000 in aggregate.  This amendment will apply to interest payable under the Second Lien Notes on an Interest Payment Date (under and as defined in Second Lien Notes Indenture) falling on or after the Second Lien Amendment Effective Date;

(b)     irrevocably and unconditionally waive any defaults, events of default, or acceleration under the Second Lien Notes Indenture and the Second Lien Notes or any insolvency event under the Existing Intercreditor Agreement which arise as a result of any steps taken in respect of the Additional Liquidity Arrangements (including without limitation any steps taken in respect of the Scheme and the Chapter 15 Filing); and

(c)     entitle all Scheme Creditors to receive, within two Business Days of the Second Lien Amendments Effective Date, the Second Lien Deferral Fee.

## 1.4    Intercreditor Agreement Side Letter

A side letter to the Intercreditor Agreement to waive any standstill period, consultation period, or notice period required in respect of any enforcement of the Shareholder Credit Security, in substantially the form set out in Appendix E of this Explanatory Statement.  The Intercreditor Agreement Side Letter will:

(a)     irrevocably and unconditionally waive any defaults, events of default, or acceleration under the Second Lien Notes Indenture and the Second Lien Notes or any insolvency event under the Existing Intercreditor Agreement which arise as a result of any steps taken in respect of the Additional Liquidity Arrangements (including without limitation any steps taken in respect of the Scheme and the Chapter 15 Filing); and

(b)     irrevocably and unconditionally waive any standstill period, consultation period, or notice period and the provision of any enforcement proposal (in each case as required under the terms of the Intercreditor Agreement), to give equivalent instructions and not to challenge any enforcement by the lenders under the Amended RCF Agreement (or assert that any such enforcement is inconsistent with the security enforcement principles stipulated in the Intercreditor Agreement) in respect of any enforcement of the rights arising under or in respect of the Shareholder Credit Support.

## 1.5    Deed of Release

A deed of release between, among others, the Company, the Scheme Creditors, and the Security Agent (the "**Deed of Release**"), which gives effect to the releases set out in 10.2(b) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement, substantially in the form

appended to Appendix F (*Deed of Release*) of this Explanatory Statement, subject to any amendments made in accordance with the terms of the Scheme Document.

1.6    **Amended Global Notes**

Amended Global Notes to reflect the amendments set out in paragraph 1.2 above.

## PART 8
## FINANCIAL INFORMATION

1.      This Part 8 (*Financial Information*) sets out certain financial information for the Group and the Company.  The Group prepares its financial statements in accordance with IFRS.

2.      This Part 8 (*Financial Information*) sets out the most recent annual audited consolidated financial information for the Group and/or the Company, including an audited income statement, a consolidated balance sheet, and an audited statement of cash flows, each as at or for the financial year ended 23 February 2019, as appropriate.  The Group's full year consolidated financial statements for year ended 23 February 2019 were signed off by KPMG LLP on 14 May 2019.

3.      Full versions of the full year consolidated financial statements for year ended 23 February 2019 (and for prior years) can be found at https://www.matalan.co.uk/corporate/corporate-publications.

4.      In addition, as disclosed in the Third Covid-19 Statement, the full year consolidated financial statements for year ended February 2020 are in the process of being revised based on year-end closing procedures and external audit, and are expected to be published at the website referred to in paragraph 3 above at the end of June 2020.

**Consolidated income statement for the Group and Company**

**For year ended 23 February 2019**

**(audited)**

| | Note | Group 52 weeks ended 23 February 2019 £'m | Group 52 weeks ended 24 February 2018 £'m | Company 52 weeks ended 23 February 2019 £'m | Company 52 weeks ended 24 February 2018 £'m |
|---|---|---|---|---|---|
| Revenue | 4 | 1,103.9 | 1,063.0 | - | - |
| Cost of sales | 4 | (975.5) | (927.0) | - | - |
| **Gross profit** | 4 | **128.4** | 136.0 | - | - |
| Administrative expenses (including exceptional items) | 4 | (61.0) | (63.9) | - | - |
| **Operating profit (including exceptional items)** | 4 | **67.4** | 72.1 | - | - |
| Operating profit (pre exceptional items) | | **68.9** | 73.9 | - | - |
| Exceptional items - administrative expenses | 29 | (1.5) | (1.8) | - | - |
| **Operating profit** | | **67.4** | 72.1 | - | - |
| Finance costs | 5 | (38.0) | (37.8) | - | - |
| Finance income | 5 | 0.7 | 0.5 | - | - |
| Exceptional finance expense | 5, 29 | - | (14.8) | - | - |
| **Net finance costs** | | **(37.3)** | (52.1) | - | - |
| **Profit before income tax and exceptional items** | 9 | **31.6** | 36.6 | - | - |
| **Total exceptional items** | | **(1.5)** | (16.6) | - | - |
| **Profit before income tax** | | **30.1** | 20.0 | - | - |
| Income tax expense | 10 | (6.6) | (5.2) | | - |
| **Profit for the period** | | **23.5** | 14.8 | - | - |
| **Attributable to:** | | | | | |
| Equity holders of the parent | | **23.5** | 14.9 | | |
| Non controlling interest | | - | (0.1) | | |
| **Profit for the period** | | **23.5** | 14.8 | | |

## Consolidated balance sheet for the Group and Company

## For year ended 23 February 2019

## (audited)

| | Note | Group 2019 £'m | Group 2018 £'m | Company 2019 £'m | Company 2018 £'m |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Property, plant and equipment | 11 | 217.7 | 207.8 | - | - |
| Intangible assets | 12 | 40.5 | 32.0 | - | - |
| Investments | 13 | - | - | 458.2 | 458.8 |
| Deferred tax asset | 10 | - | 6.2 | - | - |
| Financial assets - derivative financial instruments | 20 | 3.6 | 0.2 | - | - |
| **Total non-current assets** | | 261.8 | 246.2 | 458.2 | 458.8 |
| | | | | | |
| Inventories - goods for resale | 14 | 133.9 | 119.7 | - | - |
| Trade and other receivables | 15 | 29.7 | 29.6 | 30.1 | 30.1 |
| Financial assets - derivative financial instruments | 20 | 5.6 | 2.4 | - | - |
| Cash and cash equivalents | 16 | 72.5 | 62.2 | - | - |
| **Total current assets** | | 241.7 | 213.9 | 30.1 | 30.1 |
| | | | | | |
| **Total assets** | | 503.5 | 460.1 | 488.3 | 488.9 |
| | | | | | |
| **Liabilities** | | | | | |
| Financial liabilities – derivative financial instruments | 20 | (1.4) | (25.4) | - | - |
| Trade and other payables | 18 | (174.3) | (154.9) | (60.3) | (60.3) |
| Current income tax liabilities | | (2.7) | (2.5) | - | - |
| Provisions for other liabilities and charges | 21 | (0.5) | (0.5) | - | - |
| **Total current liabilities** | | (178.9) | (183.3) | (60.3) | (60.3) |
| | | | | | |
| Financial liabilities – borrowings | 17 | (475.0) | (473.9) | - | - |
| Financial liabilities – derivative financial instruments | 20 | (0.4) | (22.0) | - | - |
| Trade and other payables | 19 | (41.1) | (40.9) | - | - |
| Deferred income tax liabilities | 10 | (4.6) | - | - | - |
| Provisions for other liabilities and charges | 21 | (0.7) | (1.2) | - | - |
| **Total non-current liabilities** | | (521.8) | (538.0) | - | - |
| | | | | | |
| **Total liabilities** | | (700.7) | (721.3) | (60.3) | (60.3) |
| | | | | | |
| **Net (liabilities)/ assets** | | (197.2) | (261.2) | 428.0 | 428.6 |
| | | | | | |
| **Shareholders' (deficit)/ equity** | | | | | |
| Share capital | 22 | 17.3 | 17.3 | 17.3 | 17.3 |
| Share premium | | 385.6 | 385.6 | 385.6 | 385.6 |
| Hedge reserve | | 5.1 | (36.0) | - | - |
| Merger reserve | | (774.3) | (774.3) | - | - |
| Warrant reserve | | 3.1 | 3.1 | - | - |
| Capital redemption reserve | | 5.7 | 5.7 | 4.6 | 4.6 |
| Retained earnings | | 160.3 | 137.4 | 20.5 | 21.1 |
| **Total shareholders' (deficit)/ equity** | | (197.2) | (261.2) | 428.0 | 428.6 |

# Consolidated statement of cash flows for the Group

## For year ended 23 February 2019

## (audited)

| | Note | Group 2019 £'m | 2018 £'m |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Cash generated from operations | 23 | **103.7** | 121.2 |
| Interest paid | | **(37.2)** | (43.6) |
| Tax paid | | **(5.4)** | (4.5) |
| **Net cash generated from operating activities** | | **61.1** | 73.1 |
| **Cash flows from investing activities** | | | |
| Purchases of property, plant and equipment | | **(33.8)** | (62.5) |
| Purchases of intangible assets | | **(17.7)** | (10.4) |
| Purchase of shares in investment | | **-** | (0.4) |
| Interest received | | **0.7** | 0.5 |
| **Net cash used in investing activities** | | **(50.8)** | (72.8) |
| **Cash flows from financing activities** | | | |
| Bonds redeemed | | **-** | (480.0) |
| Early redemption charge | | **-** | (12.0) |
| Bonds issued – capital | | **-** | 480.0 |
| Bonds issued – costs | | **-** | (7.2) |
| Bonds repurchased | | **-** | - |
| **Net cash used in financing activities** | | **-** | (19.2) |
| Net increase/(decrease) in cash and cash equivalents | | **10.3** | (18.9) |
| Cash and cash equivalents at the beginning of the period | | **62.2** | 81.1 |
| **Cash and cash equivalents at the end of the period** | 16 | **72.5** | 62.2 |

## PART 9
## BOARD OF THE COMPANY

1.    **DUTIES, APPOINTMENT AND DISMISSAL**

**Duties and tasks of the Board**

1.1    The Board is responsible for the management of the business of the Company, which is generally understood to imply the day-to-day management of the Company and the exercise of all powers within its corporate purposes, except for those expressly attributed to either the shareholders by statute or its articles of association.

**Appointment and dismissal of directors**

1.2    Directors of the Company may be appointed by ordinary resolution of shareholders or by a decision of the Board of the Company.

1.3    A director of the Company ceases to be a director as soon as:

(a)    that person ceases to be a director by virtue of any provision of the Companies Act 2006 or is prohibited from being a director by law;

(b)    a bankruptcy order is made against that person;

(c)    a composition is made with that person's creditors generally in satisfaction of that person's debts;

(d)    a registered medical practitioner who is treating that person gives a written opinion to the Company stating that that person has become physically or mentally incapable of acting as a director and may remain so for more than three months;

(e)    by reason of that person's mental health, a court makes an order which wholly or partly prevents that person from personally exercising any powers or rights which that person would otherwise have; or

(f)    notification is received by the Company from the director that the director is resigning from office as director, and such resignation has taken effect m accordance with its terms.

**Decision making process**

1.4    Resolutions of the Board are adopted by a majority of votes of directors participating. Each director may cast one vote.  The chair of the Board or a director appointed to chair a board meeting has a casting vote in the event of a deadlock of the Board.

**Board**

1.5    As at the date of this Explanatory Statement, the members of the Board are domiciled in the UK, and are:

| Name | Board Position | Date of appointment |
|---|---|---|
| John Jason Hargreaves | Managing Director | 8 January 2014 |
| Stephen Mark Hill | Finance Director | 29 July 2013 |
| John Nicholas Mills | Company Director | 10 October 2006 |
| Gregory Vincent Pateras | Company Director | 7 August 2017 |
| William George Lodder | Secretary | 25 April 2013 |

1.6    The business address of the directors of the Company is Matalan Head Office Perimeter Road, Knowsley Industrial Park, Liverpool, L33 7SZ, England.

1.7    As recently reported in the press, John Nicholas Mills will retire as chairperson and director of the Company (and the Group). A recruitment process has been undertaken and the Company anticipates announcing a replacement shortly, following which John Nicholas Mills will step down from his Group and Company appointments, potentially after an agreed handover period. The Group is in the process of also considering potential additional appointments to the Board, the details of which shall be made publicly available if relevant and as and when appropriate. Relevant updates to Company and Group board compositions will be published on the Company's website at https://www.matalan.co.uk/corporate/corporate-publications and through regulatory disclosures in the usual way.

**Material Interests**

1.8    Section 897(2) of the Companies Act requires that this Explanatory Statement disclose:

(a)    any material interest of the directors of the Company (whether as directors or as members or as creditors of the Group companies); and

(b)    the effect on those interests of the compromise or arrangement, insofar as it is different from the effect on the like interests of other persons.

1.9    The Board is aware that John Jason Hargreaves is a shareholder of the Parent, holding 2.6 per cent. of the outstanding ordinary A shares of the Parent. John Jason Hargreaves holds £200,000 aggregate principle amount in the Second Lien Notes. Moreover, John Jason Hargreaves is related to two shareholders in the Parent: the Shareholder, who owns 47.78 per cent. of the outstanding ordinary A shares of the Parent (and who has entered into the Shareholder Equity Commitment to subscribe to further equity in the Parent as described in paragraph 6.2 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement), and Jamey Hargreaves, who also holds 2.54 per cent. of the outstanding

ordinary A shares of the Parent. The Shareholder also holds the Shareholder PIK Notes which are not subject to the Scheme, and approximately £12,000,000 of the Second Lien Notes. Jamey Hargreaves does not hold any Second Lien Notes.

1.10    As a result of the interests set out in paragraph 1.9, John Jason Hargreaves has recused himself from voting in any discussions or decisions in relation to the Scheme and the Alternative Liquidity Arrangements.

1.11    The Board is aware that John Nicholas Mills is also a shareholder of the Parent, holding outstanding ordinary B shares of the Parent amounting to less than 0.001 per cent. of the Parent's issued share capital. The Board understands that these outstanding ordinary B shares were issued to John Nicholas Mills as a management incentive. These outstanding ordinary B shares are subject to very restrictive transfer rights, and cannot be transferred without the ordinary B shareholder ceasing to be a director/employee of the Parent or tag along or drag along rights being exercised. Further, the Board understands that no dividends have been paid to ordinary B shareholders for the past decade. On this basis, the Board does not regard the holding of ordinary B shares in the Parent as giving rise to any conflict of interest in relation to the matters which are the subject of the Scheme and the Alternative Liquidity Arrangements. On that basis, John Nicholas Mills has not recused himself from voting in any discussions or decisions in relation to the Scheme and the Alternative Liquidity Arrangements.

1.12    Apart from the interests disclosed in paragraphs 1.9 and 1.11 above, to the best of the Company's knowledge, none of its directors have any interest, direct or indirect, in the Scheme and the Scheme will have no effect on the interests of those directors.

1.13    No other non-monetary benefits are established in favour of the directors of the Company. The directors of the Company have the benefit of existing directors' and officers' liability insurance.

1.14    None of the directors of the Company has or has had any interest in any transaction which is or was unusual in its nature or conditions or significant to the business which was effected by the Group during the current or immediately preceding financial year, or which was effected during an earlier financial year and remains in any respect outstanding or underperformed.

## PART 10
## ADDITIONAL INFORMATION

**Documents Available For Inspection**

Copies of the following documents may be inspected free of charge on the Scheme Website:

(a)     the full versions of the full year consolidated financial statements for year ended February 2019;

(b)     the Practice Statement Letter;

(c)     the Lock-Up Agreement;

(d)     this Explanatory Statement; and

(e)     documents relating to the Chapter 15 Filing, which will be uploaded to the Scheme Website at the appropriate time.

<div align="center">

**PART 11**
**RISK FACTORS**

</div>

1.      **RISKS RELATING TO THE ADDITIONAL LIQUIDITY ARRANGEMENTS**

1.1     Scheme Creditors are urged to evaluate carefully all information included in this Explanatory Statement, consult with their own legal, financial and tax advisers and make their own decision about whether to participate in/continue their support of the Additional Liquidity Arrangements.

1.2     A non-exhaustive list of risks related to the implementation of the Additional Liquidity Arrangements is set out below.

**Adverse publicity**

1.3     Adverse publicity relating to the Additional Liquidity Arrangements or the financial condition of the Group or of other participants in the market(s) in which it operates may have a detrimental effect on the Group's customer and supplier relationships (including financial and insurance institutions) and/or the market perception of its business.

1.4     Existing suppliers may choose not to do business with the Group, may demand quicker payment terms and / or may not extend normal trade credit. To the extent existing suppliers, choose not to continue to do business with the Group or to limit their trading with the Group, it may find it difficult to obtain new or alternative suppliers. Ongoing negative publicity may have a long-term negative effect on the brand names owned or used in the Group.

**Jurisdictional considerations**

1.5     The Parent is organised under the laws of Guernsey although the Company and other key subsidiaries are organised under the laws of England and Wales. Moreover, the Group's suppliers are located in a number of jurisdictions, and overseas franchise stores are located in the United Arab Emirates, Bahrain, Qatar, Saudi Arabia, Jordan, Oman, Egypt, Malta, Gibraltar, and Georgia. In the event that a member of the Group faces financial difficulty, creditors will most likely be subject to the insolvency laws of that member's jurisdiction of incorporation (i.e. England and Wales or Guernsey). Laws in other jurisdictions may permit third parties to commence contractual, insolvency, or similar proceedings notwithstanding the fact that a member of the Group is not organised in those jurisdictions.

1.6     Scheme Creditors should seek independent legal advice in the relevant jurisdiction when entering into financing arrangements with any member of the Group, in particular with regard to the impact of local law on their rights as creditors.

**Effectiveness of the Scheme requires the approval of Scheme Creditors.**

1.7     In order for the Scheme to be approved by Scheme Creditors, a majority in number representing not less than 75 per cent. in value of those Scheme Creditors who vote at the Scheme Meeting must vote in favour of the Scheme. If the requisite majorities of Scheme Creditors do not vote in favour of the Scheme at the Scheme Meeting, the

Scheme will be withdrawn and the Group will face additional cash requirements as early as 31 July 2020 when the cash coupon on the Second Lien Notes becomes due and payable and at a time when it has already taken extensive measures to reduce its cash outflow. See the section titled "*If the Second Lien Amendments do not occur or are materially delayed, the Group may face additional cash requirements*" beginning at paragraph 1.16 below.

1.8    Although the Participating Second Lien Noteholders have given an undertaking to vote in favour of the Scheme, such undertaking may cease to be binding in the circumstances set out under the terms of the Lock-Up Agreement.

**The Scheme Meeting may not be completed on the timeline envisaged in this Explanatory Statement.**

1.9    Factors unknown to the Group at the date of this document may result in delays to the completion of the Second Lien Amendments.

**Even if the Scheme Creditors approve the Scheme, the Scheme may be objected to and may not be completed.**

1.10    Even if the Scheme is approved at the Scheme Meeting, it is possible for a person with an interest in the Scheme (whether a Scheme Creditor or otherwise) to object to the Scheme. They may attend or be represented at the Scheme Sanction Hearing in order to make representations that the Scheme should not be approved and to appeal against the granting of the Scheme Sanction Order. Therefore, it is possible that objections will be made at or before the Scheme Sanction Hearing or that an appeal will be made against the granting of the Scheme Sanction Order by the Court and that any such objections or appeal will delay or prevent the Second Lien Amendments.

**Effectiveness of the Scheme requires the sanction of the Court.**

1.11    In order for the Scheme to become effective under English law, it must receive the sanction of the Court and the Scheme Sanction Order must be lodged with the Registrar of Companies.

1.12    The Court will not sanction the Scheme unless it is satisfied that it has jurisdiction to do so, that the correct procedures have been followed, the proposed arrangements are fair and that there are no other reasons why the Scheme should not be approved. There can be no assurance as to the Court's decision in this regard.

1.13    If the Court does not approve the Scheme, or approves it subject to conditions or amendments which (i) the Group deems unacceptable or (ii) would have (directly or indirectly) a detrimental effect on the interests of any Scheme Creditors and such conditions or amendments are not approved by the Scheme Creditors, the Scheme will not become effective and the Second Lien Amendments may not be implemented.

**The Second Lien Amendments are subject to a limited number of conditions precedent and failure to fulfil any one of those conditions may result in the Second Lien Amendments not proceeding.**

1.14  Even if the Scheme is approved by the requisite majorities of Scheme Creditors and the Scheme Effective Date occurs, in order for the Second Lien Amendments to be implemented there are a limited number of other conditions that need to be fulfilled, such as execution of the Second Lien Amendments Documents and the provision of the conditions precedent required thereunder.

1.15  There is a risk that one or more of these steps may not be completed or satisfied, in which case the Second Lien Amendments will not occur.  If the Second Lien Amendments do not occur, the Group may face additional cash requirements as early as July 31 when the cash coupon on the Second Lien Notes becomes due and payable and at a time when it has already taken extensive measures to reduce its cash outflow. See the section titled "*If the Second Lien Amendments do not occur or are materially delayed, the Group may face additional cash requirements*" beginning at paragraph 1.16 below.

**If the Second Lien Amendments do not occur or are materially delayed, the Group may face additional cash requirements.**

1.16  While the Additional Liquidity Providers have been supportive of the Group and have allowed the Scheme to go ahead as a condition subsequent to funding, this does not mean that the outcome of the Scheme has no consequence for the Company or the Additional Liquidity Providers.

1.17  As conditions to the provision of the Additional Liquidity Arrangements and to the Existing RCF Lenders agreeing permanently to waive existing potential defaults or events of default which have arisen as a result of the Covid-19 pandemic, the Existing RCF Lenders and the Additional Liquidity Providers have required that the Company takes certain measures to improve the Company's cash position in the short to medium term which include:

(a)      the HQ Sale and Leaseback;

(b)      the exchange of the Shareholder Notes for Shareholder PIK Notes (saving £4.75m of cash interest per annum); and

(c)      the Second Lien Amendments, which will result in an annual cash interest saving of £7.6m per annum (including £3.8m due in July of this year) for the Company.

These requirements have been framed as a combination of conditions precedent, conditions subsequent and ongoing obligations but have all been expressed as having significant importance to the Existing RCF Lenders and the Additional Liquidity Providers.

1.18  The conditions set out in paragraph 1.17 above underpinned the respective credit approvals obtained for providing the CLBILS Facilities and the Additional Notes and for the Existing RCF Lenders agreeing permanently to waive existing potential defaults or events of default which have arisen as a result of the Covid-19 pandemic and are needed to address the challenging environment faced by the Group in light of the Covid-19 pandemic.  Importantly, the new liquidity package were also sized on the assumption

that the cash coupon on the Second Lien Notes would not be paid. In addition, the Group's intention to consummate the Scheme was communicated to holders of the First Lien Notes as part of the First Lien Consent Solicitation.

1.19    The Amended RCF Agreement includes restrictive covenants on actual and forecasted cashflow and is subject to minimum liquidity requirements, a breach of which is an event of default which could in circumstances where the RCF Facilities are not fully drawn, lead to a drawstop of the Amended RCF Agreement, so constraining liquidity. An acceleration of the RCF Facilities following an event of default in turn cross-default into the Additional Notes, the First Lien Notes and the Second Lien Notes, significantly de-stabilising the Group's capital structure and potentially exacerbating the liquidity conditions faced by the Group.

1.20    In the event that the Scheme is not sanctioned, the Group may face additional cash requirements as early as July 31 when the cash coupon on the Second Lien Notes becomes due and payable and at a time when it has already taken extensive measures to reduce its cash outflow. This will have the following impact:

(a)    **pressure on liquidity**: within the initial store reopening and recovery period the minimum liquidity level prescribed within the Amended RCF Agreement is necessarily tight. There is therefore little room within those liquidity thresholds for the payment of cash pay coupon to the Scheme Creditors whilst the CLBILS Facilities and Additional Notes are in place. Further, the Additional Liquidity Arrangements were sized on the basis that the cash coupon on the Second Lien Notes would not be paid;

(b)    **pressure on working capital**: in common with all retail businesses the Company needs to preserve working capital over the summer months in order to begin the restocking process for the critical Christmas trading period;

(c)    **reopening of senior creditor discussions**: in the event that the liquidity covenants in the Amended RCF Agreement are breached, the Additional Liquidity Providers and the Existing RCF Lenders may seek to impose additional requirements on the Group, including a requirement to seek more substantive amendments to the Second Lien Notes given the Second Lien Notes are currently trading at a significant discount to par. Any breach of the minimum liquidity covenant prescribed within the Amended RCF Agreement will constitute an event of default and could potentially result in events of default throughout the Group's capital structure; and

(d)    **additional cost cutting**: further cost reduction within the Group to protect short term liquidity but which could slow the longer term recovery of the business.

1.21    In conclusion, the outflow of cash interest to Scheme Creditors who may be considered to be "out of the money" is highly likely to cause additional financial stress for the Company at a time when accelerated recovery from the Covid-19 pandemic is its priority. Whilst the Company is confident that the business is in a very strong position to return to its pre-Covid-19 financial health in the short to medium term, there are a range of macro-economic, consumer spending and broader factors (such as any potential extensive second Covid-19 peak and associated additional lockdown period)

outside of the Company's control that will affect the recovery of the UK retail industry as a whole.  The Company has therefore been advised by its professional advisers that it requires the maximum flexibility possible to manage its cash during this uncertain recovery period.

**The Group's indebtedness may make it difficult for it to service the Group's debt and to operate the Group's business.**

1.22   Although the Additional Liquidity Arrangements are aimed at improving the Group's financial position and deleveraging the Group's capital structure, the Group has and will continue to have for the foreseeable future a significant amount of indebtedness.

1.23   The Group's substantial indebtedness and the restrictive terms of that indebtedness may have material negative consequences for Scheme Creditors, including:

(a)   making it more difficult for the Group to satisfy the Group's obligations with respect to the Group's debt;

(b)   requiring that a substantial portion of the cash flow from operations of the Group's operating subsidiaries be dedicated to debt service obligations, reducing the availability of cash flow to fund measures to aid in the Group's financial recovery through working capital and capital expenditures and for other general corporate purposes;

(c)   increasing the Group's vulnerability to continued or further economic downturns in its industry;

(d)   exposing the Group to interest rate increases;

(e)   placing the Group at a competitive disadvantage compared to its competitors that have less debt in relation to cash flow;

(f)   limiting the Group's flexibility in planning for or reacting to changes in the Group's business and its industry;

(g)   restricting the Group from pursuing strategic acquisitions or exploiting certain business opportunities; and

(h)   limiting, among other things, the Group's ability to borrow additional funds or raise equity capital in the future and increasing the costs of such additional financings.

2.   **RISKS RELATING TO THE GROUP'S BUSINESS**

**The Group's industry is highly competitive.**

2.1   The UK retail clothing and homeware industry is highly competitive, particularly with respect to merchandise selection and quality, store location and design, inventory, price, customer service, and advertising.  The Group competes with a wide variety of retailers of varying sizes, covering different product categories across all geographic markets in which it operates.  The Group's range of products is broader than most value apparel

retailers and in the Group's "Better" and "Best" products, the Group competes with general retailers and other clothing retailers.  In the Group's "Good" products, the Group competes with supermarkets that are able to offer lower prices through larger volumes. The Group also competes more generally with local independent retailers, catalogues and various online retailers.

2.2    Some of the Group's competitors may have greater financial resources, greater purchasing economies of scale and/or lower cost bases, any of which may give them a competitive advantage over the Group.  Many of the Group's competitors are also located in town centres or in primary retail parks which historically have had greater customer flow.

2.3    Actions taken by the Group's competitors, as well as actions taken by it to maintain the Group's competitiveness and reputation, have placed and will continue to place pressure on the Group's pricing strategy, margins, and profitability.

2.4    The Group's reward loyalty scheme enables the Group to maintain an extensive customer database that the Group uses as a key part of its marketing strategy.  If the Group's competitors were able to develop their own customer databases or loyalty programs on the same scale as the Group's, then the Group's competitive advantage may be eroded, and its business, results of operations, and financial condition may be adversely affected.

2.5    In addition, some of the Group's competitors were entitled to rely upon exceptions to the orders made by the UK authorities requiring the temporary closure of businesses to the public due to the Covid-19 pandemic, such as for food retailers.  Such competitors were able to open their stores at an earlier stage during the course of the UK lockdown and sell products from exempted stores which compete with the Group's products. Consequently, the Group is likely to have lost sales to these competitors and may have lost its market share.  Food retailers and other competitors may be able to rely on similar exceptions in the event that there are any further temporary store closures or lockdowns ordered by the UK Government authorities, to the Group's detriment.

2.6    Any one of these factors or a combination thereof could have a detrimental effect on the Group's business, results of operations and financial condition.

**Uncertainty surrounding the future relationship between the UK and the EU may be a source of instability in international markets, create significant currency fluctuations, and adversely impact current trading and supply arrangements, which could have a detrimental effect on the Group's business, financial condition and results of operations.**

2.7    The Group is based in, and operates principally within, the UK.  Pursuant to the terms of the withdrawal agreement between the UK and the European Council, there is now a transition period until 31 December 2020 during which the UK and EU will seek to negotiate future arrangements including matters relating to trade, travel, and business. During the transition period, the rules which existed prior to the UK's withdrawal from the EU regarding trade and travel between the UK and the EU continue to apply.

2.8     Depending on whether the EU and the UK agree any terms regarding future arrangements prior to the end of the transition period, the UK could lose its present rights or terms of access to the single EU market, EU customs area, and to the benefits of global trade deals with non-EU countries negotiated by the EU on behalf of its members.  New or modified trading arrangements (or a lack of any arrangement at all) between the UK and other countries may have a detrimental effect on the Group's business.  If the UK no longer has access to trade with countries where the Group sources its products under the terms of an EU trade agreement and is unable to negotiate an equivalent replacement agreement, the Group may be unable to continue sourcing its supplies from that country or may not be able to do so on terms that are as favourable as the current terms under which the Group transacts business with its suppliers. Moreover, if the UK experiences a decline in trade as a result of the disruption of current trading arrangements generally, such decline could also affect the attractiveness of the UK as a global investment centre and, as a result, could have a detrimental impact on the level of investment in UK companies, and ultimately on UK economic growth. Customer behaviour may change as a result of global economic uncertainty, which may cause the Group's customers to re-evaluate when and to what extent they are willing to spend on the Group's products and services.

2.9     In addition, the announcement of the UK's referendum result to exit the EU ("**Brexit**"), the subsequent uncertainty regarding the terms upon which the UK was to leave the EU, and negotiations with respect to the terms of any future relationship between the UK and the EU, all led to a significant weakening of the pound sterling against the US dollar, the euro and other major currencies.  As a majority of the Group's purchases from suppliers are denominated in US dollars, continued weakness of the pound sterling may continue to have a negative impact on the Group's results of operations.  See the section titled "*Currency fluctuations and hedging risks could adversely affect the Group's earnings and cash flow*" beginning at paragraph 2.12 below.

2.10    The additional impact, if any, of the uncertainty of the terms of the UK's future relationship with the EU on customer behaviour, labour availability in the UK, economic conditions, interest rates, exchange rates, availability of capital or other matters is unclear.  Examples of the further impact Brexit could have on the Group's business, financial condition or results of operations include:

    (a)     uncertainty as to the terms of the UK's future relationship with the EU in terms of the impact on the free movement of the Group's employees, goods, services, and capital;

    (b)     legal uncertainty and potentially divergent national laws and regulations as the UK determines which EU treaty provisions, regulations, directives, and decisions to replace or replicate, or where previously implemented by enactment of UK laws or regulations, to retain, amend or repeal; and

    (c)     various geopolitical forces which may impact the global and/or national economy and the Group's business, including, for example, how other states deal with the Covid-19 pandemic or other EU member states proposing referendums to, or electing to, exit the EU.

2.11   At present, the terms of the UK's future relationship with the EU remain unclear, and until some details of those terms become available, it is not possible to determine the impact Brexit may have on the Group's business. This uncertainty may adversely affect business activity and economic conditions in the UK and other EU member states. In particular, changes in tax, tariffs, and other fiscal policies could have a detrimental effect on the Group's business, financial condition, and results of operations.

**Currency fluctuations and hedging risks could adversely affect the Group's earnings and cash flow.**

2.12   The Group's business is subject to risks due to fluctuations in currency exchange rates primarily related to US dollars. A majority of the Group's purchases from suppliers are denominated in US dollars. Substantially all of the Group's revenue is denominated in pounds sterling. The exchange rates between the US dollar and other world currencies have fluctuated significantly in recent years and may continue to fluctuate significantly in the future and, following the UK referendum in favour of Brexit, the pound sterling significantly weakened against the US dollar.

2.13   Although the Group may benefit from any future weakening in the exchange rate of the US dollar against the pound sterling, the Group could be adversely affected by future unfavourable shifts in currency exchange rates, especially given that the majority of the Group's goods are bought in US dollars. Consequently, the Group's input costs for US dollar purchased goods have increased as the Group's currency hedges have unwound. The Group engages in foreign exchange hedging transactions, but its hedging strategies may not adequately protect its operating results from the effects of exchange rate fluctuations or may limit any benefit that the Group might otherwise receive from favourable movements in such rates.

2.14   Currently, the Group has significantly less hedging for the current financial year ending February 2021 than it would normally have, as it has taken steps to unwind some of its existing hedging to release liquidity. The temporary reduction in hedging coverage and/or any hindrances encountered in entering into hedging arrangements may limit the Group's ability to benefit from any future weakening in the exchange rate of the US dollar against the pound sterling, and could expose the Group to future unfavourable shifts in currency exchange rates.

**The Group's revenue, profit results, cash flow, liquidity, and access to capital are sensitive to, and may be adversely affected by, general economic conditions, consumer confidence and spending patterns.**

2.15   The Group's growth, sales and profitability may be adversely affected by negative local, regional, national, or international political or economic trends or developments that reduce consumers' ability or willingness to spend, including periods of economic stagnation or disruption, rising energy costs, and the effects of other national and international events, including pandemics, war, terrorism, or the threat thereof.

2.16   Purchases of apparel and homeware products often decline during periods when economic or market conditions are unsettled or weak. Continued economic uncertainty, or a further deterioration in economic conditions, along with continued or increasing unemployment levels, food price inflation and tax increases, may affect consumer

spending and customers' use of credit by causing shifts in disposable income and discretionary purchasing, which may adversely affect the Group's revenues and profits through reduced purchases of the Group's products.  In such circumstances, the Group may increase the number of promotional sales, and its business, financial condition, and results of operations may be adversely affected.

2.17    In the past several years, the general economic and capital market conditions in the UK and other parts of the world have undergone significant turmoil.  These conditions generally affected access to capital and increased the cost of capital.  The impact of the Covid-19 pandemic may lead to a significant downturn in economic conditions.  In addition, the continued uncertainty surrounding the terms of the UK's future relationship with the EU may continue to disrupt economic and capital market conditions.  The Group's liquidity may be affected by changes in the financial markets, or the Group's capital resources may at times be insufficient to satisfy its liquidity needs.  As a result of these conditions, the Group's future cost of debt and access to the capital markets could be adversely affected.

**Higher labour costs could adversely affect the Group's business.**

2.18    The Group competes with other retailers for good and dependable employees.  The supply of such employees is limited and competition to hire and retain them could result in higher labour costs.  In addition, the Group's labour costs would be affected by changes in national labour laws, and an increase in the minimum wage or the national living wage in the UK would result in higher labour costs.  If any of these events occur and the Group is unable to pass on higher labour costs to its customers, these higher labour costs could have a detrimental effect on its business, financial condition and results of operations.

**Consumers may choose to reduce their purchases from value retailers.**

2.19    Growth in the value clothing market has outperformed growth in the overall clothing market in recent years.  However, there is a risk that consumers may choose to reduce their purchases from value retailers.  Among other factors, improved economic conditions could result in increases in disposable income of the Group's customers, prompting a shift away from value retailers.  In addition, if the Group fails to adapt to changing consumer preferences in its product offerings, consumers may choose to switch to mid-market retailers who tend to have a higher fashion content, and the Group's business, financial condition, and results of operations may be adversely affected.

**The Group is dependent upon the availability of raw materials and transportation and the ability of its third-party producers, substantially all of whom are located in foreign countries, to meet the Group's requirements.**

2.20    The Group sources substantially all of its products from non-exclusive, third-party independent manufacturers located in foreign countries.  Generally the Group does not have long-term contracts with these suppliers but, instead, conducts business on an order-by-order basis.  Therefore, the Group competes with other companies for the production capacity of these manufacturers.  The Group regularly depends upon the ability of third-party producers to secure a sufficient supply of raw materials,

adequately finance the production of goods ordered and maintain sufficient manufacturing and shipping capacity. The Group may experience operational difficulties with the manufacturers it depends on, such as a reduction in available production capacity, errors in complying with product specifications, insufficient quality control, failure to meet production deadlines, or increases in manufacturing costs. Such difficulties may negatively impact the Group's ability to deliver quality products to its stores on a timely basis, which may, in turn, have a negative impact on its customer relationships and result in lower sales, materially adversely affecting the Group's business, financial condition, and results of operations.

2.21    Lockdowns, quarantines, executive orders, and similar government orders and restrictions imposed in numerous jurisdictions for their residents to control the impact of the Covid-19 pandemic have caused disruption to the Group's supply chain. The potential economic downturn following the Covid-19 pandemic also has the potential to significantly impact the Group's supply chain.

2.22    Additionally, because most of the Group's products are manufactured in Asia and Eastern Europe, the Group faces a variety of risks generally associated with doing business in foreign markets and importing merchandise from these regions. Such risks include, among others, political instability, increased security requirements applicable to foreign goods, imposition of taxes and other charges, restrictions on imports, currency and exchange rate fluctuations, risks related to labour practices, or other issues in the foreign countries or factories in which the Group's merchandise is manufactured, delays in shipping, and increased costs of transportation. In addition, the impact of Brexit may make it more difficult for the Group to trade with suppliers in other countries.

2.23    Any of these risks, in isolation or in combination, could adversely affect the Group's business, financial condition, and results of operations. The Group and its third-party suppliers rely on the availability of raw materials and transportation at reasonable prices. The principal fabrics used in the Group's business are cotton, linens, wools, other natural fibres, synthetics, and blends of these materials. The prices paid for these fabrics depend on the market price for raw materials and the cost of labour used to produce them. The price and availability of certain raw materials, particularly cotton, and the cost and availability of transportation have fluctuated in the past and may fluctuate in the future, depending on a variety of factors, including crop yields, weather, supply conditions, foreign exchange rate fluctuations, labour costs, government regulation, war, terrorism, labour unrest, global health concerns, economic climate, the cost of petroleum, the impact of the Covid-19 pandemic, and other unpredictable factors. Additionally, costs of the Group's third-party providers are impacted by many of these same factors as well as energy costs.

2.24    Energy costs have increased in recent years and further increases may result in an increase in the Group's transportation costs for distribution, utility costs for the Group's retail stores, and costs to purchase product from the Group's manufacturers. Any significant increase in the price of products sold to the Group, raw materials, or transportation, or a decrease in the availability of raw materials or cost-efficient transportation could cause an increase in the Group's average unit cost and negatively impact its gross margins. For example, if cotton prices were to increase significantly,

the Group may have to increase the price of its products in order to offset the increased cost of cotton.  Price is a key driver in consumers' purchasing decisions in the value segment, and if the Group was unable to pass these cost increases on to its customers, the Group would expect its business, financial condition, and results of operations to be adversely affected.

2.25    The Group also requires third-party producers to meet certain standards, and have a management team in place to check the supply chain for working conditions, compliance with environmental regulations, and other matters before placing business with them.  As a result of costs relating to compliance with these standards, the Group may pay higher prices than its competitors, who may not insist on the same standards. In addition, the labour and business practices of independent apparel manufacturers have received increased attention from the media, non-governmental organizations, consumers and governmental agencies in recent years.  Failure by the Group or its independent manufacturers (or any subcontractors hired by those manufacturers without the Group's knowledge) to adhere to labour or other laws or business practices and standards accepted as ethical may result in potential litigation, negative publicity and political pressure relating to any of these events, which could have a detrimental effect on the Group's business, financial condition, and results of operations.

**Global or local economic conditions could impair the solvency of the Group's suppliers and other counterparties.**

2.26    There could be a number of adverse effects from a challenging economic environment. For example, the inability of suppliers to access liquidity, or the insolvency of suppliers, could lead to delivery delays or failures.  In addition, failures of other counterparties, including banks, insurance providers, and counterparties to comply with contractual arrangements could negatively impact the Group's business.

**Any negative impact on the reputation of and value associated with the Group's name could adversely affect the Group's business.**

2.27    The Matalan name is an important asset of the Group's business.  Maintaining the reputation of, and value associated with, the Matalan name is central to the success of its business.  If the Group's business strategy and its execution fails to accomplish this objective the Group's brand could be adversely impacted.  In addition, the international nature of the Group's supply base makes it dependent on third-party suppliers to operate their businesses effectively, on ethical and commercially reasonable terms, and in a manner that does not negatively impact the reputation of the Matalan name.  Substantial erosion in the reputation of, or value associated with, the Matalan name could have a material adverse effect on the Group's business, financial condition, and results of operations.

**If the Group is not able to respond to fashion trends in a timely manner or adjust its product offer successfully, the Group may be left with unsold inventory, decreased profits or losses.**

2.28    The Group's success depends in part on its designers' ability to anticipate and respond to changing fashion tastes and consumer demands and to translate market trends into an appropriate, saleable product offer.  Customer tastes and fashion trends change

rapidly. Since a high proportion of the Group's products are manufactured in Asia and Eastern Europe, the lead times between ordering and delivery make it more important to accurately predict, and more difficult to fulfil, the demand for items. If the Group is unable to successfully identify or react to changing styles or trends and the Group misjudges the market for its product offer, its sales will be lower and the Group may be faced with a significant amount of unsold merchandise. In addition, as the Group expands its offerings into new product categories, there is a risk that the Group's customers may not like the Group's new products or that they may prefer to shop for products in those categories from other retailers. If the Group's products are not attractive to its customers, the Group may be forced to increase its marketing promotions or price markdowns, which could have a detrimental effect on the Group's financial condition and results of operations.

**The Group's business could be harmed if it fails to maintain proper inventory levels.**

2.29    The Group seek to maintain appropriate inventory levels in its stores. Inventory levels in excess of customer demand may result in inventory markdowns or the sale of excess inventory at discounted prices. In the event that a product or group of products is successful, initial inventories will be sold and the Group will need to replenish its stock at one or more locations. If the Group is unable to replenish a particular store with the products, including sizes and colours, that need to be replenished, the Group may end up with excess inventory in one location and insufficient inventory in another. In response, the Group may be forced to increase its marketing promotions or price markdowns, which could have a detrimental effect on the Group's financial condition and results of operations. Conversely, the Group may experience inventory shortages, which might result in unfilled orders and lost revenues. The Group's supply chain may be adversely impacted by the Covid-19 pandemic. See section 3 (*Risks relating to the Covid-19 Pandemic*) below. Any failure to maintain appropriate inventory levels could have a detrimental effect on the Group's financial condition and results of operation.

**If the Group is unable to successfully implement planned improvements to its business the Group's profitability could be harmed.**

2.30    Part of the Group's strategy includes changes, upgrades and improvements to its technology and processes. It is possible that the Group may experience difficulties in implementing these changes, which could lead to unanticipated costs, divert management time and/or damage to its reputation, which could adversely affect the Group's results of operations. In addition, the Group may not fully realise all or any of the anticipated benefits of the planned improvements.

**The Group depends on a limited number of facilities for distribution of its products to its stores and to its online customers which, if affected, could have a detrimental effect on the Group's operations.**

2.31    The Group has two distribution centres, one in Liverpool (Knowsley) and one in Northamptonshire (Corby). Any major breakdown of plant or equipment, or an accident such as a serious flood or fire, in either or both of the Group's distribution centres might significantly impact both the Group's ability to distribute products to its stores and maintain an adequate product supply chain and its ability to meet the

requirements of its online customer orders. Such disruption could have an adverse effect on the Group's in-store inventory and its online sales and therefore could detrimentally affect the Group's revenue, results of operations, and financial condition. In addition, as the Group's online sales continue to grow, it may need to re-evaluate the way in which its distribution centre in Knowsley handles the mix of volume between online sales and its retail stores, which could require the Group to make additional investments to adapt the centre accordingly.

2.32    The Group currently leases its distribution centre locations. If the Group is unable to renew its leases, its ability to lease a suitable replacement location on favourable terms is subject to many factors which are not within the Group's control, such as conditions in the local real estate market, competition for desirable properties and its relationships with current and prospective landlords. If the Group's lease payments increase or the Group is unable to renew existing leases or lease suitable alternative locations, its profitability may be significantly harmed.

**Any disruption or other adverse event affecting the Group's relationship with its key operational suppliers could adversely affect its business.**

2.33    The Group depends on Capgemini and other third-party operational suppliers for information technology and other forms of support. Any significant disruption or other adverse event affecting the Group's relationship with third-party service providers could have a detrimental effect on the Group's business, financial condition, and results of operations. In addition, if such events lead the Group to replace Capgemini, or the Group's other operational suppliers, the Group may face risks and costs associated with a transfer of operations to different suppliers.

**A disruption in the Group's information technology systems could adversely affect its operations.**

2.34    The Group's business activities rely to a significant degree on the efficient and uninterrupted operation of its various computer and communications systems and those of third parties. In addition, the Group's online sales depend on the continued operation of its website. The Group has outsourced many of its information technology functions. Any significant breakdown of plant or equipment, accident such as a serious flood or fire or other significant disruption to the operations or the operations of the Group's third-party vendor could significantly affect the Group's ability to manage its information technology systems, which in turn could have a detrimental effect on the Group's business, financial condition, and results of operations. One of the Group's strategies is to continue to increase the amount of online sales of its products. Any disruption to the Group's website could have a negative effect on online sales and damage the Group's reputation in this area. The Group may be unable to maintain and upgrade its information technology systems in a manner that will avoid interruptions or disruptions of such systems. A failure or inability to maintain and upgrade the Group's information technology systems may have an adverse effect on the Group's business. In addition, the Group can provide no assurance that its IT system is fully protected against third-party intrusions, viruses, hacker attacks, information or data theft or other similar threats. The risk of a security breach or disruption, particularly through cyber-attack or cyber intrusion, including by computer hackers, foreign governments and cyber terrorists, has risen as the number, intensity and sophistication of attempted

attacks and intrusions from around the world have increased.  Any third-party intrusions, viruses, hacker attacks, information or data theft or similar threats against the Group and its IT systems may have a material adverse effect on its business, financial condition and results of operations.

**The majority of the Group's sales depend on customers specifically traveling to the Group's stores.**

2.35    Most of the Group's stores are located outside of town or city centres and thus require customers to travel to the Group's stores.  Sales at the Group's stores are derived, in part, from the high volume of traffic, and, unlike stores in city centres or in retail parks, the Group must make its stores attractive destinations.  The Group's stores must compensate for the ability of many of its competitors to generate consumer footfall due to the location of their stores.  Because the Group's customers have to travel to the Group's stores, the Group has a higher level of conversion than high street retailers and the Group's success is partly dependent on its ability to retain these higher conversion rates.  Sales volume and retail traffic may be adversely affected by economic downturns in a particular area, inflation, higher transportation costs, competition from other retail and non-retail attractions and the perceived or actual difficulty in visiting the Group's locations.  Sales volume and retail traffic may also be adversely effected by restrictive measures and guidance imposed by the UK authorities in order to reduce the impact of the Covid-19 pandemic.  See section 3 (*Risks relating to the Covid-19 Pandemic*) below.  Failure to make the Group's stores an attractive "destination" and, in the short to medium term, failure to enact appropriate social distancing measures to assist in reducing the spread of Covid-19 and to make customers feel comfortable shopping in the Group's stores, or a significant decline in the volume of customer traffic or in the conversion rates associated with its customers would be detrimental to the Group's business, financial condition, and results of operations.

**The Group depends on the ability to lease space for its stores.**

2.36    The Group currently leases all of its store locations.  The Group's current leases expire at various dates ranging from less than one year to up to 15 years.  The Group's leases provide for rent reviews, generally every five years, at which time its rents could increase.  The Group's ability to maintain its existing rental rates during renewals or to renew any expired lease on favourable terms will depend on many factors which are not within the Group's control, such as conditions in the local real estate market, competition for desirable properties, and its relationships with current and prospective landlords.  If the Group is unable to renew its leases, the Group's ability to lease a suitable replacement location on favourable terms is subject to the same factors.  If the Group's lease payments increase or it is unable to renew existing leases or lease suitable alternate locations, this could have a detrimental effect on the Group's business, financial condition, and results of operations.

**The Group's store expansion and rationalisation program and plan to develop online sales may be unsuccessful.**

2.37    An aspect of the Group's growth strategy is to open a number of additional stores in the UK and, where appropriate, to migrate stores to locations that are of a more suitable size for that market.  The success of this strategy will depend, in part, upon the Group's

ability to open and operate new stores on a timely and cost-effective basis while continuing to increase sales at its existing stores.  The opening of new stores could result in the diversion of sales from the Group's existing stores in certain cases, which may cause reductions in its operating profit and like-for-like sales.  In addition, the real estate market in a particular location may not provide favourable locations for the Group to move a store even if it is looking to do so.

2.38    The Group's ability to successfully open new stores or to move existing stores also depends upon a number of other factors, including the identification of sites suitable for the Group's stores in terms of proximity to its target demographic and distance from existing stores; the negotiation of acceptable lease terms; the hiring, training and retention of qualified personnel; the level of existing and future competition in areas where new stores are to be located; the Group's ability to integrate new stores into its operations on a profitable basis; and the capability of the Group's existing distribution system to accommodate new stores.  In addition, the process of locating, fitting-out, and opening stores requires significant management time and attention, which may be diverted from other important activities.  Because of these requirements the Group may be unable to open new stores or move existing stores on a timely or profitable basis, or be unable to secure store sites on acceptable terms.  Failure to successfully implement the Group's store expansion and rationalisation strategy could have a detrimental effect on its business, financial condition, and results of operations.

**The Group may be unable to successfully implement its planned strategies to grow its online sales and its omni-channel customer base and to further expand its store base, including through international franchise stores.**

2.39    The Group's ability to further develop its online sales depends on a number of factors, including: successfully marketing its website; hiring, training and retaining qualified personnel; integrating its growing online operations on a profitable basis; the Group's existing distribution centres accommodating its growing online operations; addressing the effect of any competition the Group's online operations may have with its existing stores; reacting to increased competition from other clothing retailers as they introduce transactional websites or expand their existing online presence; and stocking an appropriate selection of products and sizes for online consumers, who tend to have different shopping needs than customers in the Group's physical stores.  The Group's efforts to expand online sales may not result in increased sales or profits.  Failure to successfully implement the Group's plan to develop online sales could have a material adverse effect on its business, financial condition and results of operations.  The Group intends to add to its omni-channel customer base by transitioning store and online-only customers into omni-channel customers.  In order to achieve an effective transition of customers to the Group's omni-channel customer base, the Group relies heavily on advertising and promotional campaigns to drive growth in its click and collect channel which in turn generates footfall in stores from online customers.  These strategies may not be as successful as expected, and customers may not transition to omni-channel at the desired rate, impacting the future growth of sales and profit and having a detrimental effect on the Group's business, financial condition, and results of operations.  In addition, part of the Group's strategy is to open a number of new stores including through international franchise stores which depends on finding suitable franchise partners and suitable locations for franchise stores.  If the Group is unable to find

suitable franchise partners or otherwise successfully implement its growth strategy, this could have a negative impact on the Group's business.

2.40    Expansion of the Group's international operations could also expose the Group to risks associated with local and global economic and political conditions. A downturn in local economic conditions where franchise stores are located and/or political instability in those areas could impact the Group's performance and expansion plans. The impact of the Covid-19 pandemic and the measures taken to reduce the spread of Covid-19 have affected the operation of franchisees' stores, and future measures and any potential economic downturn due to the impact of Covid-19 pandemic will further affect the franchisees' operations and may impact the opening of new franchise stores. See section 3 (*Risks relating to the Covid-19 Pandemic*) below. Furthermore, even if the Group is successful in implementing its growth strategy, the Group's operating complexity will increase as its store base grows and its online sales increase. Such increased complexity will require that the Group continues to expand and improve its operating capabilities, and grow, train, and manage its employee base. The Group will need to continually evaluate the adequacy of its information and distribution systems, and controls and procedures related to financial reporting. Implementing new systems, controls and procedures and any changes to existing systems, controls and procedures could present challenges the Group does not anticipate and could negatively impact the Group. In addition, the Group may be unable to hire, train and retain a sufficient number of personnel to successfully manage its growth. Moreover, the Group's planned expansion will place increased demands on its existing operational, managerial, administrative, and other resources. These increased demands could cause the Group to operate its business less effectively, which in turn could cause deterioration in the financial performance of its individual stores or its overall business. Furthermore, new stores and the Group's growing transactional website could compete with its existing stores for customers, causing the number of customers who visit the Group's existing stores to decline and the reduction of like-for-like sales. The Group's growth could also make it difficult for it to adequately predict the expenditures it will need to make in the future. This growth may also place increased burdens on the Group's suppliers, as it will likely increase the size of its merchandise orders. In addition, increased orders may negatively impact the Group's approach of generally striving to minimise the time from purchase order to product delivery, and may increase the Group's markdown risk. If the Group does not make the necessary capital or other expenditures necessary to accommodate its future growth, it may not be successful in its growth strategy. The Group may not be able to anticipate all of the demands that its expanding operations will impose on its business, personnel, systems and controls and procedures, and the Group's failure to appropriately address such demands could have a detrimental effect on its business, financial condition and results of operations.

**The Group's future growth and profitability could be adversely affected if its advertising and marketing programs are not effective in generating sufficient levels of customer awareness and traffic.**

2.41    The Group relies on print advertising, especially direct mail, to promote new store openings, to increase consumer awareness of its product offer and pricing, and to drive store and online traffic. In addition, the Group relies and will increasingly rely on other forms of media advertising including email communications. The Group's future

growth and profitability will depend in large part upon the effectiveness and efficiency of its advertising and marketing programs. In order for the Group's advertising and marketing programs to be successful, the Group must manage advertising and marketing costs effectively in order to maintain acceptable operating margins and return on the Group's marketing investment and convert customer awareness into actual store visits and product purchases. The Group's advertising and marketing expenditures, including those associated with advertising campaigns, may not result in increased total or comparable sales or generate sufficient levels of product awareness. The Group may not be able to manage its advertising and marketing expenditures on a cost-effective basis.

**The Group's business could suffer as a result of weak sales during extreme or unseasonable weather conditions.**

2.42    The Group's results are affected by periods of abnormal, severe or unseasonable weather conditions. Exceptionally cold or hot temperatures or other extreme weather conditions, such as storms or floods, may make it difficult for the Group's employees and customers to travel to its stores located out-of-town. Temporary severe weather during one of the Group's peak trading seasons, such as late spring or early summer, could adversely affect the Group's sales and, in turn, have a detrimental effect on its business, financial condition, and results of operations. Periods of unseasonably warm or cold weather could render a portion of the Group's inventory incompatible with the prevailing weather conditions, leading to a slowdown in sales at full margin followed by more extensive markdowns at the end of the season. An extended period of unpredictable and unseasonal weather could have a detrimental effect on the Group's business, financial condition and results of operations.

**The Group's business could suffer as a result of weak sales during its peak selling seasons.**

2.43    The Group's business is subject to seasonal peaks. The Group traditionally perform well in terms of revenue, operating results, and cash flow during late spring and early summer. The Group also generates a material percentage of its sales in the Christmas season, although the Group is less dependent than high street retailers on the Christmas season. A second outbreak of Covid-19 during the Christmas season could significantly impact on the Group's sales. See section 3 (*Risks relating to the Covid-19 Pandemic*) below. The Group incurs additional expenses in anticipation of higher sales during that period, including for acquiring additional inventory and hiring additional employees. If revenue during the Group's peak seasons is significantly lower than the Group expects for any reason, it may be unable to adjust its expenses in a timely fashion and may be left with a substantial amount of unsold inventory, especially in seasonal merchandise that is difficult to liquidate. At the same time, if the Group does not have sufficient liquidity to increase its inventory, or if the Group otherwise fails to purchase a sufficient quantity of merchandise, it may not have an adequate supply of products to meet consumer demand, which in turn would cause the Group to lose sales. If any of these risks were to materialise, they could have a detrimental effect on the Group's business, financial condition, and results of operations.

**The Group holds licenses for the use of other parties' brands which may not be renewed.**

2.44    The Group has entered into license and design agreements to use certain trademarks and trade names, such as Disney and Marvel characters, to market and sell the Group's products. These license and design agreements will expire at various dates in the future. The Group may be unable to renew these licenses on acceptable terms upon expiration or be unable to acquire new licenses to use other popular trademarks. The termination or expiration of a license agreement could cause the Group to lose the sales and any associated profits generated pursuant to such license and in certain cases could result in an impairment charge for damages which could result in a detrimental effect to the Group's business, financial condition, and results of operations.

2.45    In addition to certain obligations to comply with the terms of the license agreement, most of the Group's significant licenses provide minimum payment thresholds for royalty payments that the Group must pay regardless of the sales it is able to make of the licensed products. If these thresholds are not met, the Group's licensors may be permitted contractually to terminate these agreements or seek payment of minimum royalties even if the minimum sales are not achieved. In addition, the Group's licensors may license their trademarks to other third parties, and the Group is unable to control the quality of these goods that others produce. If licensors or others do not maintain the quality of these trademarks or if the brand image deteriorates, the Group's sales and any associated profits generated by such brands may decline.

**The Group may be unable to protect its trademarks and other intellectual property or may otherwise have its brand names harmed.**

2.46    The Group believes that its registered and common-law trademarks and other intellectual property, as well as other contractual arrangements, including licenses and other proprietary intellectual property rights, have significant value and are important to the Group's continued success and its competitive position due to their recognition by retailers and consumers. Therefore, the Group's success depends to a significant degree upon its ability to protect and preserve its intellectual property. The Group relies on the enforcement of laws in the UK and other countries to protect its proprietary intellectual rights. The Group may not be able to sufficiently prevent third parties from using its intellectual property without its authorisation, particularly in those countries where the laws do not protect its intellectual property rights as fully as in the UK. The use of the Group's intellectual property or similar intellectual property by others could reduce or eliminate any competitive advantage it has developed, causing the Group to lose sales or otherwise harm the reputation of its brands.

2.47    Additionally, in the past third parties have claimed that products the Group sells infringe their intellectual property rights. The actions that the Group has taken may not be sufficient to prevent others from seeking to block sales of the Group's products as violations of proprietary rights. Although the Group has not been materially inhibited from selling products in connection with trademark disputes, as the Group extends its brands into new product categories and new product lines, it could become subject to litigation based on allegations of the infringement of intellectual property rights of third parties. In the event a claim of infringement against the Group is successful, it may be required to pay damages, royalties or license fees to continue to use intellectual property rights that the Group had been using, or it may be unable to obtain necessary licenses from third parties at a reasonable cost or within a reasonable time. Litigation and other

legal action of this type, regardless of whether it is successful, could result in substantial costs and divert management's attention and other resources.

**The Group is subject to numerous statutes and regulations, and complaints from customers and other third-parties that could affect it.**

2.48    The Group is subject to certain customs, truth-in-advertising, product safety, intellectual property protection, employee, health and safety, and other laws and regulations, including consumer credit and consumer protection regulations, zoning and occupancy ordinances and social distancing and health and safety measures arising as a result of the Covid-19 pandemic (see section 3 (*Risks relating to the Covid-19 Pandemic*) below), that regulate retailers generally and/or govern the importation, promotion and sale of merchandise. If the Group fails to comply with these laws and regulations, or to promptly implement any action required by any change in these laws or regulations, the Group could be subject to temporary or permanent closure of the affected stores, fines or other penalties under the controlling laws and regulations. In addition, if any such laws or regulations are violated by third parties that supply goods or services to the Group, it could experience delays in shipments and receipt of goods. Any of these events could have a detrimental effect on the Group's business, financial condition, and results of operations. The Group is also subject to numerous national and local environmental laws and regulations in the UK. These environmental laws and regulations are constantly changing, as are the priorities of those who enforce them. Environmental conditions relating to prior, existing or future properties may have a detrimental effect on the Group's business, financial condition and results of operations. The Group is also the subject of complaints and litigation from its customers, employees or other third parties, alleging health, environmental, safety or operational concerns, nuisance, negligence, or failure to comply with applicable laws and regulations. These claims, even if successfully disposed of without direct adverse financial effect, could have a detrimental effect on the Group's reputation and divert its financial and management resources from more beneficial uses. If the Group were to be found liable under any such claims, it could have a detrimental effect on its business, financial condition, and results of operations. Legal requirements are subject to frequent changes and differing interpretations, and the Group is unable to predict the ultimate cost of compliance with these requirements or their effect on its operations.

2.49    The Group collects extensive non-public data from customers, business contacts and employees, and the failure to adequately maintain and protect such information in compliance with applicable regulatory requirements, or failure to comply with applicable data protection law, could have a detrimental effect on the Group's business, financial condition, and results of operations.

2.50    The Group regularly collects, process, store and handle non-public data (including name, address, date of birth and other personal data) from its customers, business contacts and employees as part of the operation of its business, and therefore the Group must comply with data protection laws in the UK and the EU. Those laws impose certain requirements upon the Group in respect of the collection, use and processing of such personal data. Failure to comply with data protection laws could potentially lead to regulatory censure, fines, civil and criminal liability, as well as reputational and financial costs. In addition, the laws that would be applicable to such a failure are

rapidly evolving and may become more burdensome and costly to comply with. Failure to comply with data protection laws may lead to fines or penalties, which may be significant, or could damage the Group's reputation, which in turn could have a negative impact on the Group's business.

2.51    The scope of the notification made to, and consents obtained from, data subjects may limit the Group's ability to deal freely with the personal data in the Group's databases. It may not be possible for the Group to lawfully use that data for purposes other than those notified to data subjects, or for which they have provided consent.

2.52    The Group is also exposed to the risk that the personal data it controls could be wrongfully accessed or used, whether by employees or third parties, or otherwise lost or disclosed or processed in breach of applicable data protection law. There can be no assurance that no such breach has occurred in the past without the Group's knowledge or may not occur in the future. If the Group, or any of the third-party service providers on which it relies, fail to process, store or protect such personal data in a secure manner or if any such theft or loss of personal data were otherwise to occur, the Group could face liability under data protection laws. This could also result in damage to the Group's brand and reputation, as well as the loss of new or existing personal members or customers, any of which could have a detrimental effect on the Group's business, financial condition, and results of operations.

**Organised strikes or work stoppages by unionised employees may have a detrimental effect on the Group's business, financial condition, and results of operations.**

2.53    The Group has an agreement in place with the GMB union which covers warehouse employees, drivers, and clerks at the Group's Knowsley and Corby distribution centres. The agreement has been in place since 2003 and was re-issued in 2010 and although it does not have an expiry date, the Group periodically reviews the terms for potential updates. A trade dispute with the GMB union could result in industrial action including strikes by the affected workers and increased operating costs as a result of higher wages or benefits paid to union members. The Group had a dispute with the GMB regarding the pay increases offered to employees at the Group's Knowsley distribution centre which led to strike action during 2019. This pay dispute was resolved in October 2019 and the Group believes that relations with the GMB union are improving. However, the Group's operations may be affected by problems in the future. If the unionised workers were to engage in a further strike or other work stoppages, the Group could experience a significant disruption of operations and/or higher ongoing labour costs, which may have a detrimental effect on the Group's business, financial condition, and results of operations.

**The Group depend upon key management and other personnel, and the departure of any of such management or personnel could adversely affect the Group's business.**

2.54    The Group is currently managed by certain key senior management personnel, particularly Jason Hargreaves, John Mills, Stephen Hill and Greg Pateras, and other members of the Group's senior management. These personnel have extensive experience and knowledge of the Group's industry and its potential, as well as of

companies in the retail industry.  The Group's business also requires it to hire and retain skilled employees, particularly designers and buyers, and its success depends in part on its ability to continue to attract, motivate and retain highly qualified employees.  In addition, from time to time, as important members of the Group's leadership team leave, the Group must find suitably qualified replacements.  The loss of services of key personnel, or a failure to attract and retain or replace qualified personnel, could adversely affect the Group's business.

3.     **RISKS RELATING TO THE COVID-19 PANDEMIC**

**The recent Covid-19 pandemic has had and is expected to continue to have an adverse effect on the Group's business and results of operations.**

3.1    In late 2019, Covid-19 was first detected in Wuhan, China.  In March 2020, the World Health Organization declared Covid-19 a global pandemic, and governmental authorities around the world have implemented measures to reduce the spread of Covid-19.  These measures have adversely affected workforces, customers, consumer sentiment, economies, and financial markets, and, along with decreased consumer spending, have led to an economic downturn in many of the Group's markets.

3.2    As a result of Covid-19, on 24 March 2020, the Group temporarily closed all of its stores across the UK, without a firm date on when these would reopen.  Beginning on 18 May 2020, the Group began to reopen certain stores in England and Northern Ireland and more recently in Scotland and Wales, as permitted by regulation or local order, and aims to keep reopening stores gradually, with a view to ensuring health and safety and to continue complying with all regulations and local orders.  As at 18 June 2020, the Group had re-opened 211 stores.  The date on which all of the Group's stores will have re-opened remains uncertain.

3.3    The Group remains subject to orders, restrictions measures, and guidance imposed by the UK authorities in order to mitigate the impact of the Covid-19 pandemic.  For instance, such measures have resulted in limitations on the number of people in stores or in warehouses, requirements on sanitation and social distancing practices, work stoppages, slowdowns and delays, travel restrictions, and cancellation of events, thereby negatively impacting Group operations.  UK authorities have wide discretion to take any future action to mitigate the impact of the Covid-19 pandemic, such as by imposing further temporary store closures, lockdowns, and quarantines.

3.4    The measures taken by the UK authorities, as set out above, directly and materially impacted the Group's sales.  The Group is also faced with a significant amount of unsold merchandise, and may be forced to increase its marketing promotions and/or encourage price markdowns, which could adversely affect its financial condition and ability to operate effectively.  Likewise, profitability may be adversely affected by any future measures taken.

3.5    Due to the uncertainty of Covid-19, the Group will continue to assess the situation, including government-imposed restrictions, market by market.  The Group are unable to accurately predict the impact that Covid-19 will have on its operations going forward due to uncertainties which will be dictated by the length of time that such disruptions continue, which will, in turn, depend on the currently unknowable duration of the

Covid-19 pandemic and the impact of governmental regulations that might be imposed in response to the pandemic.

3.6    Numerous jurisdictions have imposed, and others in the future may impose, lockdowns, quarantines, executive orders and similar government orders and restrictions for their residents to control the spread of Covid-19. Such orders or restrictions have resulted in temporary store closures for the Group's franchise store operators, limitation of franchise store hours, limitations on the number of people in the franchisees' stores or in warehouses, closures of factories and offices of suppliers to the Group, disruption of the supply of goods and services to the Group, requirements on sanitation and social distancing practices, work stoppages, slowdowns and delays, travel restrictions and cancellation of events, among other effects, thereby negatively impacting Group operations.

3.7    In addition, the Group expects to be impacted by the deterioration in the economic conditions in the UK, which could have an effect on consumer spending. Further, deteriorating economic conditions globally have created a challenging environment for financing, creating substantial uncertainty regarding the availability of credit. The combination of reduced consumer spending and volatile credit markets could adversely impact the Group's liquidity. While the Group has raised additional liquidity through the CLBILS Facilities and the Additional Notes, it is difficult to accurately predict the ultimate impact of these developments on the Group.

3.8    If the Group business does not generate sufficient cash flows from operating activities, and sufficient funds are not otherwise available to the Group from borrowings under the Group's credit facility or other sources, the Group may not be able to cover its expenses, grow its business, respond to competitive challenges or fund its other liquidity and capital needs, which would harm its business.

3.9    To the extent that the Covid-19 pandemic adversely affects the Group's business, liquidity and financial results, it may also have the effect of heightening other risks described in this Part 11 (*Risk Factors*) of this Explanatory Statement, such as those relating to the Additional Liquidity Arrangements and the Group's business, financial condition, and/or results of operations.

**The Group's business has been and may continue to be materially and adversely affected by the spread of Covid-19.**

3.10   Many of the Group's suppliers either produce their products or source component parts of their products from areas affected by Covid-19. As a result, the business disruptions caused by the spread of Covid-19 may impact the Group's ability to timely acquire the required supplies and its business may be adversely affected.

3.11   In addition, consumer fears about becoming ill with the disease may continue, which will adversely affect traffic to the Group's stores. Consumer spending generally may also be negatively impacted by general macroeconomic conditions and consumer confidence, including the impacts of any recession, resulting from the Covid-19 pandemic. This may negatively impact sales in stores, when reopened to the public, and e-commerce channels.

3.12    The Covid-19 pandemic also has the potential to significantly impact the Group's supply chain if the factories that manufacture its products, the distribution centres where the Group manages its inventory, or the operations of its logistics and other service providers are disrupted, temporarily closed or experience worker shortages.

3.13    The full extent of the Covid-19 pandemic's impact on the Group's business and results of operations depends on future developments that are uncertain and unpredictable, including the duration and spread of the pandemic, its impact on capital and financial markets and any new information that may emerge concerning the severity of the virus, its spread to other regions as well as the actions taken to contain it, among others.  At this point in time, the Group cannot reasonably estimate the full extent of the Covid-19 pandemic's impact on its business and results of operations.

**Changes in consumer behaviour as a result of Covid-19 may materially and adversely affect the Group's business.**

3.14    Consumer behaviour may fundamentally change as a result of Covid-19 in both the near and long term.  Traffic in retail stores, including the Group's stores, may be materially and adversely affected with more consumers relying on ecommerce.  Consumer spending may also be negatively impacted by general macroeconomic conditions and consumer confidence, including the impacts of any recession, resulting from the Covid-19 pandemic.  All of this could materially and adversely impact sales at the Group's retail stores.

3.15    The Group may need to re-design its supply chain to focus increasingly on ecommerce sales and fulfilment, which could result in capital expenditures, business disruption and lower margin sales.

**PART 12**
**THE SCHEME DOCUMENT**

# PART 13
# DEFINITIONS AND CONSTRUCTION

## Construction

Unless the context otherwise requires:

(a)    references to any provision of any law or regulation are to be construed as referring to that provision as it may have been, or may from time to time be, amended or re-enacted, and as referring to all bye-laws, instruments, orders and regulations for the time being made under or deriving validity from that provision;

(b)    a reference to any party or person shall be construed as including its and any subsequent successors in title, permitted transferees and permitted assigns, in each case in accordance with their respective interests;

(c)    references to "**include**" mean including without limitation;

(d)    references to "**Clauses**" or "**Schedules**" are to clauses or schedules (as applicable) of this Explanatory Statement;

(e)    references to a "**person**" include references to an individual, firm, partnership, company, corporation, other legal entity, unincorporated body of persons or any state or state agency;

(f)    the singular includes the plural and *vice versa* and words importing one gender include the other gender;

(g)    headings to paragraphs and annexes, are for ease of reference only and shall not affect the interpretation of this Explanatory Statement;

(h)    to the extent that there is any conflict or inconsistency between the terms of the Scheme and this Explanatory Statement, the terms of the Scheme shall prevail;

(i)    any obligation or Liability of a Scheme Creditor shall apply to its successors, transferees and assigns; and

(j)    unless otherwise stated, all references to a time of day in the Scheme are to the time in London (Greenwich Mean Time or British Summer Time as applicable).

## Definitions

The following definitions shall apply to words and phrases used in this Explanatory Statement, except where the context otherwise requires:

| | |
|---|---|
| ***Account Holder*** | means any person recorded directly in the records of a Clearing System as holding an interest in any Second Lien |

|  | Notes in an account with the relevant Clearing System either for its own account or on behalf of its client. |
|---|---|
| **Account Holder Letter** | means the account holder letter substantially in the form set out in Appendix C (*Account Holder Letter*) of the Explanatory Statement, subject to any amendments made in accordance with the Scheme. |
| **Additional Guarantors** | has the meaning given to it in paragraph 3.1 (a) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Additional Liquidity Arrangements** | has the meaning given to it in paragraph 5.1 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Additional Liquidity Providers** | means the lenders and noteholders under the CLBILS Facilities and the Additional Notes, respectively. |
| **Additional Notes** | has the meaning given to it in paragraph 4.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Additional Notes Holders** | has the meaning given to it in paragraph 4.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Additional Notes Indenture** | has the meaning given to it in paragraph 4.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Additional Waivers** | has the meaning given to it in paragraph 10.1(a)(B) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Advisers** | means each of: |

(a)     Clifford Chance LLP, as legal adviser to the Company and Affiliates;

(b)     Cahill Gordon & Reindel (UK) LLP, as legal adviser to the Company and Affiliates;

(c)     Deloitte LLP, as financial adviser to the Company and certain of its Affiliates;

(d)     DLA Piper International LLP, as legal adviser to the Company and Affiliates;

(e)     Kirkland & Ellis International LLP, as legal adviser to the Additional Notes Holders;

(f)     Perella Weinberg Partners, as financial adviser to the Additional Notes Holders;

(g)     Latham & Watkins (London) LLP, as legal adviser to the Existing RCF Lenders and the Security Agent;

(h)     White & Case LLP, as legal adviser to the Trustee;

(i)     Paul Hastings LLP, as legal adviser to the Shareholder;

(j)     Lucid Issuer Services Limited, as Information Agent; and

(k)     any of the foregoing's partners, employees and affiliated partnerships and the partners and employees of such affiliated partnerships and their respective Subsidiaries and Holding Companies and any local counsel engaged by any of the foregoing on behalf of their client or by the client directly in connection with the Additional Liquidity Arrangements.

| | |
|---|---|
| ***Affiliate*** | means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company or a Related Fund, as at the Scheme Effective Date. |
| ***Amended RCF Agreement*** | has the meaning given to it in paragraph 3.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Board*** | means the board of directors of the Company referred to in Part 9 (*Board of the Company*) of this Explanatory Statement. |
| ***Book Entry Interests*** | means, in relation to the Second Lien Notes, a beneficial interest as principal in a Global Note, in each case held through and shown on, and transferred only through, records maintained in book entry form by a Clearing System or an Account Holder. |
| ***Brexit*** | has the meaning given to it in paragraph 2.9 of Part 11 (*Risk Factors*) of this Explanatory Statement. |

| | |
|---|---|
| ***Brussels (Recast) Regulations*** | means Regulation (EU) No 1215/2012 on Jurisdiction and Recognition and Enforcement of Judgments in Civil and Commercial Matters. |
| ***Business Days*** | means a day other than a Saturday, Sunday or other day on which banking institutions in London or New York are authorised or required by law to close. |
| ***Chairperson*** | means the chairperson of the Scheme Meeting. |
| ***Chapter 15*** | means chapter 15 of the US Bankruptcy Code. |
| ***Chapter 15 Filing*** | has the meaning given to it in paragraph 13.1 of Part 6 (*Overview of the Scheme*) of this Explanatory Statement. |
| ***Chapter 15 Hearing*** | means the hearing before the US Bankruptcy Court to obtain recognition of the Scheme as a 'foreign main proceeding' under Chapter 15 of the US Bankruptcy Code pursuant to the Chapter 15 Filing. |
| ***Chapter 15 Order*** | means an order granted under 11 USC. § 1501 et seq. of the US Bankruptcy Code to recognise, enforce and give effect to the Scheme under the laws of the US. |
| ***Chapter 15 Recognition*** | has the meaning given to it in paragraph 13.1 of Part 6 (*Overview of the Scheme*) of this Explanatory Statement. |
| ***Claim Value*** | means in respect of a Scheme Creditor, the aggregate amount in GBP of principal and accrued interest (calculated as at 16 July 2020) owing to it in respect of its Second Lien Notes held as at the Voting Record Time. |
| ***CLBILS*** | has the meaning given to it in paragraph 2.6 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***CLBILS Facilities*** | has the meaning given to it in paragraph 3.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Clearing Systems*** | means either or both of Euroclear Bank SA/NV and Clearstream Banking S.A., as applicable, and any other system designed for similar or analogous purposes, and each of their nominees and successors. |
| ***Clearstream*** | means Clearstream Banking S.A. |
| ***Common Depositary*** | means Deutsche Bank AG, London Branch. |

| | |
|---|---|
| ***Companies Act*** | means the Companies Act 2006 (as amended from time to time). |
| ***Company*** | means Matalan Finance Plc. |
| ***Court*** | means the High Court of Justice, the Court of Appeal of England and Wales and the UK Supreme Court. |
| ***Custody Instruction Deadline*** | means 5:00p.m. (London time) on 15 July 2020. |
| ***Custody Instruction Reference Number*** | means the unique reference number assigned by Euroclear or Clearstream (as applicable) to a Custody Instruction in respect of a specific Scheme Creditor. |
| ***Custody Instructions*** | means the instructions given by the Account Holder to Euroclear or Clearstream, as the case may be, to block the Second Lien Notes identified in the relevant Account Holder Letter and disclose the name, email address and telephone number of the Scheme Creditor. |
| ***Debenture*** | means the debenture dated 25 January 2018 between, amongst others, the Company, the Parent, and Lloyds Bank Plc as security agent. |
| ***Deed of Release*** | has the meaning given to it in paragraph 10.1(ii)(C) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Deloitte*** | Deloitte LLP. |
| ***Direct Participant*** | means each person who is shown in the records of the Clearing Systems as a holder of the Second Lien Notes. |
| ***Director or Former Director*** | means any person who is, or has been at any time, a director, manager, general partner, officer (or equivalent) of the Company and/or any member of the Group. |
| ***EU*** | means the European Union. |
| ***Euroclear*** | means Euroclear Bank SA/NV. |
| ***Existing RCF Agreement*** | has the meaning given to it in paragraph 3.1(c) of Part 2 (*Background to the Company, the Group and the Group's financing Arrangements prior to the Covid-19 Pandemic*) of this Explanatory Statement. |

| | |
|---|---|
| ***Existing RCF Lenders*** | has the meaning given to it in paragraph 2.7 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Explanatory Statement*** | means this document. |
| ***First Covid-19 Statement*** | has the meaning given to it in paragraph 2.1 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***First Lien Consent Fee*** | has the meaning given to it in paragraph 4.6 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***First Lien Consent Solicitation*** | has the meaning given to it in paragraph 4.6 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***First Lien Notes*** | has the meaning given to it in paragraph 3.1(a) of Part 2 (*Background to the Company, the Group and the Group's financing Arrangements prior to the Covid-19 Pandemic*) of this Explanatory Statement. |
| ***First Lien Notes Indenture*** | means the first lien notes indenture entered into between, among others, the Company and the Security Agent dated 25 January 2018. |
| ***Global Note*** | means individually and collectively, each of the global notes deposited with the Common Depositary and registered in the name of the nominee of the Common Depositary, substantially in the form of Exhibit A of the Second Lien Indenture. |
| ***Group*** | means the Parent and its Subsidiaries as at the Scheme Effective Date. |
| ***Guarantors*** | means the guarantors under the Existing RCF Agreement, the First Lien Notes Indenture, and the Second Lien Notes Indenture. |
| ***Holder*** | means a person with a Book Entry Interest in the Second Lien Notes. |
| ***Holding Company*** | means, in relation to a company or corporation, any other company or corporation in respect of which it is a Subsidiary. |
| ***HQ Sale and Leaseback*** | has the meaning given to it in paragraph 6.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |

| | |
|---|---|
| ***IFRS*** | means international accounting standards within the meaning of IAS Regulation 1606/2002 as adopted by the EU. |
| ***Information Agent*** | means Lucid Issuer Services Limited, a company incorporated in England and Wales with registered number 05098454, whose registered office is at Tankerton Works, 12 Argyle Walk London, WC1H 8HA (or any successor in title) as the information agent with respect to the Scheme. |
| ***Intercreditor Agreement*** | has the meaning given to it in paragraph 3.5 of Part 2 (*Background to the Company, the Group and the Group's financing Arrangements prior to the Covid-19 Pandemic*) of this Explanatory Statement. |
| ***Intercreditor Agreement Side Letter*** | has the meaning given to it in paragraph 10.1(a)(B) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Intermediary*** | means a person who holds an interest at the Voting Instruction Deadline in any Second Lien Notes on behalf of another person or other persons who does not hold that interest as an Account Holder. |
| ***Liability or Liabilities*** | means any present or future obligation, liability, claim, counterclaim, debt, demand, action, right of set-off, indemnity, cause of action, or right or interest of any kind or nature whatsoever at any time including without limitation, for the payment of money, performance of an act or obligation, or otherwise, whether in respect of principal, interest or otherwise, whether actual or contingent, whether fixed or undetermined, known or unknown, whether suspected or unsuspected, whether direct or indirect, whether owed jointly or severally and whether owed as principal, surety or in any capacity whatsoever and whether it arises at common law, in equity, in contract, in tort, by statute in the State of New York or England and Wales or in any other jurisdiction under whatever applicable law, under any legal theory, and in any manner whatsoever, including any amount which would constitute such a liability but for any discharge, non-provability, unenforceability or non- allowance of the same in any insolvency or other Proceedings, including any claim for breach of representation, warranty or undertaking or on an event of default or under any indemnity given under or in connection with any document or agreement evidencing or constituting any other Liability falling within this definition, and any claim for damages or restitution. |
| ***Lock-Up Agreement*** | has the meaning given to it in paragraph 9.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity* |

|  | *Arrangements (including the Scheme)*) of this Explanatory Statement. |
|---|---|
| ***Parent*** | means Missouri Topco Limited. |
| ***Participating Second Lien Noteholders*** | has the meaning given to it in paragraph 9.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***PIK Interest*** | has the meaning given to it in paragraph 5.1(a) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Practice Statement*** | means the Practice Statement issued by the Chancery Division of the High Court of Justice for England and Wales on 15 April 2002. |
| ***Practice Statement Letter*** | means the practice statement letter issued by the Company to Scheme Creditors on 9 June 2020 in respect of the Scheme. |
| ***Priority Agreement*** | has the meaning given to it in paragraph 3.2 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Proceeding*** | means any process, suit, action, legal or other proceeding in any jurisdiction, including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, execution, distraint, restraint, forfeiture, re-entry, seizure, lien, enforcement of judgment or enforcement of any security. |
| ***RCF Facilities*** | has the meaning given to it in paragraph 3.1 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***RCF Waiver*** | has the meaning given to it in paragraph 4.1 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Registrar of Companies*** | means the Registrar of Companies in England and Wales, within the meaning of the Companies Act 2006. |
| ***Related Fund*** | means in relation to a fund (the "**First Fund**") a fund which is (i) managed or advised by the same investment manager or investment adviser as the First Fund or (ii) if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an |

|  |  |
|---|---|
|  | Affiliate of the investment manager or investment adviser of the First Fund. |
| **Released Party** | has the meaning given to it in paragraph 10.2(b) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Scheme** | means the scheme of arrangement in respect of the Company under Part 26 of the Companies Act in its present form or subject to any modification, addition or condition which the Court may think fit to approve or impose. |
| **Scheme Claims** | has the meaning given to it in paragraph 6.2 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Scheme Conditions** | has the meaning given to it in paragraph 1.1 of Part 5 (*Process for Voting on and Implementation of the Scheme*) of this Explanatory Statement. |
| **Scheme Consideration** | has the meaning given to it in paragraph 10.2(a) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| **Scheme Convening Hearing** | means the court hearing to be held remotely on or around 29 June 2020. |
| **Scheme Creditors** | means a Holder of the Second Lien Notes (other than the Shareholder PIK Notes), each in their capacity as a creditor of the Company, and **"Scheme Creditor"** shall mean any one of them. |
| **Scheme Document** | means the document at Part 13 (*Definitions and Construction*) of this Explanatory Statement setting out the terms and conditions of the Scheme in its present form or with and subject to any modifications made pursuant to Clause 5 thereof. |
| **Scheme Effective Date** | means the date on which an office copy of the Court Order is delivered for registration to the Registrar of Companies in England and Wales, within the meaning of the Companies Act. |
| **Scheme Effective Date Notice** | means the notice to be sent by the Company substantially in the form set out in Schedule 1 of the Scheme Document. |

| | |
|---|---|
| ***Scheme Effective Time*** | means the earliest time at which the Scheme Effective Date Notice is issued by the Company to one or more addressees in accordance with the provisions of the Scheme Document. |
| ***Scheme Meeting*** | means the meeting of the Scheme Creditors convened at the direction of the Court for the purposes of considering and, if thought fit, approving the terms of the Scheme. |
| ***Scheme Sanction Hearing*** | means the Court hearing in the Companies Court, Business List (ChD) to be held on or around 27 July 2020 for the purposes of obtaining the Scheme Sanction Order. |
| ***Scheme Sanction Order*** | means the order or orders of the Court sanctioning the Scheme under section 899 of the Companies Act. |
| ***Scheme Website*** | means the website set up for Scheme Creditors by the Information Agent at www.lucid-is.com/matalan. |
| ***SEC*** | means the US Securities and Exchange Commission. |
| ***Second Covid-19 Statement*** | has the meaning given to it in paragraph 2.1 of Part 3 (*Background to the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Second Lien Amendments Documents*** | has the meaning given to it in paragraph 10.1(a) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Second Lien Amendments*** | has the meaning given to it in paragraph 10.1(c) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Second Lien Amendments Effective Date*** | means the date on which the Second Lien Amendments become effective in accordance with the terms of the Second Lien Amendments Documents. |
| ***Second Lien Deferral Fee*** | has the meaning given to it in paragraph 10.1(c) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Second Lien Notes Guarantees*** | means the guarantees provided by each Second Lien Notes Guarantor in accordance with article 11 of the Second Lien Notes Indenture, of obligations under the Second Lien Notes Indenture and the Second Lien Notes and any other guarantee granted by any member of the Group in relation to the Second Lien Notes. |

| | |
|---|---|
| ***Second      Lien      Notes Guarantors*** | means the providers of the Second Lien Notes Guarantees including, without limitation, those listed in Schedule 4 to the Scheme Document. |
| ***Second Lien Notes*** | has the meaning given to it in paragraph 3.1(b) of Part 2 (*Background to the Company, the Group and the Group's financing Arrangements prior to the Covid-19 Pandemic*) of this Explanatory Statement. |
| ***Second Lien Notes Indenture*** | means the senior notes indenture dated 25 January 2018 between, among others, the Company and the Trustee, as supplemented, amended and restated from time to time. |
| ***Second Lien Supplemental Indenture*** | has the meaning given to it in paragraph 10.1(a)(A) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Security Agent*** | means Lloyds Bank Plc. |
| ***Security Agent Instruction Letter*** | has the meaning given to it in paragraph 10.1(a) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Securities Act*** | shall have the meaning given to it in the securities law notice at the beginning of this Explanatory Statement. |
| ***Shareholder*** | means John Hargreaves. |
| ***Shareholder Credit Security*** | has the meaning given to it in paragraph 6.4 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Shareholder Default*** | has the meaning given to it in paragraph 6.3 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Shareholder      Equity Commitment*** | has the meaning given to it in paragraph 6.2 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Shareholder Notes*** | means the £50,000,000 Second Lien Notes held by the Shareholder and cancelled on 9 June 2020 pursuant to Section 2.10 of the Second Lien Notes Indenture. |

| | |
|---|---|
| ***Shareholder PIK Notes*** | has the meaning given to it in paragraph 5.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Shareholder PIK Notes Indenture*** | has the meaning given to it in paragraph 5.1 of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***Subsidiary*** | means a subsidiary within the meaning of section 1159 of the Companies Act and a subsidiary undertaking within the meaning of section 1162 of the Companies Act. |
| ***Trustee*** | means Deutsche Trustee Company Limited in its capacity as trustee under the Second Lien Notes Indenture. |
| ***Trustee Instruction Letter*** | has the meaning given to it in paragraph 10.1(a) of Part 4 (*Rationale for and Summary of the Additional Liquidity Arrangements (including the Scheme)*) of this Explanatory Statement. |
| ***UK*** | means the United Kingdom. |
| ***US*** | means the United States of America. |
| ***US Bankruptcy Code*** | means Title 11 of the United States Code. |
| ***US Bankruptcy Court*** | means the US Bankruptcy Court for the Southern District of New York or other appropriate forum in a case filed under Chapter 15 of the US Bankruptcy Code. |
| ***US Bankruptcy Rules*** | means Rule 2002(q)(1) of the Federal Rules of Bankruptcy Procedure. |
| ***Voting Instruction Deadline*** | means 5:00p.m. (London time) on 16 July 2020. |
| ***Voting Record Time*** | means 5:00p.m. (London time) on 16 July 2020. |

## APPENDIX A
## INSTRUCTIONS TO SCHEME CREDITORS

**Please take the action requested of you in these instructions URGENTLY.  There is only a limited time period within which the Account Holder Letter can be returned, duly executed and completed by all relevant persons as directed in these instructions, in order to vote at the Scheme Meeting.  If you have any questions, contact the Information Agent immediately via email at** matalan@lucid-is.com.

1.      **Class of Scheme Creditors**

1.1     The Scheme is proposed between the Company and its Scheme Creditors.

1.2     The Scheme will have a single class of creditors, comprised of certain Holders.  All Scheme Creditors will be treated in the same or materially the same way by the Scheme.

1.3     The Company shall hold the Scheme Meeting for its Scheme Creditors.

2.      **A Scheme Creditor's Claim Value for Scheme voting purposes**

2.1     The Claim Value attributable to a Scheme Creditor is the aggregate amount in GBP of principal and accrued interest (calculated as at 16 July 2020) owing to a Scheme Creditor in respect of its Second Lien Notes held at the Voting Record Time.

2.2     The Claim Value of each Scheme Creditor will be calculated as at the Voting Record Time based on information confidentially provided to the Company (acting through the Information Agent).  This information from the respective Scheme Creditor's Account Holder Letter will be used by the Chairperson of the Scheme Meeting to determine whether the resolution is passed at the Scheme Meeting.  Scheme Creditors do not need to take any action in respect of confirming the amount of their Claim Value other than providing the details requested in the applicable Account Holder Letter.  Scheme Creditors are entitled to be informed of the determined amount of their Claim Value prior to the commencement of the Scheme Meeting upon written request to the Information Agent via email at matalan@lucid-is.com.

3.      **Admission of claims**

3.1     The Chairperson of the Scheme Meeting may, for voting purposes only, make a final determination if there is any dispute as to the actual amount of a Claim Value to be admitted at the Scheme Meeting.  The Chairperson's determination will be final and binding on all concerned.

3.2     The value of a Scheme Creditor's claim for voting purposes in the Scheme will be the aggregate amount in GBP of principal and accrued interest (calculated as at 16 July 2020) owing to a Scheme Creditor in respect of its Second Lien Notes held at the Voting Record Time.

4.      **Scheme Meeting**

4.1     The Chairperson will commence the Scheme Meeting at **10:00a.m.**  (London time) on 20 July 2020, at which time all Scheme Creditors are requested to attend via Remote Participation Methods (as defined below), the details of which shall be available from

the Information Agent.  Scheme Creditors will be able to see and/or hear the Chairperson of the Scheme Meeting, to ask questions and receive answers.  It will not be possible to attend the Scheme Meeting physically in person due to the Covid-19 outbreak.

4.2    If you cease to be a Scheme Creditor before the Voting Record Time, you will not be entitled to attend and vote at the Scheme Meeting.

4.3    If you are a Scheme Creditor of the Company as at the Voting Record Time, you will be entitled to attend and vote at the Scheme Meeting, either in person or by proxy and in each case via the Remote Participation Methods, and your vote will be taken into account for the purpose of establishing whether or not the requisite approvals for the Scheme have been obtained.

4.4    The Information Agent has been appointed to facilitate communications with the Scheme Creditors.  The Information Agent's remuneration and expenses, and all costs incurred by it on behalf of the Company, shall be met by the Group.

5.    **Attending the Scheme Meeting**

5.1    The Scheme Meeting has been ordered by the Court to take place commencing at **10:00a.m.** (London time) on 20 July 2020.  The Scheme Meeting will take place via webinar hosted by Clifford Chance LLP, as set out in Appendix B (*Notice of the Scheme Meeting*) of the Explanatory Statement.

5.2    The Scheme Meeting will not be held physically, and it will not be possible to attend the Scheme Meeting in person physically because of the Covid-19 outbreak.  Instead, Scheme Creditors may attend the Scheme Meeting remotely by webinar, either by:

(a)    **Telephone**: Scheme Creditors who wish to attend the Scheme Meeting by telephone may do so by calling the number provided to them by the Information Agent.  The live audio from the Scheme Meeting will be available from 10:00a.m. (London time) on 20 July 2020. Scheme Creditors will be able to hear the Chairperson, to ask questions, and receive answers through the telephone. It will not be possible to attend the Scheme Meeting by telephone using a rotary dial telephone.  If a Scheme Creditor has no alternative to a rotary dial telephone they should contact matalan@lucid-is.com to make alternative arrangements for participation by telephone; or

(b)    **Video conference**: Scheme Creditors who wish to attend the Scheme Meeting online video conference may do so by accessing the link provided to them by the Information Agent.  The video conference from the Scheme Meeting will be available from 10:00a.m. (London time) on 20 July 2020. Scheme Creditors will be able to see and hear the Chairperson, to ask questions, and receive answers through the video conference,

(together, the "**Remote Participation Methods**").

5.3    In order to use either Remote Participation Method, each Scheme Creditor must send the Account Holder Letter (and any other information required in Appendix B (*Notice of the Scheme Meeting*) of the Explanatory Statement) by email in pdf to

matalan@lucid-is.com as soon as possible and in any event so as to be received by no later than 5:00p.m. (London time) on 16 July 2020.

5.4     If the requirements in paragraph 5.3 above are not met, admittance to the Scheme Meeting will be permitted prior to the commencement of the Scheme Meeting on the submission of proof of personal identity (for example, passport or other picture identification) and a valid Account Holder Letter to the Information Agent in pdf by email at matalan@lucid-is.com.  Scheme Creditors are advised that admittance to the Scheme Meeting in this way and delivery of the Account Holder Letter to the Information Agent on the date of the Scheme Meeting will be subject to time-consuming verification with respect to the requirements for participating in the Scheme Meeting.  Accordingly, it is recommended that Scheme Creditors submit their Account Holder Letter to the Information Agent so as to be received by 5:00p.m. (London time) on 16 July 2020.

6.     **Voting at the Scheme Meeting**

*General*

6.1     Each Scheme Creditor should immediately contact its Account Holder (through any intermediaries, if appropriate) to ensure that a valid Account Holder Letter in respect of its Scheme Claim is delivered to and received by the Information Agent.

6.2     It will be the responsibility of Account Holders to obtain from the Holders (through any intermediaries, if applicable) on whose behalf they are acting in accordance with the procedures established between them, whatever information or instructions they may require to identify the relevant Holder from details contained within an Account Holder Letter and to provide the information, instructions, confirmations and representations required to be given by the Account Holder Letter for and on behalf of the relevant Holder.  To assist this process, each Holder is strongly encouraged to contact its Account Holder (through any intermediaries, if appropriate) to enable that Account Holder to complete an Account Holder Letter and deliver such Account Holder Letter to the Information Agent before the Voting Instruction Deadline.

6.3     If a person is in any doubt as to whether or not it is a Holder, such person should contact the Information Agent using the contact details in the Account Holder Letter set out in Appendix C (*Account Holder Letter*) of the Explanatory Statement.

6.4     A person that becomes a Scheme Creditor after the Voting Record Time may, at the direction of the Company, be entitled to receive its Deferral Fee provided that it is a Holder on the Second Lien Amendments Effective Date, but it will not be entitled to vote at the Scheme Meeting.

*Voting procedure*

6.5     In order to vote at a Scheme Meeting, each Holder (through any intermediaries, if applicable) should instruct its Account Holder to complete and sign an Account Holder Letter as described below and deliver the completed and signed Account Holder Letter to the Information Agent on behalf of the Company before the Voting Instruction Deadline.

6.6     Holders of Second Lien Notes held through Euroclear or Clearstream and who are not Account Holders in such Clearing Systems and who wish to vote in respect of the Scheme must contact their broker, dealer, bank, custodian, trust company, other trustee, or nominee to make arrangements for:

(a)     the relevant Clearing System to block the Second Lien Notes in the relevant Account Holder's account within the time limit specified by the relevant Clearing System **by no later than the Custody Instruction Deadline, being 5:00p.m. (London time) on** 15 July 2020;

(b)     their Account Holder in the relevant Clearing System through which they hold the Second Lien Notes to complete and deliver the Account Holder Letter to the Information Agent **by the Voting Instruction Deadline, being 5:00p.m. (London time) on** 16 July 2020; and

(c)     such Custody Instructions to contain the name, email address and telephone number of the Scheme Creditor**.**

6.7     The Second Lien Notes must be blocked by no later than the Custody Instruction Deadline in accordance with the normal operating procedures imposed by Euroclear or Clearstream.  Any Second Lien Notes blocked in Euroclear or Clearstream for this purpose shall be released to the Account Holder or the relevant Clearing System the day following conclusion of the Scheme Meeting, on 21 July 2020. As the procedure for blocking such Second Lien Notes may take a considerable period of time, Holders should ensure that Custody Instructions are given as early as possible so that the relevant Second Lien Notes may be blocked prior to the Custody Instruction Deadline. Please also see paragraph 7 below for more information on blocking.

*Voting in person*

6.8     To the extent a Scheme Creditor wishes to vote on the Scheme in person, prior to the Scheme Meeting, the Information Agent will provide each Scheme Creditor with (i) a dedicated phone line (with appropriate country codes) to dial in to, and (ii) a unique creditor ID which each Scheme Creditor will be required to provide to register their vote by telephone.

6.9     **IMPORTANT**: In order to obtain the details to vote at the Scheme Meeting by telephone, each Scheme Creditor must send the Account Holder Letter (and any other information required in Appendix B (*Notice of the Scheme Meeting*)) of the Explanatory Statement by email in pdf to matalan@lucid-is.com as soon as possible and in any event so as to be received by no later than 5:00p.m. (London time) on 16 July 2020.

6.10    It will not be possible to vote at the Scheme Meeting by telephone using a rotary dial telephone.  If a Scheme Creditor has no alternative to a rotary dial telephone they should contact matalan@lucid-is.com to make alternative arrangements for voting by telephone.

6.11    The Scheme Meeting will be adjourned for up to 30 minutes to allow Scheme Creditors to vote by telephone.  Voting by telephone shall apply whether the Scheme Creditor is attending the Scheme Meeting by telephone or by video conference.

6.12   Scheme Creditors should follow the recorded prompts for instructions.  The telephone numbers for Voting will be open from the start of the Scheme Meeting until up to 30 minutes after the Scheme Meeting has been adjourned to allow for voting.

7.   **Procedure for blocking the Second Lien Notes**

*Account Holders in Euroclear/Clearstream*

7.1   Holders must irrevocably instruct their Account Holders in Euroclear or Clearstream (as applicable) to, and those Account Holders must, block the Second Lien Notes which are the subject of that Holder's Account Holder Letter.  Each Holder should instruct its Account Holder to confirm that (and the Account Holder should ensure that) the Account Holder Letter cross references the relevant Custody Instruction Reference Number.  This will enable the Information Agent to verify the blocking of the Second Lien Notes.

7.2   It is the responsibility of Account Holders to ensure that they comply with any particular deadlines and instructions imposed by the relevant Clearing System for blocking the Second Lien Notes.

*Invalid Account Holder Letters*

7.3   The Information Agent will use all reasonable endeavors to assist Holders to complete their Account Holder Letters validly, should it receive any Account Holder Letters which are not valid.  However, failure to deliver a valid Account Holder Letter on behalf of a Holder to the Information Agent in the manner and within the deadlines referred to above will mean that the voting instructions contained in such Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Holder will not be entitled to vote at the Scheme Meeting.

7.4   Failure to include a valid Custody Instruction Reference Number in an Account Holder Letter delivered on behalf of a Holder to the Information Agent will invalidate that Account Holder Letter and its voting instructions.

7.5   None of the Company, any member of the Group, the Information Agent or any other person will be responsible for any loss or liability incurred by a Holder as a result of any determination by the Information Agent that an Account Holder Letter contains an error or is incomplete, even if this is subsequently shown not to have been the case.

7.6   The Information Agent is an agent of the Company and owes no duty, express or implied, to any Scheme Creditor, Account Holder or Clearing System.

7.7   Holders are advised to check with the bank, securities broker, relevant Account Holder, or other Intermediary through which they hold their Second Lien Notes whether such Intermediary applies different deadlines for any of the events specified.

8.   **Account Holder Letters**

8.1   Each Holder must ensure that its Account Holder completes and submits to the Information Agent a valid Account Holder Letter in order to vote at the Scheme Meeting.  For the purpose of voting, Account Holder Letters must be submitted such

that they are received by the Information Agent before the Voting Instruction Deadline, being **5:00p.m.** (London time) on 16 July 2020.

8.2     Pursuant to Part 1 of the Account Holder Letter set out in Appendix C (*Account Holder Letter*) of the Explanatory Statement, Account Holders are required to request:

(a)     the relevant Clearing System to block the Second Lien Notes in their account within the time limit specified by Euroclear or Clearstream by no later than the Custody Instruction Deadline, being **5:00p.m.** (London time) on 15 July 2020; and

(b)     complete and deliver the Account Holder Letter to the Information Agent by the Voting Instruction Deadline, being **5:00p.m.** (London time) on 16 July 2020.

As set out above, the procedure for blocking such Second Lien Notes may take a considerable period of time, and Holders should ensure that Custody Instructions are given as early as possible so that the relevant Second Lien Notes may be blocked prior to the Custody Instruction Deadline.

8.3     For the purposes of voting in respect of Second Lien Notes held in Euroclear or Clearstream, the Account Holder Letter must be completed and signed by the Account Holder.

8.4     Failure to deliver a valid Account Holder Letter on behalf of a Holder by the Voting Instruction Deadline will mean that the voting instructions contained in the Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting, the relevant Holder will not be entitled to vote at the Scheme Meeting.

8.5     Notwithstanding any other provision of this Explanatory Statement, the Chairperson will be entitled, at his or her sole discretion, to permit a Holder in respect of which a completed Account Holder Letter has not been delivered prior to the Voting Instruction Deadline to vote at the Scheme Meeting if the Chairperson considers that the relevant Holder has produced sufficient proof that it is entitled to vote.

9.      **Completing your Account Holder Letter**

9.1     Each Holder will need to give its Account Holder information and instructions as to voting and certain other matters.

9.2     In summary each Holder may elect:

(a)     to instruct the Chairperson as its proxy to cast its vote in accordance with the wishes of that Holder;

(b)     to attend and vote at the Scheme Meeting in person or by a duly authorised representative if a corporation, in each case via webinar; or

(c)     to instruct someone else as its proxy to cast its vote in accordance with the wishes of that Holder,

in each case, by instructing its Account Holder to deliver on its behalf and ensuring that the voting intention section of the Account Holder Letter is completed.

9.3    Each Holder should also ensure that the following is included in the designated sections of the Account Holder Letter delivered on its behalf:

(a)    its identity and country of residence/headquarters;

(b)    details of the Second Lien Notes which are the subject of the Account Holder Letter, including the ISIN number(s), the principal amount of the Notes held at the relevant Clearing System(s), the identity of the relevant Clearing System(s), the account number of the Account Holder in the relevant Clearing System(s) and the Custody Instruction Reference Number(s); and

(c)    its voting instructions.

10.    **Lodging your Account Holder Letter**

10.1    Account Holder Letters for the purposes of voting at the Scheme Meeting should be delivered by Account Holders as soon as possible to the Information Agent online via the Scheme Website or via email at matalan@lucid-is.com, and, in any event, before the Voting Instruction Deadline, being **5:00p.m.** (London time) on 16 July 2020**.**

10.2    Each Holder should note that, unless a valid Account Holder Letter is delivered on its behalf to the Information Agent before the Voting Instruction Deadline, the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting, the Holder will not be entitled to vote at the Scheme Meeting.

10.3    Any Account Holder Letter delivered will be irrevocable until the earlier of:

(a)    if the Scheme is not approved by the requisite majorities at the Scheme Meeting, the conclusion of the Scheme Meeting; or

(b)    the withdrawal of the Scheme by the Company.

11.    **Assignment and Transfers after the Voting Record Time**

11.1    The Company shall not be under any obligation to recognise any assignment or transfer of a Scheme Claim after the Voting Record Time for the purposes of the Scheme or the Scheme Document; or have any obligations to any person other than a Scheme Creditor, **provided that**, where the Company has received from the relevant parties notice in writing of an assignment or transfer prior to the Scheme Effective Date, the Company, may, in its sole discretion and subject to the production of such other evidence in relation to such transfer or assignment as they may require and to any other terms and conditions which the Company may consider necessary or desirable, agree to recognise such assignment or transfer for the purposes of the Scheme.

11.2    Any assignee or transferee of a Scheme Claim so recognised by the Company shall be bound by the terms of the Scheme as a Scheme Creditor and shall produce such evidence as the Company may reasonably require to confirm that it has agreed to be bound by the terms of the Scheme.

12.   **Further copies**

If you require further copies of this document or Account Holder Letters these can be obtained via the Scheme Website.

# APPENDIX B
## NOTICE OF THE SCHEME MEETING

**IN THE HIGH COURT OF JUSTICE**                    **No. _____ 2020**

**BUSINESS AND PROPERTY COURT OF ENGLAND & WALES**
**COMPANIES COURT (CHD)**

### IN THE MATTER OF MATALAN FINANCE PLC
### AND IN THE MATTER OF THE COMPANIES ACT 2006

**NOTICE IS HEREBY GIVEN** that by an Order dated 29 June 2020 made in the above matter the High Court of Justice of England and Wales (the "**Court**") has directed that the Scheme Meeting be convened of the Scheme Creditors (as such term is defined in the scheme of arrangement hereinafter referred to) of the Company for the purposes of considering and, if thought fit, approving (with or without modification) a scheme of arrangement proposed to be made between the Company and its Scheme Creditors (the "**Scheme**").

The Scheme Meeting to consider the Scheme will be held via webinar (with both video and audio participation enabled) hosted by Clifford Chance LLP on 20 July 2020, commencing at **10:00a.m.** (London time). A Scheme Creditor wishing to attend the Scheme Meeting (via webinar) may obtain details by contacting the Information Agent via email at matalan@lucid-is.com. In each case details will be given to Scheme Creditors upon the Information Agent being satisfied that any Scheme Creditor (or its representative) requesting the same has provided evidence of their authority to represent that body corporate at the Scheme Meeting (for example, a valid power of attorney and/or board minutes). Scheme Creditors will be able to see and hear the Chairperson of the Scheme Meeting, to ask questions and receive answers through the webinar. It will not be possible to attend the Scheme Meeting physically in person due to the Covid-19 outbreak.

A copy of the document in which the terms of the Scheme are contained (the "**Scheme Document**") and a copy of the statement required to be furnished pursuant to section 897 of the Companies Act 2006 (the "**Explanatory Statement**") are incorporated in the document of which this notice forms part and can also be obtained via the Scheme Website at www.lucid-is.com/matalan or by contacting the Information Agent via email at matalan@lucid-is.com. Scheme Creditors may also request hard copies of the Scheme Document from Clifford Chance LLP (contacts: Melissa Coakley / Philip Hertz, email: ProjectKansasCoreCC@CliffordChance.com) and when so requested shall be provided with them free of charge.

Scheme Creditors are requested to attend the Scheme Meeting at the time and place indicated above, either in person or by proxy. Scheme Creditors may vote in person at the Scheme Meeting or they may appoint another person, whether a Scheme Creditor or not, as their proxy to attend and vote in their place.

In order to enable Scheme Creditors to vote in person or by proxy at the Scheme Meeting, an **Account Holder Letter** accompanies this notice.

The Voting Record Time is **5:00p.m.** (London time) on 16 July 2020.

It is requested that the Account Holder Letter be completed, signed and submitted in accordance with the procedures described in this Explanatory Statement, so as to be received by the Information Agent, by no later than **5:00p.m.** (London time) on 16 July 2020.

By the said Order, the Court has appointed Melissa Coakley, or, if she is unable to act, any other person appointed by the Company, to act as Chairperson of the Scheme Meeting referred to above and has directed the Chairperson to report the result of the Scheme Meeting to the Court.

The Scheme will be subject to the subsequent approval of the Court.

Clifford Chance LLP
10 Upper Bank Street
London
E14 5JJ


.....................................................................
**SOLICITORS FOR MATALAN FINANCE PLC**

Dated:

# APPENDIX C
## ACCOUNT HOLDER LETTER

**For use by Account Holders in respect of the**

£80,000,000 9½ per cent. second lien secured notes due 2024
ISIN: XS1756324684 / XS1756325491
(the "**Second Lien Notes**")

issued by

**Matalan Finance Plc (the "Company")**

in relation to

the Company's scheme of arrangement under
Part 26 of the Companies Act 2006 (the "**Scheme**")

Capitalised terms used but not defined in this Account Holder Letter shall have the same meaning as given to them in the explanatory statement relating to the Scheme dated ___ June 2020 (the "**Explanatory Statement**"), subject to any amendments or modifications made by the Court.

**This Account Holder Letter is only to be completed by Account Holders.**

Persons who are Account Holders, i.e. recorded directly in the records of Euroclear or Clearstream as holding an interest in the Second Lien Notes, must use this Account Holder Letter to register details of their interests in the Second Lien Notes and to make certain elections with respect to the Scheme, the delivery of the Deferral Fee and certain instructions relating to the Second Lien Notes.

**<u>A SEPARATE ACCOUNT HOLDER LETTER MUST BE COMPLETED IN RESPECT OF EACH SEPARATE BENEFICIAL HOLDING OF INTEREST IN THE SECOND LIEN NOTES.</u>**

## IMPORTANT DEADLINES

| | |
|---|---|
| **5:00p.m. (London time) 15 July 2020** | **Custody Instruction Deadline**.  Acceptance of an Account Holder Letter by the Information Agent for the purposes of voting on the Scheme is subject to receipt by the Information Agent of a Scheme Creditor's Custody Instructions prior to this time. |
| **5:00p.m. (London time) 16 July 2020** | **Voting Record Time.** The time at which the amount of Second Lien Notes held by a Scheme Creditor will be determined for the purposes of calculating the Claim Value of such Scheme Creditor and for the purposes of voting on the Scheme. |
| **5:00p.m. (London time) 16 July 2020** | **Voting Instruction Deadline.**  For a Scheme Creditor to vote on the Scheme using an Account Holder Letter, its validly completed Account Holder Letter must be submitted to and received by Lucid Issuer Services Limited (the **"Information Agent"**) online via the Scheme Website or as a pdf via email to [matalan@lucid-is.com](mailto:matalan@lucid-is.com) prior to this time. |
| | Submission of an Account Holder Letter (or failure to submit an Account Holder Letter) before the Voting Instruction Deadline will not preclude a Scheme Creditor from voting in person or by proxy at the Scheme Meeting provided that the Scheme Creditor or its proxy is able to establish the Scheme Creditor's identity and entitlement to vote at the Second Lien Notes Scheme Meeting by providing a copy of the Account Holder Letter, a passport or identity card (if relevant), and evidence of authorisation to represent the relevant Scheme Creditor via email to [matalan@lucid-is.com](mailto:matalan@lucid-is.com) prior to the commencement of the Scheme Meeting. |
| **5:00p.m. (London time) 15 July 2020** | **Custody Instruction Deadline**.  Acceptance of an Account Holder Letter by the Information Agent for the purposes of voting on the Scheme is subject to receipt by the Information Agent of a Scheme Creditor's Custody Instructions prior to this time. |
| **10:00a.m. (London time) 20 July 2020** | **Scheme Meeting**.  The Scheme Meeting will take place via webinar hosted by Clifford Chance LLP.  Scheme Creditors wishing to attend the Scheme Meeting (via webinar) may obtain details from the Information Agent by contacting them at [matalan@lucid-is.com](mailto:matalan@lucid-is.com). Upon the Information Agent being satisfied that any Scheme Creditor (or its representative) requesting the same has provided evidence of their authority to represent the Scheme Creditor at the Scheme Meeting (for example, a valid power of attorney and/or board minutes) and the Information Agent being satisfied in respect of the same, they shall provide the details. |
| | Scheme Creditors are entitled to attend the Scheme Meeting in person or by appointing a proxy, provided that the Scheme Creditor or its proxy is able to establish the Scheme Creditor's identity and entitlement to vote at the Scheme Meeting, and provide the Scheme Creditor's Custody Instructions (if not already received by the Custody Instruction Deadline). |

### INSTRUCTIONS AND DEADLINE FOR RECEIPT OF CUSTODY INSTRUCTIONS AND ACCOUNT HOLDER LETTER

<div style="border:1px solid">

**In order to be validly submitted, this Account Holder Letter should be completed as follows:**

**Part 1 (*Scheme Creditor and Holding Details*):** Part 1 must be completed to include Scheme Creditor and holding details.

**Part 2 (*Voting Participation*):** Part 2 must be completed in order to vote in respect of the Scheme.

Completed Account Holder Letters must be completed and submitted to the Information Agent in pdf format by email to matalan@lucid-is.com by no later than the Voting Instruction Deadline, which is 5:00p.m. (London time) on 16 July 2020. Account Holder Letters received after the Voting Instruction Deadline will not constitute valid voting instructions for the purposes of voting on the Scheme. The Second Lien Notes identified in this Account Holder Letter must be blocked by no later than the Custody Instruction Deadline, which is 5:00p.m. (London time) on 15 July 2020. Originals of this Account Holder Letter are not required.

</div>

**You are strongly advised to read the Explanatory Statement and the Scheme Document, in particular, Appendix A (*Instructions to Scheme Creditors*) to the Explanatory Statement, before you complete this Account Holder Letter.**

**All relevant documentation can be found on the Scheme Website at www.lucid-is.com/matalan. Scheme Creditors may view and download documents relating to the Scheme from the Scheme Website once there have registered. In order to register on the Scheme Website and access certain documents available on the Scheme Website, Scheme Creditors will require a username and password. The username and password can be obtained by registering on the Scheme Website.**

All relevant Parts of this Account Holder Letter should be completed by the Account Holder for and on behalf of the Scheme Creditor.

**If the Scheme Effective Date occurs, the Scheme will become effective and binding on all Scheme Creditors, regardless of whether you voted in favour of or against the Scheme or abstained from voting.**

**The Second Lien Amendments will become effective on the Second Lien Amendments Effective Date (which is anticipated to occur on or around 28 July 2020).**

This Account Holder Letter and any obligations arising out of or in connection with this Account Holder Letter shall be governed by, and interpreted in accordance with, English law.

A summary of each Part of this Account Holder Letter is set out below.

## PART 1
## SCHEME CREDITOR AND HOLDING DETAILS

**This Part 1 of the Account Holder Letter must be validly completed by the Account Holder and submitted to the Information Agent on or prior to the Voting Instruction Deadline in order for this Account Holder Letter to constitute valid voting instructions.**

Part 1 of this Account Holder Letter requires:

(a)     details of the Scheme Creditor, the Account Holder, and the Scheme Claims to which this Account Holder Letter relates, as well as details for delivery of the Deferral Fee; and

(b)     in the case of Account Holders with accounts in either Euroclear or Clearstream, a Custody Instruction Reference Number in respect of any Second Lien Notes that are identified in Part 1 (*Scheme Creditor and Holding Details*) of this Account Holder Letter must be provided by the Account Holder by submitting its Custody Instructions to the relevant Clearing System to block the trading of the Second Lien Notes by the Custody Instruction Deadline.  Such Custody Instruction Reference Number must be specified in the space provided in Part 1, Section 3 (*Holding Details*) of this Account Holder Letter.

Part 1 (*Scheme Creditor and Holding Details*) of the Account Holder Letter must be validly completed by the Account Holder and submitted to the Information Agent.

## PART 2
## VOTING PARTICIPATION

Part 2 of the Account Holder Letter enables a Scheme Creditor to make elections with respect to the approval of the Scheme and the appointment of a proxy to attend the Scheme Meeting.

Part 2 of the Account Holder Letter should be completed by the Account Holder on behalf of the Scheme Creditor and submitted to the Information Agent prior to the Voting Instruction Deadline if the Scheme Creditor wishes to vote on the Scheme.

Account Holder Letters received by the Information Agent after the Voting Instruction Deadline will not constitute valid instructions for the purposes of voting on the Scheme. However, Scheme Creditors will still be able to vote on the Scheme separately by attending the Scheme Meeting or appointing a proxy to attend the Scheme Meeting on their behalf.

**If a Scheme Creditor wishes to amend its voting instructions provided in an Account Holder Letter, it may do so by submitting a new Account Holder Letter to the Information Agent by the Voting Instruction Deadline. The last validly completed Account Holder Letter received by the Information Agent prior to the commencement of the Scheme Meeting will take precedence over any earlier validly submitted Account Holder Letter(s) in respect of that Scheme Creditor.**

**Acceptance of an Account Holder Letter by the Information Agent for the purposes of voting on the Scheme is subject to receipt by the Information Agent of a Scheme Creditor's Custody Instructions prior to 5:00p.m. (London time) on 15 July 2020 (the Custody Instruction Deadline).**

**FOR ASSISTANCE CONTACT THE INFORMATION AGENT:**

**Lucid Issuer Services Limited
Email: matalan@lucid-is.com**

**Scheme Website: www.lucid-is.com/matalan**

## IMPORTANT INFORMATION

| Scheme Voting | **Scheme Creditors may only vote on the Scheme if they are holders of the Second Lien Notes at the Voting Record Time.**<br><br>**A Scheme Creditor that is a party to the Lock-Up Agreement is, pursuant to the terms of the Lock-Up Agreement, obliged to vote in favour of the Scheme.**<br><br>For a Scheme Creditor to vote on the Scheme, Parts 1 and 2 of this Account Holder Letter **must** be validly completed and received by the Information Agent on or prior to **the Voting Instruction Deadline**.<br><br>**The Voting Record Time and the Voting Instruction Deadline will occur at the same time.** |
|---|---|
| **Block on trading** | Scheme Creditors will be "blocked" from trading their Second Lien Notes in Euroclear and Clearstream, following delivery of their Custody Instructions to the relevant Clearing System, until the day following the Scheme Meeting, being 21 July 2020.<br><br>In order to be validly completed, the Account Holder Letter must specify a Custody Instruction Reference Number.  The Custody Instruction Reference Number must be requested on or prior to the Custody Instruction Deadline, and must apply to all Second Lien Notes that are identified in Part 1 (*Scheme Creditor and Holding Details*) of this Account Holder Letter.<br><br>Where a Scheme Creditor or its proxy intends to attend the Scheme Meeting in person, the Account Holder Letter and a current, full and valid signed passport shall be required to be sent to the Information Agent by email at matalan@lucid-is.com prior to the commencement of the Scheme Meeting as proof of personal identity and the passport number contained therein must match that in Part 2 (*Voting Participation*) of the Scheme Creditor's Account Holder Letter. |
| **Deferral Fee** | Scheme Creditors shall be entitled to receive the Deferral Fee on 29 July 2020, but only in respect of such Second Lien Notes as it holds as at the Voting Record Time. |

## PART 1
## SCHEME CREDITOR AND HOLDING DETAILS

**This Part 1 of the Account Holder Letter must be validly completed by the Account Holder and submitted to the Information Agent.**

**Irrespective of any elections made under any other Part of this Account Holder Letter, any Account Holder Letter received by the Information Agent that does not include all information requested in this Part 1 will not constitute a valid Account Holder Letter and the relevant Scheme Creditor will not be entitled to vote on the Scheme until a validly completed Account Holder Letter is received by the Information Agent.**

## SECTION 1
## SCHEME CREDITOR DETAILS

If you are an Account Holder who has interests in the Second Lien Notes for your own account in which case, you are the beneficial owner of and/or the holder of the ultimate economic interest in the relevant Second Lien Notes held in global form through the Clearing Systems with a claim in respect of any amount outstanding under the Second Lien Notes as at the Voting Record Time (being **5:00p.m. (London time) on 16 July 2020**), **please provide all information required below.**

Please identify the Scheme Creditor on whose behalf you are submitting this Account Holder Letter.

**To be completed for all Scheme Creditors:**

Full Name of Scheme Creditor: _____

If the Scheme Creditor is a corporate or institution, name of authorised employee: _____

If the Scheme Creditor is an individual, country of domicile: _____

If the Scheme Creditor is a company or institution:

(a)    place of statutory seat _____

(b)    central administration _____

(c)    principal place of business _____

E-mail address: _____

Telephone number (with country code): _____

## SECTION 2
## ACCOUNT HOLDER DETAILS

**To be completed by Account Holders representing Scheme Creditors**

Full name of Account Holder:

Applicable Clearing System*          ☐   Euroclear

                                     ☐   Clearstream

                                     * *Please tick relevant box*

Account Number of Account Holder at
Clearing System:                     _____

Authorised employee of Account Holder:
(*print name*)                       _____

Telephone no. of authorised employee
(with country code):                 _____

E-mail of authorised employee:
                                     _____

Authorised     employee     signature:
(*sign and print name*)              _____

Date:
                                     _____


Please note that the Euroclear or Clearstream account identified above shall be used for the
transfer of the Deferral Fee.

Please ensure that you have completed all relevant sections of this Account Holder Letter prior
to submitting this Account Holder Letter to the Information Agent.  By signing above, the
Account Holder confirms that it has obtained:

(a)     all necessary consents, authorisations, approvals and/or permissions required to be
        obtained by it under the laws and regulations applicable to it in any jurisdiction in order
        to sign this Account Holder Letter for itself or on behalf of the Scheme Creditor (as
        applicable); and

(b)     the authorisation of the relevant Scheme Creditor to complete and submit this Account
        Holder Letter on their behalf.

Acceptance of this Account Holder Letter by the Information Agent is subject to the relevant
Clearing System confirming to the satisfaction of the Information Agent that the Second Lien
Notes identified in Part 1 (*Scheme Creditor and Holding Details*) of this Account Holder Letter
have been blocked on or by the Custody Instruction Deadline.  In addition, the acceptance of
this Account Holder Letter by the Information Agent is subject to the Information Agent
reconciling the Custody Instruction Reference Number allocated by Euroclear or Clearstream.

Information in this Account Holder Letter must be consistent with such Custody Instructions and, in the event of any ambiguity, the Custody Instructions shall take precedence.

## SECTION 3
## HOLDING DETAILS

**Details of the Second Lien Notes to which this Account Holder Letter relates**

The Account Holder, on behalf of the relevant Scheme Creditor, holds the following Second Lien Notes to which this Account Holder Letter relates, and which have been "blocked" through delivery of Custody Instructions to the relevant Clearing System by the Custody Instruction Deadline, the reference number in relation to which is identified below.

**Total amount of Second Lien Notes to which this Account Holder Letter relates:**

| ISIN | Amount held at Clearing System | Clearing System | Clearing System Account number | Custody Instruction Reference Number |
|---|---|---|---|---|
| XS1756324684 | [•] | [•] | [•] | [•] |
| XS1756325491 | [•] | [•] | [•] | [•] |

## PART 2
## VOTING PARTICIPATION

### SECTION 1: ACCOUNT HOLDER CONFIRMATIONS

**The Account Holder named above in Part 1 (*Scheme Creditor and Holding Details*) hereby confirms to the Company and the Information Agent as follows (select "yes" or "no" as appropriate for each item):**

A.    That all authority conferred or agreed to be conferred pursuant to this Account Holder Letter and every obligation of the Account Holder under this Account Holder Letter (including any elections made in this Account Holder Letter) shall be binding upon the successors and assigns of the Account Holder (in the case of a corporation or institution) or the successors, assigns, heirs, executors, administrators, trustees in bankruptcy and legal representatives of the Account Holder (in the case of a natural person) and shall not be affected by, and shall survive, the insolvency, bankruptcy, dissolution, death or incapacity (as the case may be) of the Account Holder and that all of the information in this Account Holder Letter is complete and accurate.

**YES**    ☐

**NO**    ☐

B.    For Scheme Creditors and Account Holders holding Second Lien Notes in Euroclear or Clearstream that, on or prior to the Custody Instruction Deadline, the Scheme Creditor has instructed the Account Holder and the Account Holder has instructed Clearstream and/or Euroclear, as the case may be, to block the Second Lien Notes identified in Part 1, Section 3 (*Holding Details*) with effect on and from the Custody Instruction Deadline and that a Custody Instruction Reference Number for each such blocking instruction appears in this Account Holder Letter.

**YES**    ☐

**NO**    ☐

C.      That, in relation to the Second Lien Notes identified in Part 1, Section 3 (*Holding Details*) of this Account Holder Letter, the Account Holder has authority to (i) give the voting instructions set out in Part 2, Section 2 (*Voting Participation*) of this Account Holder Letter and, if applicable, to nominate the person named in Part 2, Section 2 (*Voting Participation*) of this Account Holder Letter to attend the Scheme Meeting, and (ii) make the elections and/or give the confirmations on behalf of the Scheme Creditor.

**YES**

**NO**

D.      For Scheme Creditors, that it has made its own independent decision as to how to vote (or instruct its proxy to vote) at the Scheme Meeting, in consultation with its own agents and professional advisers to the extent the Scheme Creditor considers it necessary.

**YES**

**NO**

**An Account Holder who is unable to confirm "yes" in respect of paragraphs (A) to (D) above should contact the Information Agent using the contact details set out in this Account Holder Letter for assistance.**

## SECTION 2: VOTING PARTICIPATION

### (A) Attendance at the Scheme Meeting (*tick only ONE of the boxes below*)

The Account Holder (or if different, the Scheme Creditor identified in Part 1 (*Scheme Creditor and Holding Details*) of this Account Holder Letter) wishes to:

|  |  |
|---|---|
| ☐ | appoint the Chairperson of the Second Lien Notes Scheme Meeting as its proxy to attend and vote on its behalf at the Second Lien Notes Scheme Meeting; |
| ☐ | appoint the following individual (being a person other than the Chairperson of the Second Lien Notes Scheme Meeting) as its proxy to attend and vote on its behalf at the Second Lien Notes Scheme Meeting; <br><br> Name: <br><br> Passport Country and number / identification number: |
| ☐ | attend and vote at the Scheme Meeting in person. <br><br> Name: <br><br> Passport Country and number / identification number: |

### (B) Voting instruction (*tick only ONE of the boxes below*)

|  |  |
|---|---|
| ☐ | **FOR** the Scheme |
| ☐ | **AGAINST** the Scheme |

**APPENDIX D**
**SECOND LIEN SUPPLEMENTAL INDENTURE**

# APPENDIX E
## INTERCREDITOR AGREEMENT SIDE LETTER

**APPENDIX F**
**DEED OF RELEASE**

## APPENDIX G
## SIMPLIFIED GROUP STRUCTURE